# EXHIBIT J

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Utah

 SEALED

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

E-mail accounts for e-mail address aisc04@aol.com and
bme2012@aol.com, stored at the premises owned,
maintained, or operated by AOL Inc.

Case No. 2:12mj 216 EJF

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:

See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____, there is now concealed *(identify the person or describe the property to be seized)*:

See Section II of Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☐ property designed for use, intended for use, or used in committing a crime;

☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. section 1503(a) | Influencing or Injuring Officer or Juror Generally |

The application is based on these facts:

See attached Affidavit of Special Agent Thomas M. Hopkins

☑ Continued on the attached sheet.

☐ Delayed notice of __30__ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Thomas M. Hopkins, DOJ-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: 8/2/2012 ~~06/13/2012~~ EJF

_____
*Judge's signature*

City and state:  Salt Lake City, Utah

Evelyn J. Furse
*Printed name and title*

Subject to Protective Order

US00121375

## ATTACHMENT A

The premises to be searched and seized is the e-mail account identified as aisc04@aol.com and bme2012@aol.com, other user-generated data stored with that account, and associated subscriber, transactional, user connection information associated with that account, as described further in Attachment B, all of which is maintained by AOL, which accepts service of process at:

Public Safety and Criminal Investigations Unit
Attn: Custodian of Records
AOL Inc.
22000 AOL Way
Dulles, VA 20166
(Fax) (703) 265-2305

Subject to Protective Order

## ATTACHMENT B

I.  **Search Procedure**

   A.  Within fourteen days of the search warrant's issue, the warrant will be presented to AOL personnel, who will identify the account and files to be searched, as described in Section II below.

   B.  AOL will then create an exact electronic duplicate of that account and files ("the account duplicate").

   C.  AOL will provide the account duplicate to law enforcement personnel.

   D.  Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

   E.  If AOL provides data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel shall not knowingly review the contents of the late-created data without a follow-up warrant or court order.

II.  **Accounts and Files to Be Copied by AOL Personnel**

   A.  All data files associated with the e-mail addresses or accounts designated aisc04@aol.com and bme2012@aol.com, including, without limitation:

   1.  The contents of all e-mail, whether draft, deleted, sent, or received;

   2.  The contents of all text or instant messages;

   3.  The contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content;

   4.  The contents of all calendar data;

   5.  Lists of friends, "buddies", contacts, or other subscribers;

Subject to Protective Order

6.     Records pertaining to communications between AOL and any person regarding this account and any e-mail accounts associated with this address, [*] including, without limitation, contacts with support services and records of actions taken.

B.     All subscriber and transactional records for the aisc04@aol.com and bme2012@aol.com e-mail accounts and any associated e-mail accounts and secondary contact e-mail accounts, including:

1.     Subscriber information for this and any associated e-mail accounts:

    a.     Name(s) and AOL account identifiers;

    b.     Address(es);

    c.     Records of session times and durations;

    d.     Length of service (including start date) and types of service utilized;

    e.     Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;

    f.     The means and source of payment for such service (including any credit card or bank account number); and

    g.     The Internet Protocol address used by the subscriber to register the account or otherwise initiate service.

2.     User connection logs for any connections to or from this and any associated e-mail accounts, including:

    a.     Connection time and date;

    b.     Disconnect time and date;

2

*associated accounts means any email account opened *by your company* by Michael Taylor, Johannes Thaler, or Robert Lustyik TMT

c. The IP address that was used when the user connected to the service;

d. Source and destination of any e-mail messages sent from or received by the account, and the date, time, and length of the message;

e. Any address to which e-mail was or is to be forwarded from the account or e-mail address;

f. Any e-mail address that is a secondary e-mail contact for the account or for which the account serves as a secondary e-mail contact.

**III.** **Records and Data to Be Seized by Law Enforcement Personnel**

A. Evidence, fruits, or instrumentalities of violation of 18 U.S.C. §§ 1503 (a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Effecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud) involving Robert Lustyik or Michael Taylor since January 1, 2009, including, without limitation, information relating to:

 1. All communications between or among Robert Lustyik, Michael Taylor, including Taylor's business e-mail addresses;

 2. All records pertaining to any business relationship between or among Robert Lustyik, Michael Taylor, and Johannes "Hannes" Thaler;

 3. All records or communications consisting of or pertaining to Robert Lustyik's contact with Michael Taylor's business or business associates, including Johannes "Hannes" Thaler;

3

US00121379

4.  All records or communications consisting of or pertaining to Robert Lustyik's contact with individuals concerning the investigation of Michael Taylor and/or AISC;

5.  All records or communications pertaining to Michael Taylor providing Robert Lustyik or Johannes "Hannes" Thaler with anything of value;

6.  The identity of the person or persons who have owned or operated the aisc04@aol.com and bme2012@aol.com e-mail accounts or any associated e-mail accounts;

7.  The existence and identity of any co-conspirators;

8.  The travel or whereabouts of the person or persons who have owned or operated the aisc04@aol.com and bme2012@aol.com e-mail accounts or any associated e-mail accounts;

9.  The identity, location, and ownership of any computers used to access this e-mail account;

10. Other e-mail or Internet accounts providing Internet access or remote data storage for Taylor or any associated e-mail accounts; and

11. The existence or location of paper print-outs of any data from any of the above.

B.  All of the subscriber and transactional records described in Sections II(B).

4

Subject to Protective Order                                    US00121380

Subject to Protective Order

US00121381

$2:12mj216-EJF$

SEALED

## AFFIDAVIT OF SPECIAL AGENT THOMAS M. HOPKINS
## IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Thomas M. Hopkins, being first duly sworn, hereby depose and state as follows:

### INTRODUCTION AND AGENT BACKGROUND

1.      I am a Special Agent of the Department of Justice, Office of the Inspector General (DOJ-OIG) and am assigned to the New York Field Office, Boston, Massachusetts Area Office. I have been employed as a Special Agent with DOJ-OIG since July 1997.  Prior to the DOJ-OIG, I was employed as a Criminal Investigator with the Internal Revenue Service, Inspection Division, from March 1988 through July 1997, and as a Special Agent with the Department of State, Bureau of Diplomatic Security, from November 1985 through March 1988.  My duties with the DOJ-OIG include investigating allegations of criminal and administrative misconduct by DOJ personnel, including Federal Bureau of Investigation (FBI) employees, as well as allegations of waste, fraud and abuse regarding DOJ personnel and programs.  I have received training in many subject areas, including public corruption and financial crimes.  I have also conducted and/or assisted in investigations involving abuse of position and obstruction of justice by federal law enforcement personnel and others.

2.      I am currently investigating FBI Special Agent Robert Lustyik, Jr., who is assigned to counter-intelligence duties in the FBI's New York Division, for attempting to influence the investigation by federal law enforcement officers and prosecutors in the District of Utah into allegations of theft of federal funds, wire fraud and money laundering involving Michael Taylor, an individual with whom Lustyik has a personal business relationship, in violation of 18 U.S.C. §§ 1503(a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Affecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud).

1

Subject to Protective Order

US00121382

3.    I am submitting this affidavit in support of an application for a search warrant under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize the e-mail accounts identified as aisc04@aol.com, bme2012@aol.com,  and other user-generated data stored with those accounts, and associated subscriber, transactional, and user connection information associated with that account, as described in Attachment A.   These e-mail accounts are relevant to the investigation because there is probable cause to believe that: (1) aisc04@aol.com is an e-mail account operated by Taylor to share information and documents with Lustyik and another individual, Johannes Thaler; (2) bme2012@aol.com is an e-mail account operated by Thaler to share information and documents with Lustyik and Taylor; (3) Taylor, Lustyik, and Thaler use the accounts to communicate with each other regarding both their business activities and the federal investigation of which Taylor is a target, and do so without having to transmit e-mails to and from their personal accounts; and (3) Lustyik has attempted and continues to attempt to influence the federal criminal investigation into Taylor.  I therefore have probable cause to believe that these accounts contain evidence, fruits, and instrumentalities of the violation identified above, as described in Attachment B.  Because the e-mail addresses contain the domain name "aol.com," I have probable cause to believe that the account and the relevant data are maintained by America Online, Inc., government databases indicate, accepts service of process at:

> Public Safety and Criminal Investigations Unit
> Attn: Custodian of Records
> AOL Inc.
> 22000 AOL Way
> Dulles, VA 20166
> (Fax) (703) 265-2305

as described in Attachment A.

2

US00121383

4.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE
## THAT FEDERAL CRIMES WERE COMMITTED

5.     I have probable cause to believe that FBI Special Agent Robert Lustyik, Jr., date of birth 06/24/1962, a citizen of the United States, assigned to the FBI's New York Division, has attempted and continues to attempt to influence the investigation by federal law enforcement officers and prosecutors in the United States Attorney's Office for the District of Utah (USAO), in violation of 18 U.S.C. §§ 1503 (a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Effecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud). The Utah investigation concerns allegations of theft of federal funds, bribery, procurement fraud, wire fraud, money laundering, and conspiracy to commit those offenses, involving Michael Taylor, an individual with whom Lustyik appears to have a business relationship. I have probable cause to believe that Lustyik has concealed this business relationship from both the FBI and the federal law enforcement officers in the District of Utah, and that the prospect of substantial financial gains from the business relationship is being offered and accepted in exchange for Lustyik's official actions with respect to the Utah investigation.

6.     Michael Taylor, date of birth 10/21/1960, is a former member of the United States Army Special Forces, and currently resides in Harvard, Massachusetts. He is the owner of American International Security Corporation (AISC), a company located in Boston, MA, which offers private security services. In 2007, AISC was awarded a contract eventually totaling over

3

Subject to Protective Order

US00121384

$53 million in payments made by the Department of Defense (DoD) to supply services related to training Afghan army special forces in Afghanistan. It is this contract that is the subject of the USAO's criminal investigation.

7.      Taylor has previously operated as a law enforcement source for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF). In 2004, I assisted in an internal affairs investigation which revealed that Taylor, while working as a paid undercover for the ATF, provided a $44,000 no-interest loan as well as between $6,000 to $10,000 toward the purchase of a Harley Davidson motorcycle, to an ATF agent with whom Taylor was working. The activity resulted in the premature retirement of the ATF agent, who wrongfully accepted and failed to report the receipt of the loan and gift from Taylor.

8.      Taylor, AISC, and others are currently targets of a criminal investigation by the Department of Defense's (DoD) Defense Criminal Investigative Service (DCIS), Immigration and Customs Enforcement/ Homeland Security Investigations (HSI), the Internal Revenue Service - Criminal Investigations (IRS-CI), and the USAO regarding allegations of fraud in the awarding and performance of that contract. The allegations include: (1) that Taylor bribed several DoD officials whose responsibilities included award and oversight of the contract; (2) that Taylor conspired to defraud DoD in connection with procuring the contract; (3) that Taylor's company, AISC, submitted false claims for payments from the contract; and (4) that individuals associated with the scheme, including Taylor, thereafter engaged in money laundering in the District of Utah and elsewhere to conceal the source and ownership of the proceeds derived from the scheme.

9.      Taylor has been questioned by investigators regarding those allegations, retained counsel, and been the subject of related civil forfeiture proceedings filed on September 2, 2011

4

US00121385

in United States District Court, District of Utah.  Criminal indictment of Taylor in the District of Utah is being pursued by the USAO.

10.     The investigation into Taylor and AISC has yielded evidence that Taylor communicates with Lustyik via e-mail.  These e-mails were obtained through a search warrant of Taylor's e-mails in the Utah criminal investigation.  That investigation has determined that the e-mail addresses aisc01@aol.com is used by Taylor to send and receive e-mail messages relating to AISC business and to correspond with Lustyik and others.

11.     A review of these e-mails shows that the e-mail address blustyik16@hotmail.com corresponds to Lustyik.  For example, the user of e-mail address blustyik16@hotmail.com has signed his e-mail messages as "Bob" or "Bob Lustyik".

12.     The e-mail communications reveal that an individual whom I have identified as Johannes "Hannes" Thaler is also involved with Taylor and Lustyik in business activities and that Thaler communicates with them using the e-mail account hannestee@yahoo.com.   For example, the name "Hannes Thaler" appears alongside the e-mail address hannestee@yahoo.com on the line indicating the originator of multiple e-mail messages sent to Taylor.  In addition, in one of the e-mail messages to Taylor, Lustyik identified Hannes' as having the last name Thaler. I have determined that Thaler is a long time personal friend of Lustyik.  For example, I have learned that the two are approximately the same age, resided in the same town, attended and played sports at the same high school, and that Thaler is "Facebook friends" with Lustyik's wife, brother, and nephew.[1]

13.     The e-mail communications between and among Taylor, Lustyik, and Thaler

---

[1] I have not been able to determine whether Lustyik has established a Facebook account.

5

indicate that they and others are involved in a business relationship. The e-mail communications further indicate that this business relationship involves exploiting Taylor's extensive overseas contacts in the pursuit of lucrative contracts for (among other things) security services and energy development throughout the Middle East, Africa, and elsewhere. As described in greater detail below, these emails provide evidence that Lustyik is engaged in personal business relationship with an FBI source that could expose him to potential serious administrative and/or criminal penalties. More importantly, the emails regarding the business relationship—and its potential to yield significant financial benefits to Lustyik—provide a potential motive for Lustyik to obstruct the Utah-based investigation of Taylor.

14. The e-mail communications between and among Taylor, Lustyik, and Thaler revealed that they make use of what they refer to as a "dead drop," a "drop box," or simply the "box," which the evidence indicates are password-protected e-mail accounts into which each may contribute and access documents and information related to their common business activity, the Utah-based prosecution of Taylor, and other matters—and do so without having to send each other e-mails to and from their personal e-mail accounts. This is accomplished by sharing the username and password with all the participants, who then sign in to the account and post as draft e-mails messages or information that they wish to share with the others, without having to send those emails.

15. On June 13, 2012, pursuant to an application I made under 18 U.S.C. § 2703(a) and Rule 41 of the Federal Rules of Criminal Procedure a search and seizure warrant for Taylor's e-mail account, aisc01@aol.com was issued. I executed the warrant on June 15, 2012. My review of the content of that account yielded more explicit references to the "dead drop" by Taylor, Lustyik and Thaler, indicating that it was in fact another e-mail account operated by

6

US00121387

Taylor, aisc04@aol.com.    I confirmed Taylor's ownership of that account through records obtained from AOL, Inc.

16.    My review also revealed messages between Taylor, Lustyik, and Thaler indicating that their business relationship was continuing, as were Lustyik's attempts to influence the District of Utah's investigation of Taylor.

17.    Similarly, e-mail content I obtained pursuant to search warrants executed on May 29, 2012 and June 15, 2012, regarding Lustyik's e-mail account, blustyik16@hotmail.com, and Thaler's e-mail account, hannestee@yahoo.com, respectively, likewise yielded additional messages between the three evidencing an ongoing business relationship and Lustyik's continuing attempts to influence the District of Utah's investigation of Taylor.    As will be discussed in greater detail below, these e-mails also contained numerous references to the "dead drop" accounts, including discussions about ensuring that their communications via the "dead drop" were not being monitored by either the FBI or the investigators on the Utah case.

### BUSINESS RELATIONSHIP BETWEEN LUSTYIK AND TAYLOR

18.    My investigation identified numerous e-mails in which Lustyik and Taylor discussed business opportunities.    In one series of e-mails Taylor advised Lustyik of a lucrative potential contract protecting an oil-drilling operation in the South Sudan.    Specifically, in an October 24, 2011 e-mail, Taylor (aisc01@aol.com) forwarded to Lustyik a thread of communications from an oil company seeking to hire Taylor's company.    Taylor wrote Lustyik, "Bob, These guys want to come see me about drilling for oil in South Sudan.    Let's talk about this ASAP.  Mike."

19.    In a message on the same topic, also dated October 24, 2011, Taylor wrote to Lustyik, "They want to meet the South Sudan ambassador that I told him I met before to ask if

Subject to Protective Order

US00121388

they can bid on an oil block.  If all goes well and they get it we will get 7% and the security contract.  They want to know if I can arrange the meeting next week.  Do you know if the ambassador is in DC or NY or if he is still the ambassador? Mike"

20.   This e-mail discussion appears to refer back to an earlier e-mail message, dated June 19, 2011, where Lustyik e-mailed the Ambassador from the South Sudan to the United States, stating, "[w]e are willing to provide you with 2 to 3 percent of any contract signed.  For example, 2 percent of a 20 million dollar contract is 200 thousand US dollars.  Please contact me either way so we may arrange to provide you with your "gift" [sic] for the last meeting you arranged."  In reply, the ambassador wrote, "I do not do that, taking percentages.  Sorry for that. I am an honest Diplomat for my country . . ."

21.   In replying to the Ambassador's e-mail, after apologizing for his "unpleasant mistake," Lustyik wrote, "I can have my Boss make direct contact with you if you believe that is more appropriate . . . I can assist you with AISCO [Taylor's company] . . . Please let me know if there is an opportunity for Mr Taylor to meet with your Vice President and yourself . . . I can assure you that Mr Taylor is someone who can be invaluable to your exciting new beginning in South Sudan…" This e-mail is signed, "Bob Lustyik."

22.   The Ambassador, in his reply, stated, "I will keep you informed about his schedule the VP".  Lustyik forwarded this e-mail string to Taylor (aisc01@aol.com).

23.   My review of e-mail messages obtained pursuant to the search and seizure warrant executed May 29, 2012, relating to the e-mail account blustyik16@hotmail.com, revealed that Lustyik, Taylor, and Thaler remain in communication, utilizing Lustyik's e-mail account, blustyik16@hotmail.com, to discuss their business activities.  For example, in a May 7, 2012 e-mail, obtained through the search and seizure warrant issued May 23, 2012, Taylor advised

8

Subject to Protective Order

US00121389

Lustyik, under the subject "Contract-Good News," that he "just got a call about a project we have been trying to get since last October and the call was to inform me that we got the contract in the Congo. It's not a big one yet, about 10 men, but they said it's a test to see how we do. If we do good, then they will give us others in Africa which I think the next one is in Nigeria." The message appears to refer to a security detail contract.

24.     An April 30, 2012 e-mail, obtained through a search and seizure warrant issued June 13, 2012, relating to the e-mail account aisc01@aol.com,  concerns another potential security contract, also, under the subject, "Somali Piracy." Therein, Taylor wrote Lustyik, Thaler and an individual I have identified as their business associate, Michael Feldman, "With pleasure we would help these companies pass through this area. It's best to have some folks on the main vessel and two smaller fast boats to interdict the pirates. We will cost much less than their present losses and will give them a guarantee in writing that we will not allow the pirates to board their ships. We have a full staff of US Special Forces folks that would love this type of job if we can get it. "

25.     My review of email messages obtained pursuant to the search and seizure warrant executed on   Taylor's email account yielded additional evidence concerning the business relationship between Taylor, Lustyik and Thaler, including a December 20, 2011 exchange in which Taylor implicitly linked Lustyik's obstruction of the Utah-based investigation with potential economic benefit to Lustyik. The exchange included the following:

Thaler to Taylor: "Mike, How much oil are we talking about in this transaction?"

Taylor to Thaler: "4 million barrels per month. If they can only do 2 million barrels I can get the other 2 million from the Congo. Make sure you let the big guy know about this. We want him retired in 6 months to work with us. I'll make you guys more money than

9

Subject to Protective Order

US00121390

you can believe. provided they don't think I'm a bad guy and put me in jail."

Thaler to Taylor: "The big guy knows."

The "big guy" referenced in the exchange, I believe, is Lustyik, whom I know to be eligible to retire from the FBI as of June 2012. My review of e-mail messages obtained pursuant to the search and seizure warrant executed on Lustyik's account revealed that on December 21, 2011, Thaler forwarded the above-related thread to Lustyik, writing, "Check this out."

## LUSTYIK'S CONTACTS WITH THE UTAH INVESTIGATORS AND USAO IN THE DISTRICT OF UTAH REGARDING TAYLOR

26.     My investigation has revealed that Taylor and Lustyik discussed the Utah investigation of Taylor via e-mail.  For example, on October 25, 2011, Taylor e-mailed Lustyik and stated, "I'm wondering if the other guy is trying to cook something up.  Not your buddy's outfit, the other one that we are checking to see what authority they have.  He is the guy that is trying to make everything fit into his theory."  From my review of records and information obtained from other agents and witnesses, I believe that Taylor is referring to either S/A Darnell (who is an investigator within the Department of Defense) or one of the other investigators on the Utah case when he discussed "the other guy."  This is also supported by the fact that on November 22, 2011, Taylor e-mailed Lustyik with a lengthy recitation of discussions Taylor had with his attorney regarding the Utah investigation.  In that e-mail, Taylor stated that "[m]y lawyer also told the AUSA's that he believes the investigator from DOD has a theory and is trying to fit evidence into his theory . . ."

27.     In another e-mail message dated November 4, 2011 to Lustyik, Taylor stated, "Did you hear back from your buddy yet?  I heard news that was not great as to which way they are leaning."  In replying, Lustyik  responded, "Really?  I will call u tonite.  There is no way they

10

US00121391

indict you." Taylor responded, "I think they may be bullshiting. We have caught them in a few lies." Lustyik then asked, "[t]hey or the DOD guy? They r talking indictment ? They are so full of shit." From my review of records and information obtained from other agents and witnesses, I believe that the "DOD guy" that Lustyik is referring to is S/A Darnell.

28.   In a related e-mail string which had discussed the Utah investigation, directly following Taylor's e-mail stating "I think they may be bullshiting. We have caught them in a few lies," Lustyik responded, "We gotta figure out a way to lock down the SS gig." Based on my review of e-mail communications between Taylor and Lustyik, I believe this refers to a private business deal in the South Sudan that Taylor and Lustyik had previously discussed.

29.   In January 2012, Utah-based HSI Special Agent (S/A) Shaun Helt, who is a co-case agent in the Taylor/AISC investigation, learned that a query had been made via the Treasury Enforcement Communications System (TECS) by an FBI analyst in Washington, DC regarding Taylor.

30.   S/A Helt called the analyst, who told S/A Helt he made the TECS query at Lustyik's request. The analyst, who seemed uneasy when S/A Helt spoke with him, did not know why Lustyik had made the request. S/A Helt next called Lustyik, who told S/A Helt that he had asked for the TECS query as a routine background check on Taylor because he was considering using Taylor as a confidential source.

31.   In February 2012, Utah-based DCIS Special Agent Keith Darnell, co-case agent with S/A Helt on the Taylor/AISC investigation, called Lustyik. In that phone call, Lustyik admitted that Taylor had told him that he (Taylor) was under investigation. Lustyik further told S/A Darnell, "how are you going to indict Taylor – he is a real patriot and we are trying to work him as a confidential source," or words to that effect. Lustyik gave S/A Darnell the impression

11

Subject to Protective Order

US00121392

that he was just beginning his work with Taylor, and yet the above e-mail traffic, along with other e-mails that I have examined, makes clear that Lustyik had been dealing with Taylor since at least June 2011.

32.    Thereafter, Lustyik called S/A Darnell in Utah several times, and told S/A Darnell things such as, "I don't know how you think this guy has committed a crime – he is a patriot," or words to that effect.

33.    S/A Darnell at one point asked Lustyik if he was trying to shut down the Utah investigation, to which Lustyik replied, "no at least not now, but it may come to that".

34.    S/A Darnell then advised Lustyik to contact the federal prosecutor who was handling the Taylor/AISC investigation, Assistant United States Attorney (AUSA) Robert Lund.

35.    Thereafter, Lustyik's partner, FBI Special Agent Sara Jones, reached out to AUSA Lund and arranged for a video telephone conference between AUSA Lund and Lustyik to discuss the FBI's using Taylor as a confidential source.

36.    AUSA Lund and AUSA Cy Castle, who is working on the Taylor/AISC criminal and civil forfeiture investigations, spoke with Lustyik from Utah via video telephone conference on March 1, 2012.  Lustyik indicated that he was obliged to confine the discussion to non-classified matters.

37.    Lustyik offered to provide AUSA Lund with documentation showing why Taylor was valuable as a confidential source, and Lustyik did in fact provide four FBI 302 reports of interviews to AUSA Lund in early March 2012.

38.    The FBI 302 reports provided by Lustyik to the AUSAs in Utah appear to deviate from standard FBI 302 reports, in that they are unsigned and do not have a file number. Furthermore, the reports mostly contained dated information on Taylor stretching back to the

12

Subject to Protective Order

1980s and 1990s. The FBI 302 reports Lustyik provided were unaccompanied by any indication that their creation or dissemination was authorized by FBI supervisory personnel, in apparent violation of FBI policy.

39.    As a result of Lustyik's insistence that Taylor not be indicted, as well as the FBI 302 reports Lustyik provided, the Utah USAO was impacted in its investigation of Taylor. Specifically, the investigators and the AUSAs were required to take a number of steps to address the matters raised in the 302 reports, including conducting additional witness interviews. In addition, the USAO has had to consider whether Taylor's alleged work with Lustyik justified a decision to not indict him with his other co-conspirators.

40.    S/A Darnell also received an e-mail message from Lustyik on April 3, 2012, in which Lustyik again suggested that Taylor be used as a confidential source and not indicted. Specifically, Lustyik stated, "Can't we just get him to be a CW for you guys ??"

41.    On or about April 25, 2012, AUSA Lund received a call from Taylor's attorney in the civil forfeiture matter, during which Taylor's attorney specifically referenced Taylor's value to the FBI as a confidential source.

42.    On or about May 17, 2012, Lustyik provided AUSA Lund with two additional FBI 302 reports in support of his purported need to use Taylor as a confidential source. These two new FBI 302 reports contained the same deviations as the first four that Lustyik had provided to AUSA Lund.

43.    On or about May 23, 2012, S/A Darnell e-mailed Lustyik, asking whether the Salt Lake City investigators could expect anything further from Lustyik. On or about May 24, 2012, S/A Darnell received an e-mail message from Lustyik in response, stating, "The DEA [Drug Enforcement Administration] Agent who is working w Taylor right now will most likely be the

13

last one. . . If u can give me a heads up before u guys indict him, that would be great. So I can

shut stuff down. Or else I'm stuck in the middle. In the muck." This e-mail is the first mention

of a DEA Agent working with Taylor, despite the fact that Lustyik had been pressing Taylor's

use as a confidential source for the prior four months.

      44.    On or about Thursday, May 31, 2012, S/A Helt initiated telephone contact with

Lustyik, who advised that Taylor was officially signed up with the FBI and was working

presently for the DEA, though the DEA had not formally opened him as a confidential source.

The conversation was recorded by S/A Helt.

      45.    On or about Thursday, May 31, 2012, shortly after his recorded call to Lustyik,

S/A Helt received a telephone call from DEA S/A Ric Bachour, who advised that Taylor was

providing information on five different DEA investigations in the Middle East and Afghanistan,

but was not formally opened with the DEA as a confidential source. Bachour requested that any

charging of Taylor be put off for four to six months.   I have learned that, prior to his

employment with the DEA, Bachour was employed by and received compensation from Taylor.

I have also learned that in 2002 Taylor gave a proffer at the United States Attorney's Office in

Boston, in connection with a Department of Labor investigation of Taylor, and volunteered that

Bachour and another DEA agent had been his employees. Taylor ultimately was not charged in

that investigation.   According to Taylor's proffer, the other DEA agent had been in Taylor's

employ while employed at the same time as a DEA agent.

      46.    On or about June 6, 2012, S/A Helt received text messages from Lustyik, who

stated, "I am heading down to my HQ tomorrow to talk to our unit Chief before he goes to Main

Justice . . .even though HQ is hot on this. The speed (or lack thereof) is controlled by me," and

Subject to Protective Order

US00121395

that "Louie Freeh called our ADIC[2] on MT's [Taylor's] behalf so we are under a microscope now. I never realized they knew each other but, they do." Louis Freeh was the Director of the Federal Bureau of Investigation from 1993 until 2001.

47.    On or about June 8, 2012, Lustyik traveled to Washington, D.C. to attend a meeting for the purpose of vetting Taylor as an FBI undercover.

48.    On June 11, 2012, Lustyik called S/A Helt in a call that S/A Helt recorded. In that call, Lustyik informed S/A Helt that "we're going to wait and see what you guys are going to do . . . we'll go ahead and stand by and watch the indictment." Lustyik stated that he would probably get involved after that, and that the FBI's General Counsel was going to call Main Justice. Lustyik added that even if the FBI goes to Main Justice, the FBI wasn't going to push to stop the indictment; Lustyik stated, "the FBI doesn't have the balls to do that anymore." Lustyik also stated that the first 15 people Michael Taylor was going to call as character witnesses (presumably at trial if he is indicted) are retired FBI agents.

49.    On June 21, 2012, Lustyik notified S/A Helt that he was meeting with the "DoD" regarding Taylor. Lustyik did not further elaborate, but asked S/A Helt to inform S/A Darnell of that fact.

50.    In a July 10, 2012 text message to S/A Helt, Lustyik provided information intended to be shared with the Utah prosecutors, writing, "Just let them know we r working MT jointly now with the DOD. So us, DOD n DEA r all using him in some great stuff"

---

[2] An ADIC is an Assistant Director in Charge.

15

## PROBABLE CAUSE TO BELIEVE THAT THE
## RECORDS CONTAIN EVIDENCE, FRUITS, AND
## INSTRUMENTALITIES OF THE CRIMES IDENTIFIED ABOVE

51.    I also have probable cause to believe that aisc04@aol.com and bme2012@aol.com are e-mail accounts owned by Taylor and Thaler, respectively, and the data associated with these accounts contain evidence, fruits, and instrumentalities of the crimes identified above.

52.    I have probable cause to believe that Taylor, Lustyik, and Thaler utilize the account aisc04@aol.com, to exchange information and documents concerning both their business activity and the Utah-based investigation of Taylor.

53.    Specifically, I have identified aisc04@aol.com as the "dead drop" used by Taylor, Lustyik and Thaler to exchange information and documents relating to their business activities and Lustyik's attempts to obstruct the Utah-based investigation of Taylor. For example, in an e-mail exchange of February 9, 2012, relative to the subject line, "Dead Drop," Taylor writes Lustyik, "our site is aisc04@aol.com and the password is Giants2012." In my experience, a "dead drop" is an account that allows multiple individuals to access and exchange information and documents online without sending or receiving emails. Typically, rather than sending an email containing the information or documents, individuals using the account will instead tell each other to check the "dead drop" for messages—in the form of draft emails—which the others can access, read, and, if necessary, delete so as to avoid leaving an electronic trail of communication.[3]

---

[3] Because of the way in which dead drops are typically used, in my experience, it is possible that Lustyik, Taylor, and Thaler have deleted some or all the contents of the dead drops that we seek authorization to search and seize. Given their significant use of the dead drops, however, and the apparently sensitive nature of the communications that they consign to that medium, I have probable cause to believe that any content that does remain in the "dead drops" will have significant investigative value. Moreover, regardless of the content of the dead drops, I have

16

Subject to Protective Order

US00121397

54.    Among the content obtained from e-mail account aisc01@aol.com pursuant to the search warrant executed on June 15, 2012, was an e-mail exchange on February 15, 2012, in which Taylor wrote Lustyik,, "you have a message waiting for you," and that "the box is loaded for you."   In reply, Lustyik, having apparent difficulty in acquiring the message, questioned Taylor, "Did u save it as a draft? Because it says the drafts r empty?"   Taylor answered, "When I go in I click on "Review Mail"  I'll check it now and see if it's there."  Lustyik then counseled, "Its got to be saved as a draft."   Taylor replied, "I just checked it and it's there.  I click on "Mail Waiting to be sent" and I see it."

55.    In another exchange, on March 9, 2012, Lustyik wrote Taylor, "We got some huge info that will make it impossible for Utah to indict u now.  We will have it over next week I believe."   In reply to Taylor's question, "Can you tell me what the info is," Lustyik wrote, "GoGiants," an apparent reference to the password to the dead drop, which I believe is an instruction that Taylor will find the information in the "dead drop," aisc04@aol.com.

56.    The search warrant for the contents of the e-mail account blustyik16@hotmail.com executed on May, 29, 2012, revealed a May 4, 2012, exchange in which Taylor directed Lustyik to check the "dead drop" to obtain details regarding a business opportunity, as follows:

> Taylor:  "Remember the photo I showed you with the guys face on the bar? There are three containers in Tabrouq filled with the same. They want us to move them. What do we do?"
>
> Lustyik:  "Mail them to my house"
>
> Taylor:  "I can arrange that but you would need a building permit. Check Giants for details."

---

probable cause to believe that the associated subscriber, transactional, and user connection information associated with the dead drop accounts (as described in Attachment A) would constitute important evidence regarding Lustyik, Taylor, and Thaler's communications regarding their business activity and the Utah-based investigation of Taylor.

17

Subject to Protective Order

US00121398

Lustyik: "Go big blue !"

57.   In another exchange, from May 6, 2012, also obtained from Lustyik's e-mail, Taylor, Lustyik and Thaler discuss concerns regarding the security of the aisc04@aol.com "dead drop," after learning of attempts to access it by unknown persons.  They intermingle discussion of such concerns with conversation of business activities, as follows:

> Taylor: "Someone was in the e-mail about 3 hours ago from Newtonville, MA.  Some times it's weird as to where they say someone was in the site because I looked in it a few time and it said I was in the UK when I know it was me due to the time."
>
> Lustyik: "So we need to change it then.  I will delete it all and then we will make a new one.  When I go in where does it say I do it from?"
>
> Taylor: "Hannes is better at this stuff then I am.  We should have him do it."
>
> Lustyik: "Will do."
>
> Taylor: "I will text the new phrase.  The name is the same."
>
> Lustyik: "Text it to Hannes n he will text it to me."

The conversation continued on the following day, May 7, 2012, with Taylor writing Lustyik, "I just got a call about a project we have been trying to get since last October and the call was to inform me that we got the contract in the Congo. It's not a big one yet, about 10 men, but they said it's a test to see how we do. If we do good then they will give us others in Africa which I think the next one is in Nigeria. I'll have the details e-mailed to me tomorrow. It's a straight protection detail for their company executives who will be working in the Congo." Taylor forwarded the message to Thaler, who notified Lustyik, "I checked the box. I see why MT is concerned. I checked the history of who's looking in and the 3 of us come up. But, there was also someone from a town in Mass. It's a different IP address from the 3 of us." Lustyik responded by asking Thaler, "How many times did that person access it?"  In reply, Thaler

18

US00121399

wrote, "I only saw one time.  But it goes back a couple days."  Lustyik then questioned Thaler, "is there a way to check a history."  Thaler answered, "Yeah, but it only goes back a few long ins. I don't know it you can check any farther back."

The conversation continued with Lustyik expressing concern over who might be trying to access the "dead drop,' telling Thaler, "I don't want it to be Utah or someone affiliated w them," and concluding that "it can't be the bureau," referring to the FBI.  On the following day, Thaler speculated that Taylor's "computer is bugged."

58.    In an April 26, 2012 e-mail, Taylor informed Lustyik, "Draft night.  Go Pats-it's loaded."  Based on my review of the emails, I believe this is a reference to a new password for the dead drop.  My belief that "Go Pats" is the password for a dead drop is bolstered by the fact that, like the initial password ("Go Giants"), it is an apparent reference to a professional football team,  the New England Patriots (which plays in Massachusetts, where Taylor is from), and by the fact that none of the emails referencing "Go Pats" occurred during football season.  Indeed, there are numerous emails from Taylor to Lustyik, where the subject line is merely, "Go Pats," and in some instances, the body of the email will also simply read, "Go Pats," indicating that they used the phrase as a shorthand or coded reference for the dead drop.  These emails are dated, February 24 and 28, 2012; March 2, 2012 (the subject line reads "Pats v. Giants" and the body of the email reads "Go Pats"); March 12 and 13; March 18, and April 3, 2012 (in both, the body of the email repeated, "Go Pats"); April 26 (the email quoted above) and 28, 2012; May 4, 2012 (the body of the email stating, "It's loaded"); May 14, 2012 (the body of the email stating "Just reloaded at 04:30 your time"); and May 16, 2012.  There are also three emails from Taylor to Thaler, where the subject line is "Go Pats," but with no content in the body: two emails dated May 16, 2012, and one dated May 18, 2012.

19

US00121400

59.     On May 16, 2012, in response to an email by Taylor with simply "Go Pats" in the subject line, Thaler responded, "Got it. I've been trying to get in touch with the big guy all morning. Will let you know when I contact him." As noted above, I believe "big guy" refers to Lustyik. In a separate email that same day, responding again to Taylor's email, Thaler replied, "Meeting with the big guy tonight to go over things."

60.     Taylor sent additional emails to Lustyik with the "Go Pats" subject line on May 16 and 30, 2012; another one on May 30, 2012, with Thaler copied (Taylor wrote in the body, "Another one."); and still another on May 31, 2012.

61.     Thaler responded to a May 31, 2012 email from Taylor, with the subject line "Go Pats," not copying Lustyik, stating, "The big guy says that the AUSA in Utah is officially interviewing him next week. So, he needs your contact with him to be with me only (he doesn't check the box anyway – I give him the roster changes), until his return. He says it's a good thing, his being called there, but, he wants to stay cautious." While I have uncovered no evidence that the interview Thaler describes in this e-mail ever took place, the exchange nevertheless demonstrates Lustyik's concern to conceal his correspondence and relationship with Taylor.

62.     Taylor sent additional emails to Thaler with the "Go Pats" subject line on May 17, 2012 (Thaler responded, "Done"); May 19, 2012 (Thaler responded, "Roger that"); May 25 and 30, 2012; and June 1, 2012.

63.     On May 19, 2012, Taylor forwarded Thaler information regarding the sale of isotopic copper; in response to Thaler's question, "What is this?" Taylor tells Thaler to read the first email, then states, "Go Pats in 5 minutes." In a later portion of that email string, Taylor

20

US00121401

asked Thaler, "Any word at all from the big guy?" Thaler responded "I told him to go Pats. Haven't heard from him since. Don't know if he checked or not."

64.     An e-mail exchange obtained pursuant to a search and seizure warrant executed on June 15, 2012, relating to the e-mail account hannestee@yahoo.com, belonging to Thahler, indicated that Lustyik and Thaler's concerns for the security of aisc04@aol.com, related above, occasioned the establishment by Thaler of a new "dead drop."

65.     On May 7, 2012, Lustyik wrote Thaler, "we should nake whole new box n password n u call n pass it to him.  N me."  In reply, one week later, Thaler wrote Lustyik, "BME2012. Same mail service Horsemen80."  I understand "bme2012" to refer to a new e-mail account established at AOL by Thaler, who indicated in his message to Lustyik that the new site is at "the same mail service" as, presumably, the previous dead drop, aisc04@aol.com, and that the new dead drop is therefore bme2012@aol.com.  I understand "bme" to be a reference to Blue Meadow Energy, a company of which Thaler has claimed to be the Vice President of Global Sales and Marketing and which shares addresses and telephone numbers in common with Taylor's AISC business.  I understand "Horsemen80" to be the password for the e-mail account, bme2012@aol.com and believe the password to be a reference to Lustyik, who played football for the Tarrytown High School "Horsemen" and who graduated in 1980.[4]

66.     Another email I obtained pursuant to a search and seizure warrant executed on June 15, 2012, relating to the e-mail account hannestee@yahoo.com, belonging to Hannes Thaler, indicated that as recently as May 27, 2012, Lustyik, Taylor and Thaler were using the

---

[4] While the apparent establishment of the new dead drop at bme2012@aol.com raises the possibility that Lustyik, Taylor, and Thaler have discontinued their use of the aisc04@aol.com dead drop, it bears noting that the use of "Go Pats" as a coded reference to the dead drop continued even after Lustyik and Thaler decided to establish the new account.

21

Subject to Protective Order

US00121402

"dead drop" to communicate regarding their business interests.    The e-mail contains an intelligence report which Lustyik forwarded to Thaler stating, "this was in the box today." Although the report is unsigned, it indicates that it is being sent from Beirut.  I have reason to believe it was submitted by Taylor, who I know had travelled to Beirut prior to May 27, 2012. The report also contains information concerning the prospect of deriving business-related benefit in "moving cash" in large quantities and on a frequent basis.  Lustyik forwarded the report to Thaler with the caveat, "I'm not sure if this is a scam or not," and, in what I believe is a reference to Taylor, "I don't think he is either."

## TECHNICAL BACKGROUND

67.    In my training and experience, and through discussions with other agents, I have learned that e-mail hosting companies, such as AOL Inc., maintain server computers connected to the Internet.  Their customers use those computers to send e-mail on the Internet.

68.    AOL Inc. ("AOL") provides e-mail services to customers as part of its Internet service.

69.    AOL customers may access their accounts on the company's e-mail servers from any computer connected to the Internet.

70.    AOL maintains electronic records relating to their customers. These records include account application information, account access information, and e-mail transaction information.

71.    When an AOL customer sends an e-mail, it is initiated at the customer's computer, transferred via the Internet to AOL's servers, and then transmitted to its end destination. Conversely, an e-mail sent to an AOL customer resides on AOL's servers until it is transferred by the customer to his computer to be read.

22

72.     By default, unread e-mail will remain on AOL's servers for 30 days. Sent e-mail will remain for up to 30 days. The length of time that read e-mail remains on AOL's servers depends on how a customer configures his account, but it is usually 30 days. In addition, AOL has storage capacity that allows customers, so choosing, to store opened incoming e-mail and sent e-mail without a set expiration date, subject to a maximum size limit.

73.     AOL's legal compliance guide also indicates that it can provide the following additional information associated with a subscriber's account: address books; "buddy" lists; photos, files, data, or information; and World Wide Web profiles or homepages.

## LEGAL AUTHORITY

74.     The government may obtain both electronic communications and subscriber information from an e-mail provider by obtaining a search warrant. 18 U.S.C. §§ 2703(a), 2703(c)(1)(A).

75.     Any court with jurisdiction over the offense under investigation may issue a Section 2703 search warrant, regardless of the location of the website hosting company or e-mail provider whose information will be searched. 18 U.S.C. § 2703(b)(1)(A). Furthermore, unlike other search warrants, Section 2703 warrants do not require an officer to be present for service or execution of the search warrant. 18 U.S.C. § 2703(g).

76.     If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber. 18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

## CONCLUSION

77.     Based on the information described above, I have probable cause to believe FBI Special Agent Robert Lustyik, Jr., has attempted to and continues to attempt to influence the

23

US00121404

criminal investigation by federal law enforcement officers and prosecutors in the District of Utah into allegations of theft of federal funds, bribery, procurement fraud, wire fraud, money laundering, and conspiracy to commit those offenses, involving Michael Taylor, an individual with whom Lustyik has a personal business relationship, and others, in violation of 18 U.S.C. § 1503 (a) (Influencing or Injuring Officer or Juror Generally).

78.     Based on the information described above, I have probable cause to believe that computer systems owned or operated by AOL hold evidence, fruits, and instrumentalities of these crimes as described in Attachment A.  AOL accepts service of process at:

> Public Safety and Criminal Investigations Unit
> Attn: Custodian of Records
> AOL Inc.
> 22000 AOL Way
> Dulles, VA 20166
> (Fax) (703) 265-2305

79.     Based on the information described above, I have probable cause to believe that the evidence of  18 U.S.C. § 1503 (a) (Influencing or Injuring Officer or Juror Generally) includes e-mail content and other records, as more fully described in Attachment B to the search warrant.

80.     The procedures that will be used to copy and review the relevant records are set out in Attachment B to the search warrant.

**REQUEST TO SEAL AND PRECLUDE NOTICE TO THE SUBSCRIBER(S)**

81.     I request that this Application and Warrant be sealed by the Court until such time as the Court, pursuant to Local Rule DUCrimR 49-2, directs otherwise.  I further request that, pursuant to 18 U.S.C. § 2705(b), the Court order AOL not to notify any person (including the

Subject to Protective Order

US00121405

subscriber(s) or customer(s) to which the materials relate) of the existence of this Application, the Court's warrant, or the execution of the warrant, unless and until authorized to do so by the Court. Such an Order is justified because notification of the Application, the Court's warrant, or the execution of the warrant could seriously jeopardize the ongoing investigation. Such disclosure could give the subscriber an opportunity to destroy evidence, notify confederates, or flee or continue flight from prosecution.

## FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT

82.    Federal Rule of Criminal Procedure 41(e)(2)(A) and (B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance. If the Court issues this warrant, the United States will execute it not by entering the premises of AOL, as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data. This practice is approved in 18 U.S.C. § 2703(g),[5] and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices. It is possible that the company could produce the data outside the 14-day deadline, in which case the United States would want to view the data without a further court order or follow-up warrant, with the exception of any records or data that were created (as opposed to copied) after the 14-day deadline.

83.    For these reasons, I request that the Court approve the procedures in Attachment B, which will allow the United States to review evidence that the company provides after the 14-

---

[5] Section 2703(g) provides that "[n]otwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service."

Subject to Protective Order                                                 US00121406

day deadline, with the exception of any records or data that were created (as opposed to copied) after the 14-day deadline. The United States would be prohibited from knowingly reviewing late-created data, and could not knowingly review it without a further order or follow-up warrant from this Court.

Respectfully submitted,

Thomas M. Hopkins
Special Agent
United States Department of Justice
Office of the Inspector General

Subscribed and sworn to before me
on August 2, 2012,

UNITED STATES MAGISTRATE JUDGE

26

Subject to Protective Order

US00121407