# EXHIBIT K

AO 106 (Rev. 04/10)  Application for a Search Warrant

# UNITED STATES DISTRICT COURT
for the
District of Utah



SEALED

In the Matter of the Search of
*(Briefly describe the property to be searched
or identify the person by name and address)*

E-mail accounts for e-mail address aisc01@aol.com, stored at the premises owned, maintained, or operated by AOL Inc.

)
)
)
)
)
)

Case No. 2:12 mj 248 DP

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location)*:
See Attachment A.

located in the _____ Eastern _____ District of _____ Virginia _____ , there is now concealed *(identify the person or describe the property to be seized)*:
See Sections II & III of Attachment B.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more)*:
- ☑ evidence of a crime;
- ☑ contraband, fruits of crime, or other items illegally possessed;
- ☐ property designed for use, intended for use, or used in committing a crime;
- ☐ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 1503(a) | Influencing or Injuring Officer or Juror Generally |
| 18 U.S.C. § 208 | Acts Affecting a Personal Financial Interest |
| 18 U.S.C. §§ 1341, 1343,1346 | Honest Services Mail and Wire Fraud |

The application is based on these facts:
See attached Affidavit of Special Agent Thomas M. Hopkins

- ☑ Continued on the attached sheet.
- ☐ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

_____
*Applicant's signature*

Special Agent Thomas M. Hopkins, DOJ-OIG
*Printed name and title*

Sworn to before me and signed in my presence.

Date: _____ 09/07/2012 _____

_____
*Judge's signature*

City and state:  Salt Lake City, Utah

DUSTIN PEAD
*Printed name and title*

Subject to Protective Order

SEALED

### AFFIDAVIT OF SPECIAL AGENT THOMAS M. HOPKINS
### IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT

I, Thomas M. Hopkins, being first duly sworn, hereby depose and state as follows:

#### INTRODUCTION AND AGENT BACKGROUND

1.    I am a Special Agent of the Department of Justice, Office of the Inspector General (DOJ-OIG) and am assigned to the New York Field Office, Boston, Massachusetts Area Office. I have been employed as a Special Agent with DOJ-OIG since July 1997. Prior to the DOJ-OIG, I was employed as a Criminal Investigator with the Internal Revenue Service, Inspection Division, from March 1988 through July 1997, and as a Special Agent with the Department of State, Bureau of Diplomatic Security, from November 1985 through March 1988. My duties with the DOJ-OIG include investigating allegations of criminal and administrative misconduct by DOJ personnel, including Federal Bureau of Investigation (FBI) employees, as well as allegations of waste, fraud and abuse regarding DOJ personnel and programs. I have received training in many subject areas, including public corruption and financial crimes. I have also conducted and/or assisted in investigations involving abuse of position and obstruction of justice by federal law enforcement personnel and others.

2.    I am currently investigating FBI Special Agent Robert Lustyik, Jr., who is assigned to a counterintelligence squad in the FBI's New York Division, for attempting to influence the investigation by federal law enforcement officers and prosecutors in the District of Utah of allegations of theft of federal funds, wire fraud, and money laundering involving Michael Taylor, an individual with whom Lustyik has a personal business relationship, in violation of 18 U.S.C.

1

§§ 1503(a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Affecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud).

   3. I make this affidavit in support of an application for a search warrant for information associated with a certain account that is stored at premises owned, maintained, controlled, or operated by AOL Inc., an e-mail provider headquartered at 22000 AOL Way, Dulles, VA. The information to be searched is described in the following paragraphs and in Attachments A and B. This affidavit is made in support of an application for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A) and 2703(c)(1)(A) to require AOL Inc. to disclose to the government records and other information in its possession pertaining to the subscriber or customer associated with the account aisc01@aol.com, including the contents of communications, user-generated data stored with that account, and associated subscriber, transactional, and user connection information associated with that account. This e-mail account is relevant to the investigation because there is probable cause to believe that: (1) aisc01@aol.com is Taylor's business e-mail account; (2) the account is used to communicate with an e-mail account operated by Lustyik, regarding mutual business activities between the two and others, as well as to communicate concerning the federal investigation of which Taylor is a target; and (3) Lustyik has attempted and continues to attempt to influence the federal criminal investigation into Taylor. I therefore have probable cause to believe that this account contains evidence, fruits, and instrumentalities of the violations identified above, as described in Attachment B. Because the e-mail address contains the domain name "aol.com," I have probable cause to believe that the account and the relevant data are maintained by America Online, Inc., which government databases indicate accepts service of process at:

   Public Safety and Criminal Investigations Unit

2

Subject to Protective Order

Attn: Custodian of Records
AOL Inc.
22000 AOL Way
Dulles, VA 20166
(Fax) (703) 265-2305

as described in Attachment A.

4.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## PROBABLE CAUSE TO BELIEVE
## THAT FEDERAL CRIMES WERE COMMITTED

5.     I have probable cause to believe that FBI Special Agent Robert Lustyik, Jr., date of birth 06/24/1962, a citizen of the United States, assigned to the FBI's New York Division, has attempted and continues to attempt to influence the investigation by federal law enforcement officers and prosecutors in the District of Utah, in violation of 18 U.S.C. § 1503(a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Affecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud).  The Utah investigation concerns allegations of theft of federal funds, bribery, procurement fraud, wire fraud, money laundering, and conspiracy to commit those offenses, involving Taylor, an individual with whom Lustyik appears to have a business relationship.  I have probable cause to believe that Lustyik has concealed this business relationship from both the FBI and the federal law enforcement officers in the District of Utah, and that the prospect of substantial financial gains from the business

3

Subject to Protective Order                                                        US00121424

relationship is being offered and accepted in exchange for Lustyik's official actions with respect to the Utah investigation.

6.     Taylor, who I know is a former member of the United States Army Special Forces, has previously operated as a law enforcement source for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).

7.     In 2004, I assisted in an internal affairs investigation which revealed that Taylor, while working as a paid undercover for the ATF, provided a $44,000 no-interest loan as well as between $6,000 to $10,000 toward the purchase of a Harley Davidson motorcycle, to an ATF agent with whom Taylor was working. The activity resulted in the premature retirement of the ATF agent, who wrongfully accepted and failed to report the receipt of the loan and gift from Taylor.

8.     Taylor is currently the owner of American International Security Corporation (AISC), a company located in Boston, MA, which offers private security services. In 2007, AISC was awarded a contract eventually totaling over $53 million in payments made by the Department of Defense (DoD) to supply services related to training Afghan army special forces in Afghanistan. The circumstances surrounding the award of this contract has been the subject of an on-going criminal investigation by the Defense Criminal Investigative Service (DCIS), Immigration and Customs Enforcement/Homeland Security Investigations (HSI), the Internal Revenue Service - Criminal Investigations (IRS-CI), and the United States Attorney's Office in the District of Utah (USAO). As a result of that investigation, Taylor and AISC were indicted, along with others, on August 22, 2012, by a federal grand jury sitting in the District of Utah. The indictment charges Taylor and AISC with conspiracy (18 U.S.C. § 371); government procurement fraud (41 U.S.C. § 2102(b)); thirteen counts of bribery of a public official (18

4

U.S.C. § 201 (b)(l)(B)); sixteen counts of wire fraud (18 U.S.C. § 1343); conspiracy to commit money laundering (18 U.S.C. § 1956(h)) and nineteen counts of money laundering (18 U.S.C. §§ 1956 and 1957). The indictment also seeks criminal forfeiture of several assets and a money judgment against Taylor, AISC and his co-defendants for $54 million.

     9.    Prior to indictment, Taylor had been questioned by investigators regarding these allegations, retained counsel, and has been the subject of related civil forfeiture proceedings filed on September 2, 2011, in United States District Court, District of Utah.

     10.    Michael Taylor is scheduled to appear in connection with the indictment on September 18, 2012. Department of Homeland Security records indicate that Michael Taylor flew to Lebanon on July 4, 2012. He was scheduled to return to the United States on August 28, 2012, but did not board the flight. He is reportedly now scheduled to return to the United States on September 8.

     11.    The investigation into Taylor and AISC has yielded evidence that Taylor communicates with Lustyik via e-mail. These e-mails were originally obtained through a search warrant of Taylor's e-mails in the criminal investigation into Taylor and AISC by the USAO. A review of those e-mails shows the e-mail address blustyik16@hotmail.com as corresponding to Lustyik. For example, the user of e-mail address blustyik16@hotmail.com has signed his e-mail messages as "Bob" or "Bob Lustyik".

     12.    In or about January 2012, Lustyik opened Taylor as an FBI source, subject to validation through established FBI processes. In a recorded telephone call on July 20, 2012, FBI Assistant Special Agent-in-Charge Scott Olsen told Utah Criminal Chief, Assistant United States Attorney (AUSA) Felice Viti, that the FBI elected to close Taylor as an FBI source for cause.

5

US00121426

13.    The e-mail communications between Taylor and Lustyik indicate that the two are involved in a business relationship with Johannes "Hannes" Thaler, an individual whom I have identified as a childhood friend of Lustyik, and others.  The e-mail communications further indicate that this business relationship involves exploiting Taylor's extensive overseas contacts in the pursuit of lucrative contracts for (among other things) security services and energy development throughout the Middle East, Africa, and elsewhere.  As described in greater detail below, these e-mails provide evidence that Lustyik is engaged in a personal business relationship with an FBI source that could expose him to potential serious administrative and/or criminal penalties.  More importantly, the e-mails regarding the business relationship—and its potential to yield significant financial benefits to Lustyik—provide a potential motive for Lustyik to obstruct the Utah-based investigation of Taylor.

14.    This is the second application I am making for a search warrant under 18 U.S.C. §§ 2703(a), 2703(b)(1)(A), and 2703(c)(1)(A) and Rule 41 of the Federal Rules of Criminal Procedure to search and seize the contents of the e-mail account identified as aisc01@aol.com. On June 13, 2012, a search and seizure warrant for that account was issued.  I executed the warrant on June 15, 2012, and received e-mail content on June 26, 2012.  I have also previously received two search warrants for Lustyik's e-mail account, blustyik16@hotmail.com, and one search warrant for the contents of Johannes Thaler's e-mail account, hannestee@yahoo.com.  My review of the content from those warrants indicated that Lustyik's business relationship with Taylor and Thaler is continuing and revealed that Lustyik is continuing to attempt to influence the District of Utah's investigation on Taylor's behalf.

6

Subject to Protective Order

US00121427

**BUSINESS RELATIONSHIP BETWEEN LUSTYIK AND TAYLOR**

15.     My investigation identified numerous e-mails in which Lustyik and Taylor discussed business opportunities.  In one series of e-mails Taylor advised Lustyik of a lucrative potential contract protecting an oil-drilling operation in the South Sudan.  Specifically, in an October 24, 2011 e-mail, Taylor forwarded to Lustyik a thread of communications from an oil company seeking to hire Taylor's company.  Taylor wrote Lustyik, "Bob, These guys want to come see me about drilling for oil in South Sudan.  Let's talk about this ASAP.  Mike."

16.     In a message on the same topic, also dated October 24, 2011, Taylor wrote to Lustyik, "They want to meet the South Sudan ambassador that I told him I met before to ask if they can bid on an oil block.  If all goes well and they get it we will get 7% and the security contract.  They want to know if I can arrange the meeting next week.  Do you know if the ambassador is in DC or NY or if he is still the ambassador?  Mike."

17.     This e-mail discussion appears to refer back to an earlier e-mail message, dated June 19, 2011, Lustyik e-mailed the Ambassador from the South Sudan to the United States, stating, "[w]e are willing to provide you with 2 to 3 percent of any contract signed.  For example, 2 percent of a 20 million dollar contract is 200 thousand US dollars.  Please contact me either way so we may arrange to provide you with your 'gift'" for the last meeting you arranged."  In reply, the ambassador wrote, "I do not do that, taking percentages.  Sorry for that.  I am an honest Diplomat for my country . . . ."

18.     In replying to the Ambassador's e-mail, Lustyik wrote, "I can have my Boss make direct contact with you if you believe that is more appropriate . . .  I can assist you with AISCO [Taylor's company] . . .  Please let me know if there is an opportunity for Mr Taylor to meet with your Vice President and yourself . . . I can assure you that Mr Taylor is someone who can be

7

US00121428

invaluable to your exciting new beginning in South Sudan . . . ." This e-mail is signed, "Bob Lustyik."

19.     The Ambassador, in his reply, stated, "I will keep you informed about his schedule the VP." Lustyik forwarded this e-mail string to Taylor.

20.     An October 25, 2011 e-mail exchange, obtained through a search and seizure warrant issued June 13, 2012, concerning the e-mail account hannestee@yahoo.com, belonging to Johannes Thaler, with the subject title of "Sudan Oil Deal," contained additional conversation in the discussion related above, concerning Lustyik, Taylor and Thaler's pursuit of a contract in the South Sudan.  Therein, Thaler asked Lustyik, "when is Mike going to start paying us?" Lustyik replied, "Taylor is looking for a way to take care of me so I said u n I r working together on these and he said he will be sending money ur way."  When Thaler asked, "How much?," Lustyik wrote, "I think he might want to give us 200 gs."

21.     An April 30, 2012 e-mail, obtained through the search and seizure warrant issued June 13, 2012, concerning the e-mail account aisc01@aol.com, belonging to Michael Taylor, relates to another potential security contract, also, under the subject, "Somali Piracy."  Therein, Taylor wrote Lustyik, Thaler, and an individual I have identified as their business associate, Michael Feldman, "With pleasure we would help these companies pass through this area.  It's best to have some folks on the main vessel and two smaller fast boats to interdict the pirates.  We will cost much less than their present losses and will give them a guarantee in writing that we will not allow the pirates to board their ships.  We have a full staff of US Special Forces folks that would love this type of job if we can get it."

22.     My review of e-mail messages obtained pursuant to the search and seizure warrant for Lustyik's e-mail account issued May 23, 2012, revealed that Lustyik, Taylor, and Thaler

8

US00121429

remain in communication, using their respective e-mail accounts including Taylor's aisc01@aol.com account, to discuss their business activities. For example, in a June 11, 2012 e-mail, obtained through the search and seizure warrant issued May 23, 2012, Taylor advised Lustyik and Thaler that he was attaching "the signed deal with the company of the crowned prince in Abu Dhabi" for a high-tech airborne surveillance system called "Buckeye." "Each system," Taylor continued, "sells for $30 million, [and] each system give [sic] us $20 million profit."

## LUSTYIK'S CONTACTS WITH THE UTAH INVESTIGATORS AND USAO IN THE DISTRICT OF UTAH REGARDING TAYLOR

23.   In January 2012, Utah-based HSI Special Agent (S/A) Shaun Helt, who is a co-case agent in the Taylor/AISC investigation, learned that a query had been made via the Treasury Enforcement Communications System (TECS) by an FBI analyst in Washington, D.C., regarding Taylor.

24.   S/A Helt called the analyst, who told S/A Helt he made the TECS query at Lustyik's request. The analyst, who seemed uneasy when S/A Helt spoke with him, did not know why Lustyik had made the request. S/A Helt next called Lustyik, who told S/A Helt that he had asked for the TECS query as a routine background check on Taylor because he was considering running Taylor as a confidential source.

25.   In February 2012, Utah-based DCIS Special Agent Keith Darnell, co-case agent with HSI S/A Helt on the Taylor/AISC investigation, called Lustyik. Lustyik admitted that Taylor had told him he (Taylor) was under investigation. Lustyik told S/A Darnell, "how are you going to indict Taylor – he is a real patriot and we are trying to work him as a confidential source," or words to that effect.

9

US00121430

26.    Thereafter, Lustyik called S/A Darnell (who was in Utah) several times, and told S/A Darnell things such as, "I don't know how you think this guy has committed a crime – he is a patriot," or words to that effect.

27.    S/A Darnell at one point asked Lustyik if he was trying to shut down the Utah investigation, to which Lustyik replied, "no at least not now, but it may come to that".

28.    S/A Darnell then advised Lustyik to contact the federal prosecutor who was handling the Taylor/AISC investigation, AUSA Robert Lund.

29.    Thereafter, Lustyik's partner, FBI Special Agent Sara Jones, reached out to AUSA Lund and arranged for a video telephone conference between AUSA Lund and Lustyik to discuss the FBI's using Taylor as a confidential source.

30.    AUSA Lund and AUSA Cy Castle, who in addition to working on the criminal investigation is also one of the attorneys handling the civil forfeiture action against Taylor and AISC, spoke with Lustyik from Utah via video telephone conference on March 1, 2012. Lustyik indicated that he was obliged to confine the discussion to non-classified matters.

31.    Lustyik offered to provide AUSA Lund with documentation showing why Taylor was valuable as a confidential source, and Lustyik did in fact provide four FBI 302 reports of interviews to AUSA Lund in early March 2012.

32.    The FBI 302 reports provided by Lustyik to the AUSAs in Utah were unsigned, bore no file number and were unaccompanied by any indication that their dissemination was authorized by FBI supervisory personnel. Furthermore, the reports mostly contained dated information on Taylor stretching back to the 1980s and 1990s.

33.    As a result of Lustyik's insistence that Taylor not be indicted, as well as the FBI 302 reports Lustyik provided, the Utah USAO was impacted in its investigation of Taylor.

10

Specifically, the investigators and the AUSAs were required to take a number of steps to address the matters raised in the 302, including conducting additional witness interviews. In addition, the USAO had to consider whether Taylor's alleged work with Lustyik justified a decision to not indict him with his other co-conspirators.

34.     S/A Darnell also received an e-mail message from Lustyik on April 3, 2012, in which Lustyik again suggested that Taylor be used as a confidential source and not indicted.

35.     On or about April 25, 2012, AUSA Lund received a call from Taylor's attorney in the civil forfeiture matter, during which the attorney specifically referenced Taylor's value to the FBI as a confidential source.

36.     On or about May 17, 2012, Lustyik provided AUSA Lund with two additional FBI 302 reports in support of his purported need to use Taylor as a confidential source. As with the original four FBI 302s Lustyik sent to AUSA Lund, these two new FBI 302 reports were unsigned and bore no case numbers nor indicia that their dissemination was authorized by FBI supervisory personnel. On June 7, 2012, Lustyik sent the following text messages to S/A Helt:

> "Louie Freeh called our ADIC[1] on MT's behalf so we are under a microscope now.  I never realized they knew each other, but, they do."

> ". . . Let me know what you guys want on this. Even though HQ is hot on this. The speed (or lack there of) is controlled by me. All I ask for is guidance"

37.     On June 11, Lustyik sent a text message to S/A Helt inquiring as to the anticipated June 28, 2012 date for the indictment of Taylor in Utah.

---

[1] An ADIC is an Assistant Director of the FBI

11

38.   On June 21, 2012, Lustyik notified S/A Helt that he was meeting with the "DoD" regarding Taylor, and told S/A Helt to tell S/A Darnell (the DCIS agent working on the case) about the meeting.  Lustyik did not further elaborate.

39.   On July 9, 2012, Lustyik sent a text message to S/A Helt urging him to inform the Utah prosecutors that "we r working M[ichael] T[aylor] now with the DOD.  So us. DOD n DEA r all using him in some great stuff."  I understand "DOD" and "DEA" to refer to the Department of Defense and the Drug Enforcement Administration, respectively.

40.   On August 6, 2012, Lustyik sent a text message to S/A Helt asking him to have Keith Darnell the DCIS case agent call him.  On August 8, 2012, DCIS S/A Keith Darnell called and spoke with Lustyik.  The call was consensually recorded.   During the call Lustyik and S/A Darnell, among other things, discussed the FBI's vetting of Taylor.  For the first time, Lustyik indicated to S/A Darnell that the FBI has some negative information on Taylor.  When S/A Darnell asked about that information, however, Lustyik responded something to the effect that the only negative information was from another FBI office and that the agent who provided the information "admitted" that he did not really do any research and did not do due diligence. Lustyik went on to say something to the effect that the agent who had provided the negative information on Lustyik "almost could be brought up on charges.  He did such a crappy job." After discussing the potential timing of the indictment, Lustyik warned S/A Darnell that Taylor's FBI file contained Taylor's denials to wrongdoing regarding the USAO investigation – information which would be relevant to the case prosecutors and jurors.  Lustyik told S/A Darnell that if Lustyik "was your people out there, I'd be like damn sure that like I got a piece of this thing [the FBI file]" because "you know, there's even stuff in there like, you know, a two and a half hour interview with Taylor about how he goes, you know, when we say to him like,

12

'Hey, well, you know, did you do this?  Like because we don't care,' like, 'we're not the people, you know, like looking at this.' And then goes into like, how he did not do it, and like his, what he believes is the evidence against him.  And, and you know, his thoughts on it and stuff like that.  And like, you know, no, no one prosecuting this case wants that to come out and have a jury, or whoever look at it and be like, 'Well wait a minute, if that's in like an FBI file,' you know.  So . . . and it's in there, somewhere" or words to that effect.

41.   On August 15, 2012, HSI S/A Shaun Helt spoke by telephone with Lustyik. During that conversation, Lustyik again reiterated to S/A Helt that the investigators and prosecutors in Utah should see the FBI's file on Taylor and indicated that he [Lustyik] had heard from a "retired agent" that Taylor was to be indicted on the 22nd.  During the conversation, Lustyik also said that if Taylor were put in jail, he would not care, he would still try to work Taylor, even from jail, or words to that effect.  He also said words to the effect that he was "100%" certain Taylor was coming back to answer the indictment, and that if the Utah team had trouble getting him back in the country, Lustyik would assist by holding a conference call between himself, the Utah investigators, and Taylor, telling Taylor he needed to return.

## PROBABLE CAUSE TO BELIEVE THAT THE RECORDS CONTAIN EVIDENCE, FRUITS, AND INSTRUMENTALITIES OF THE CRIMES IDENTIFIED ABOVE

42.   I have probable cause to believe that aisc01@aol.com is Taylor's e-mail account, and the data associated with this account contains evidence, fruits, and instrumentalities of the crimes identified above.  As noted above, I have received a previous search warrant for e-mail data from this e-mail account, which confirmed that Taylor is the user of this account.

13

US00121434

43.   Likewise, I have probable cause to believe that blustyik16@hotmail.com is Lustyik's e-mail account.  As noted above, I have received two search warrants for e-mail data from this e-mail account, which confirmed that Lustyik is the user of that account.

44.   The USAO investigation of Taylor and this investigation have established that Taylor operates the e-mail account aisc01@aol.com, which is the e-mail account used to communicate with Lustyik.

45.   The USAO investigation of Taylor identified approximately 70 e-mail messages made between Taylor and Lustyik from approximately June 2011 through approximately December 2011.

46.   In several e-mail messages, Taylor and Lustyik discussed FBI related activity and colleagues.

47.   In several e-mail messages in October and November 2011, Lustyik and Taylor discussed the Utah criminal investigation into Taylor and AISC.  For example, on October 25, 2011, Taylor e-mailed Lustyik and stated, "I'm wondering if the other guy is trying to cook something up.  Not your buddy's outfit, the other one that we are checking to see what authority they have.  He is the guy that is trying to make everything fit into his theory."  From my review of records and information obtained from other agents and witnesses, I believe that Taylor is referring to either S/A Darnell (who is an investigator within the Department of Defense) or one of the other investigators on the Utah case when he discussed "the other guy."  This is also supported by the fact that on November 22, 2011, Taylor e-mailed Lustyik with a lengthy recitation of discussions Taylor had with his attorney regarding the Utah investigation.  In that e-mail, Taylor stated that "[m]y lawyer also told the AUSA's that he believes the investigator from DOD has a theory and is trying to fit evidence into his theory . . . ."

14

US00121435

48.     In another e-mail message dated November 4, 2011 to Lustyik, Taylor stated, "Did you hear back from your buddy yet?  I heard news that was not great as to which way they are leaning." Lustyik responded, "Really?  I will call u tonite.  There is no way they indict you." Taylor responded, "I think they may be bullshiting.  We have caught them in a few lies." Lustyik asked, "[t]hey or the DOD guy?  They r talking indictment ?  They are so full of shit." From my review of records and information obtained from other agents and witnesses, I believe that the "DOD guy" that Lustyik is referring to is S/A Darnell.

49.     In a related e-mail string which had discussed the Utah investigation, directly following Taylor's e-mail stating "I think they may be bullshiting.  We have caught them in a few lies," Lustyik responded, "We gotta figure out a way to lock down the SS gig."  Based on my review of e-mail communications between Taylor and Lustyik, I believe this refers to a private business deal in the South Sudan that Taylor and Lustyik had previously discussed.

50.     Following these exchanges, in January 2012, agents investigating Taylor and AISC in Utah had telephonic contact with an individual identifying himself as FBI Special Agent Robert Lustyik, who questioned and criticized the investigation of Taylor and claimed to be contemplating opening Taylor as an FBI confidential source.  Lustyik gave S/A Darnell the impression that he was just beginning his work with Taylor, and yet the above e-mail traffic, along with other e-mails that I have examined, makes clear that Lustyik had been dealing with Taylor since at least June 2011.

51.     Investigation into Taylor and AISC identified numerous e-mail messages which on the surface appear to be operational activities being performed by Taylor and others.  For example, in an e-mail dated October 28, 2011, Taylor e-mailed Lustyik a list of names of persons "that deal in international drugs and some use the profits to assist Hizballah."  However, in the

15

US00121436

same e-mail string, Lustyik responded, "I've been playing phone tag w ya . . . . Will the Oil co be paying for Hannes' [Johannes Thaler, an associate of Taylor] travel to DC?" Taylor responded, "[y]es, they will pay for the expenses. I need to talk with you as soon as you can." This exchange suggests that Lustyik has taken a personal interest in a business venture being pursued by Taylor and Johannes "Hannes" Thaler, whom I have identified as a childhood friend of Lustyik. The intermingling of the discussion of personal pecuniary interests by Lustyik and Taylor with other exchanges – regarding purportedly official operational activities – indicates that the Lustyik–Taylor relationship may have deviated from the legitimate handler–source structure.

52.     These messages, and others reflecting Lustyik's involvement in some of Taylor's business activities, expose Lustyik to potential administrative and/or criminal penalties should they be discovered.

53.     The e-mails obtained previously obtained from Taylor's account, aisc01@aol.com, demonstrate that Taylor continues to use this e-mail account to contact Lustyik and Thaler about mutual business dealings and the Utah case and support a finding that probable cause exists that the account aisc01@aol.com contains evidence, fruits, and instrumentalities of the crimes identified above. For example,

a.     On April 19, 2012, Taylor e-mailed Lustyik under the subject "Update", informing Lustyik that the Utah investigators were asking about bonuses and enhancements related to the contract at issue in that investigation. On April 20, 2012, Lustyik responded to Taylor indicating that Lustyik expected two FBI supervisors, or Special Agents in Charge, to contact the Utah team to speak about Taylor, and further indicated that an Assistant United States Attorney would do the same. Lustyik told Taylor that he would also be sending one more 302 to

16

Subject to Protective Order

US00121437

Utah summarizing an interview Lustyik purportedly did of another retired FBI agent regarding Taylor. Having outlined for Taylor all of the steps that were purportedly being taken to influence the Utah investigation, Lustyik asked Taylor a question: "Can you think of anyone else that we can neutralize with an interview? Someone who they might try to use against you that we could go speak with that would basically ruin their offensive? Where are Harris n Young [Taylor's co-defendants]?" Taylor responded with contact information for David Young and informed Lustyik that Harris was in Vietnam. Taylor also provided the names of a number of other potential witnesses and their role in the Utah case and, in one instance, a telephone number for the witness. Also on April 20, Lustyik responded, "After reading this . . . what does your lawyer say? It appears as we have discussed all along that this isn't a case against you? I am going to interview Young and just blow the doors off this thing."

   b.   On June 12, 2012, in an e-mail exchange between Taylor and Thaler, Taylor assured Thaler that he spoke with Dr. Hameed and "our two projects are going to happen. He is 100% sure. The 106 MW and the drilling." Based upon my review of the e-mail traffic, Dr. Hameed appears to be an Iraqi businessman with whom Taylor is working to obtain contracts from the Iraqi government to supply electricity ("the 106 MW") and to obtain rights to drill for oil. Later in the day, Thaler asked Taylor via the same e-mail chain, "Mike, Do we have a time frame for any of the deals we have on the table? I was hoping to have a surprise for the big guy [Lustyik] on his birthday on the 24th." Taylor responded that "The best one is the Buckeye. I just sent the pricing details a few hours ago. I believe this will hit first in and very possible before the 24th." Thaler replied, "Great, that would be a nice 50th present for him. He hasn't mentioned Hannah's bills lately, but I know that weighs on him." Based upon my review of the e-mails and other evidence, "Hannah" is a reference to Lustyik's daughter, who is undergoing

17

US00121438

medical treatment. Taylor responded, raising the Utah investigation, "Ok, good. Waiting on him to finish and he will call me. When Buckeye hits we will be all set. Of course provided I'm not in jail."

        c.   In the same e-mail exchange, Thaler reassured Taylor that "From what he was telling me yesterday, it doesn't sound like they have much of a case, also, the fact that you're working with Ric's company and have been working for other companies in the past is only going to help. Especially if you've been paid by these companies – it really proves your credibility and loyalty. The only thing you are guilty of is poor business practice – by having too much trust in the people that work for you and assuming they are doing their jobs according to the rules. You hold yourself to a higher standard than most people – which is a very admirable trait – but most people are just in it for themselves and will jump at any opportunity to make an extra buck." This response by Thaler indicates that Lustyik has talked to Thaler about the Utah investigation as well as Taylor's work as a source for various Government agencies, which he refers to as "companies."

        d.   In response to Thaler's assurance discussed above, Taylor stated, "The problem is when indicted it scares people away from doing business with you which may very well kill the Buckeye deal." This exchange is significant in that Taylor therein informs Thaler, Lustyik's business associate and childhood friend, that the Buckeye deal is the one most likely to result in the quickest money for Lustyik but that it would be jeopardized were Taylor to be indicted in Utah.

      54.   In addition, I have reviewed e-mails from Lustyik's e-mail account, which were obtained pursuant to a search warrant signed by Magistrate Judge Alba on May 23, 2012, and a search warrant signed by Magistrate Judge Furse on August 2, 2012. A number of these e-mails

18

US00121439

further support a finding that probable cause exists that the account aisc01@aol.com contains evidence, fruits, and instrumentalities of the crimes identified above. For example,

    a.  On May 14, 2012, aisc01@aol.com e-mailed blustyik16@hotmail.com and stated, "Brooks [Taylor's attorney] called me after speaking with Utah and he says he believes they are going to indict me.  He also says there is no deal to be made because of something called guidelines that will put me in jail forever."  Lustyik forwarded this e-mail Johannes "Hannes" Thaler, with whom both Taylor and Lustyik are associated.  Thaler responded, "I know.  This doesn't sound good.  He told me a while back his family would be better off with him dead than indicted."  Lustyik replied to Thaler, "I've done everything possible.  The ausa is crazy."

    b.  In an e-mail string related to the one above, Lustyik responded to Taylor, "Relax. Give main justice a shot.  Plus.  Barbara is going to convince the jury there is no case."  I believe that Lustyik's reference to "Barbara" refers to the fact that the AISC Operation's Manager Barbara Auterio was subpoenaed to testify before the grand jury in relation to the Utah criminal investigation.  Later on in the e-mail string, Lustyik e-mailed Taylor, "They have no case.  Trust me.  The fact that I (the fbi) appears to be failing at stopping this is so disheartening."  The next day, Lustyik again e-mailed Taylor regarding Barbara Auterio's impending grand jury testimony. In that e-mail, Lustyike wrote, "A lot of fight left either way Mike."  Barbara is allowed to say whatever she wants.  They ask a question . . . she starts every answer w. 'No way he did this.'"

    c.  On June 3, 2012, Lustyik e-mailed Taylor at aisc01@aol.com, stating,

> So we have got them running scared now. Their investigators are panicked about our calls n meeting w OGA and main Justice.  We meet w Farbiage again on tuesday am.  He is gonna ask to have the venue moved to NY. Sean Helt, one of their investigators said . . . . "Well if ur doing that we will pull the trigger on it now."  I told him.  If u have a case u wouldve (sic) indicted way before now.  Then speaking w ausa asst.  She said. "We aren't even sure we can indict on this."  So they don't have a clue.

19

US00121440

I believe that "OGA" is a reference to the FBI's Office of General Counsel, and "main Justice" refers to Department of Justice headquarters in Washington. Based upon my review of the e-mails, other evidence, and Department of Justice personnel listings, "Farbiage" appears to be a reference to Assistant United States Attorney Michael Farbiaz of the Southern District of New York. I believe that Lustyik's reference to "Sean Helt" is the recorded call S/A Helt made of his conversation with Lustyik four days earlier. However, we have no evidence that Lustyik ever spoke to AUSA Farbiaz regarding Taylor. Nor do we have any evidence that Lustyik spoke with an AUSA who informed him that Taylor could not be indicted; there is no female AUSA assigned to the Utah USAO's criminal investigation of Taylor. Additionally, the call between S/A Helt and Lustyik was recorded, and Lustyik did not in fact make the statement to S/A Helt he reported making above.

   d.  Also on June 3, 2012, in an e-mail string related to the one above, Taylor asked Lustyik, "What is the chance of having the venue moved to NY? Sounds great but the 'cow pokes' don't listen to anyone." Lustyik responded, "Based on your "mahopac address." U have NO NEXUS to Utah at all. None. It should be in Boston or NY." This appears to be a reference to an address Taylor provided to Lustyik on January 6, 2012: "Mike Taylor 74 UNION VALLEY ROAD  MAHOPAC, NY 10541."

   e.  On June 5, 2012, Lustyik e-mailed Taylor at aisc01@aol.com, and stated, "Finally we have everyone on board and our HQ is forcing the hand of MJ [Main Justice]. The biggest hurdle is that its a DOD [Department of Defense] case not a DOJ [Department of Justice] case but it might work to our advantage. Our Unit Chief (UC) is calling over to her friend at MJ who handles that region. That friend's husband is high up in DOD. I am playing every card in my

Subject to Protective Order                                                    US00121441

hand.  Our AUSA said that with all the different agencies and retired guys involved there is no way that they win this case if it went to trial.  I reminded everyone that the GOAL is no trial."  Later on in the same e-mail string, Lustyik wrote, "We push the issue every day until we get a resolution."  As of the date of this affidavit, I have no information that anyone at the Department of Justice or the FBI tried to prevent the presentation of the indictment to the grand jury.

   f. Lustyik has a contact in the business of refining gold and in a number of e-mails asked Taylor to find a source of gold at a discount and otherwise discussed the money they could make if they could find a source for gold.  In an August 9, 2012 e-mail, Taylor informed Lustyik that the people he contacted only sell gold at the market rate, but that "We are checking to see if there is a factory in Turkey."  Lustyik responded, "Out of curiosity. How soon do u think we could have some money in hand after the 17th of August? I know u n I have way more on our plates, but I'm worried about Hannes. He went All-In w this and I'm hoping we can give him a date of relief. He is way to [sic] valuable for us to lose. Wait till you see how he has handled [Michael] Feldman. 498 million dollar deal already past phase one for funding. All him while Feldman watched. Yesterday was Hannes's Bday."  Taylor replied, "We are very close, very close, in fact one deal is approved and the money is ready. We are just getting registered with the Ministry of Natural Resources to be their Approved Vender List which will be done in a few days if it's not already done."

   g. At the time of the August 9th e-mail exchange, Lustyik and Taylor were both aware that the USAO in Utah planned to present an indictment to the grand jury against Taylor and others by Labor Day. As the August 9, 2012 e-mail exchange continued, Lustyik continued to ask Taylor for a time frame for a pay out, this time raising his efforts on Taylor's behalf with regard to the Utah investigation, "So is there a time frame I can tell Hannes to alleviate his

21

US00121442

worries?  Also, you r horrible at reading my e-mails. I don't even think Darnell [the DCIS case agent] knew about any pending indictment.  He was saying they still hadn't decided yet." Taylor responded, "If they have not decided yet maybe you can remind him that I had no idea what was going on over there.  I was coaching and didn't pay a lot of attention and also had no idea he was making money from Harris on this. Still today Young says that I didn't know and even said it to my lawyers, 3 of them by saying it wasn;t [sic] any of my business."  Lustyik assured Taylor that "Its [sic] all in the file. I promise", to which Taylor replied, "I know, I sound like a little brother nagging."

   h.  Continuing the August 9, 2012 e-mail exchange, Lustyik then turned the conversation back to money, "Spoke w Hannes…. (sic) he is suicidal.  Great.  I told him what u said.  Basically.  Do u think he will have any money by say August 30th?  Also had a GREAT talk w Paul.  We r meeting in Mystic on thursday."  Based on the context and other e-mails, I have probable cause to believe Paul is Paul Kelly, one of the persons interviewed for one of the FBI 302s provided to Utah and a former AUSA in Boston who represents an AISC employee in the Utah investigation.

   i.  The exchange continues to mix discussions of Lustyik's and Taylor's business interests with Lustyik's and Taylor's efforts to stop the Utah indictment.  On August 10, 2012, Lustyik informed Taylor that he had "sent the DOD guy an e-mail and we set up a secure call for 9 am monday."  Based upon my review of the e-mails and other evidence, Lustyik's reference to "the DOD guy" reflects an effort to get Taylor opened as a source with the Department of Defense, and, in so doing, potentially delay or derail the Utah indictment.  Taylor replied, "Good.  I hope he has some good news like it's over.  We have so much good stuff going on over here [Taylor was in the Middle East]."  Lustyik responded, "Paul n I have a great plan also.  It

22

will be attacks on all fronts. Hey Hannes asked about the Buckeye?" In an e-mail dated August 11, 2012, Taylor responded that the "Buckeye is working just slooooow because of Ramandan."

j. In response, Lustyik explained to Taylor the plan he and "Paul" – another apparent reference to former AUSA Paul Kelley – had come up with, "I am meeting with Paul this Thursday. We are going to have him call out to the [FBI] Director. I've asked him to throw me under the bus. I want him to tell the Director that you have been supplying life saving information to me and now I haven't returned any comm [communication] for a month wo [without] any explanation. Paul will ask for a face to face w him n NY. We will be called down and I will then be able to tell the truth behind all this BS to the Director. And he will tell me to fcuk [sic] the process, reopen you [as an FBI source] and then he will call [Utah Criminal Chief, AUSA Felice] Viti. So I will be a speed bump for a while but it will finally get us to the top. Paul has trouble throwing me under the bus....but its what I want so let's go for it." Taylor replied, "Paul explained this to me and also said he was not comfortable throwing you under the bus even if it's only for a brief period of time until the truth is known. I just hope the CEO [the FBI Director] tells you to open me back up [meaning as an FBI source]." In response, Lustyik assured Taylor that "it will work. I'm a big boy. I can take it. No worries."

k. The exchange then continued on August 11th, with Taylor raising the issue of his working for DOD, telling Lustyik, "All of this gets done before your CEO gets involved if DOD steps up to the plate." Lustyik responded that "I don't trust [Utah AUSA] Viti that this is true and we can't take the chance." Taylor agreed, "I agree 100%, whatever works." Lustyik responded, "So then under the bus I go!" Taylor replied, "But you are not really going under the bus because you are doing what they told you to do which is close me. I still hope DOD comes thru-it won't hurt if both happen." Lustyik agreed, stating "I want it to be both. BUT if the

23

Subject to Protective Order

Director calls...u are saved."  In response, Taylor raised the issue of their business together, writing, "I want to thank you from the bottom of my heart.  I hope something works.  I need another 30 days here to bring the cash in."  Lustyik responded, "If ur lawyer asked they would give it [referring to another tolling agreement, extending the time for indictment].  They r in disarray."  Taylor replied, "I'll ask him and will ask Paul as well."

l.   The exchange continued the next day, August 12, 2012, with Lustyik emailing Taylor and bringing the conversation back to business, "U gotta find us a gold mine company.  Not that u don't having have enough on ur plate . . . ."  Taylor responded, "OK, let me check Africa."

## TECHNICAL BACKGROUND

55.   In my training and experience, and through discussions with other agents, I have learned that e-mail hosting companies, such as AOL Inc., maintain server computers connected to the Internet.  Their customers use those computers to send e-mail on the Internet.

56.   AOL Inc. ("AOL") provides e-mail services to customers as part of its Internet service.

57.   AOL customers may access their accounts on the company's e-mail servers from any computer connected to the Internet.

58.   AOL maintains electronic records relating to their customers. These records include account application information, account access information, and e-mail transaction information.

59.   When an AOL customer sends an e-mail, it is initiated at the customer's computer, transferred via the Internet to AOL's servers and then transmitted to its end destination.

Subject to Protective Order

US00121445

Conversely, an e-mail sent to an AOL customer resides on AOL's servers until it is transferred by the customer to his computer to be read.

60.   By default, unread e-mail will remain on AOL's servers for 30 days.  Sent e-mail will remain for up to 30 days.  The length of time that read e-mail remains on AOL's servers depends on how a customer configures his account, but it is usually 30 days.  In addition, AOL has storage capacity that allows customers, so choosing, to store opened incoming e-mail and sent e-mail without a set expiration date, subject to a maximum size limit.

61.   AOL's legal compliance guide also indicates that it can provide the following additional information associated with a subscriber's account:  address books; "buddy" lists; photos, files, data, or information; and World Wide Web profiles or homepages.

## LEGAL AUTHORITY

62.   The government may obtain both electronic communications and subscriber information from an e-mail provider by obtaining a search warrant.  18 U.S.C. §§ 2703(a), 2703(b)(1)(A), 2703(c)(1)(A).

63.   Any court with jurisdiction over the offense under investigation may issue a Section 2703 search warrant, regardless of the location of the website hosting company or e-mail provider whose information will be searched.   18 U.S.C. §§ 1703(a), 2703(b)(1)(A), 2703(c)(1)(A), 2711(3).  Furthermore, unlike other search warrants, Section 2703 warrants do not require an officer to be present for service or execution of the search warrant.  18 U.S.C. § 2703(g).

25

Subject to Protective Order

64.     If the government obtains a search warrant, there is no requirement that either the government or the provider give notice to the subscriber.   18 U.S.C. §§ 2703(b)(1)(A), 2703(c)(3).

## CONCLUSION

65.     Based on the information described above, I have probable cause to believe FBI Special Agent Robert Lustyik, Jr., has attempted and continues to attempt to influence the investigation by federal law enforcement officers and prosecutors in the District of Utah, in violation of 18 U.S.C. §§ 1503(a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Affecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud).

66.     Based on the information described above, I have probable cause to believe that computer systems owned or operated by AOL hold evidence, fruits, and instrumentalities of these crimes as described in Attachment A.  AOL accepts service of process at:

> Public Safety and Criminal Investigations Unit
> Attn: Custodian of Records
> AOL Inc.
> 22000 AOL Way
> Dulles, VA 20166
> (Fax) (703) 265-2305

67.     Based on the information described above, I have probable cause to believe that the evidence of 18 U.S.C. §§ 1503(a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Affecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud) includes e-mail content and other records, as more fully described in Attachment B to the search warrant.

26

Subject to Protective Order

US00121447

68.    The procedures that will be used to copy and review the relevant records are set out in Attachment B to the search warrant.

## REQUEST TO SEAL

69.    I request that this Application and Warrant be sealed by the Court until such time as the Court, pursuant to Local Rule DUCrimR 49-2, directs otherwise.  Such an Order    is justified because notification of the Application, the Court's warrant, or the execution of the warrant could seriously jeopardize the ongoing investigation.  Such disclosure could give the subscriber an opportunity to destroy evidence, notify confederates, or flee or continue flight from prosecution.

## FOURTEEN-DAY RULE FOR EXECUTION OF WARRANT

70.    Federal Rules of Criminal Procedure 41(e)(2)(A) and (B) directs the United States to execute a search warrant for electronic evidence within 14 days of the warrant's issuance.  If the Court issues this warrant, the United States will execute it not by entering the premises of AOL, as with a conventional warrant, but rather by serving a copy of the warrant on the company and awaiting its production of the requested data.  This practice is approved in 18 U.S.C. § 2703(g),[2] and it is generally a prudent one because it minimizes the government's intrusion onto Internet companies' physical premises and the resulting disruption of their business practices.  It is possible that the company could produce the data outside the 14-day

---

[2]  Section 2703(g) provides that "[n]otwithstanding section 3105 of this title, the presence of an officer shall not be required for service or execution of a search warrant issued in accordance with this chapter requiring disclosure by a provider of electronic communications service or remote computing service of the contents of communications or records or other information pertaining to a subscriber to or customer of such service."

27

deadline, in which case the United States would want to view the data without a further court order or follow-up warrant, with the exception of any records or data that were created (as opposed to copied) after the 14-day deadline.

71.    For these reasons, I request that the Court approve the procedures in Attachment B, which will allow the United States to review evidence that the company provides after the 14-day deadline, with the exception of any records or data that were created (as opposed to copied) after the 14-day deadline.  The United States would be prohibited from knowingly reviewing late-created data, and could not knowingly review it without a further order or follow-up warrant from this Court.

Respectfully submitted,

Thomas M. Hopkins
Special Agent
United States Department of Justice
Office of the Inspector General

Subscribed and sworn to before me
on September 22, 2012,

_____
UNITED STATES MAGISTRATE JUDGE

28

Subject to Protective Order

## ATTACHMENT A

The premises to be searched and seized is the e-mail account identified as aisc01@aol.com, other user-generated data stored with that account, and associated subscriber, transactional, and user connection information associated with that account, as described further in Attachment B, all of which is maintained by AOL, which accepts service of process at:

    Public Safety and Criminal Investigations Unit
    Attn: Custodian of Records
    AOL Inc.
    22000 AOL Way
    Dulles, VA 20166
    (Fax) (703) 265-2305

Subject to Protective Order

**ATTACHMENT B**

I.     **Search Procedure**

  A.  Within fourteen days of the search warrant's issue, the warrant will be presented to AOL personnel, who will identify the account and files to be searched, as described in Section II below.

  B.  AOL will then create an exact electronic duplicate of that account and files ("the account duplicate").

  C.  AOL will provide the account duplicate to law enforcement personnel.

  D.  Law enforcement personnel will then search the account duplicate for the records and data to be seized, which are described in Section III below.

  E.  If AOL provides data that was created after fourteen days from the warrant's issue ("late-created data"), law enforcement personnel shall not knowingly review the contents of the late-created data without a follow-up warrant or court order.

II.    **Accounts and Files to Be Copied by AOL Personnel**

  A.  All data files associated with the e-mail address or account designated aisc01@aol.com, including, without limitation:

    1.  The contents of all e-mail, whether draft, deleted, sent, or received;

    2.  The contents of all text or instant messages;

    3.  The contents of all electronic data files, whether word-processing, spreadsheet, image, video, or any other content;

    4.  The contents of all calendar data;

    5.  Lists of friends, "buddies", contacts, or other subscribers; and

US00121451

6.       Records pertaining to communications between AOL and any person regarding this account and any e-mail accounts associated with this address, including, without limitation, contacts with support services and records of actions taken.

B.      All subscriber and transactional records for the aisc01@aol.com e-mail account and any associated e-mail accounts and secondary contact e-mail accounts, including:

1.       Subscriber information for this and any associated e-mail accounts:

      a.      Name(s) and AOL account identifiers;

      b.      Address(es);

      c.      Records of session times and durations;

      d.      Length of service (including start date) and types of service utilized;

      e.      Telephone instrument number of other subscriber number or identity, including any temporary assigned network address;

      f.      The means and source of payment for such service (including any credit card or bank account number); and

      g.      The Internet Protocol address used by the subscriber to register the account or otherwise initiate service.

2.       User connection logs for any connections to or from this and any associated e-mail accounts, including:

      a.      Connection time and date;

      b.      Disconnect time and date;

2

Subject to Protective Order

    c.    The IP address that was used when the user connected to the service;

    d.    Source and destination of any e-mail messages sent from or received by the account, and the date, time, and length of the message;

    e.    Any address to which e-mail was or is to be forwarded from the account or e-mail address; and

    f.    Any e-mail address that is a secondary e-mail contact for the account or for which the account serves as a secondary e-mail contact.

**III.   Records and Data to Be Seized by Law Enforcement Personnel**

A.    Evidence, fruits, or instrumentalities of violation of 18 U.S.C. § 1503(a) (Influencing or Injuring Officer or Juror Generally), 208 (Acts Affecting a Personal Financial Interest), 1341, 1343, and 1346 (Honest Services Mail and Wire Fraud) involving Robert Lustyik or Michael Taylor since January 1, 2009, including, without limitation, information relating to:

    1.    All communications between or among Robert Lustyik, Michael Taylor, including Taylor's business e-mail addresses, and Johannes "Hannes" Thaler;

    2.    All records pertaining to any business relationship between or among Robert Lustyik, Michael Taylor, and Johannes "Hannes" Thaler;

Subject to Protective Order

US00121453

3. All records or communications consisting of or pertaining to Robert Lustyik's contact with Michael Taylor's business or business associates, including Johannes "Hannes" Thaler;

4. All records or communications consisting of or pertaining to Robert Lustyik's contact with individuals concerning the investigation of Michael Taylor and/or AISC;

5. All records or communications pertaining to Michael Taylor providing Robert Lustyik or Johannes "Hannes" Thaler with anything of value;

6. The identity of the person or persons who have owned or operated the aisc01@aol.com e-mail account or any associated e-mail accounts;

7. The existence and identity of any co-conspirators;

8. The travel or whereabouts of the person or persons who have owned or operated the aisc01@aol.com e-mail account or any associated e-mail accounts;

9. The identity, location, and ownership of any computers used to access this e-mail account;

10. Other e-mail or Internet accounts providing Internet access or remote data storage for Taylor or any associated e-mail accounts; and

11. The existence or location of paper print-outs of any data from any of the above.

B. All of the subscriber and transactional records described in Sections II(B).

4