# EXHIBIT N

AO 106 (Rev. 04/10) Application for a Search Warrant

# UNITED STATES DISTRICT COURT

for the

District of Massachusetts

| | |
|---|---|
| In the Matter of the Search of<br>*(Briefly describe the property to be searched<br>or identify the person by name and address)*<br><br>Imaged copy of a Dell Inspiron Laptop computer,<br>model N5040, serial number 1CJ2LP1 | )<br>)<br>)<br>)<br>) |

Case No. 12-mj-6226

## APPLICATION FOR A SEARCH WARRANT

I, a federal law enforcement officer or an attorney for the government, request a search warrant and state under penalty of perjury that I have reason to believe that on the following person or property *(identify the person or describe the property to be searched and give its location):*

imaged copy of a Dell Inspiron Laptop computer, model N5040, serial number 1CJ2LP1.

located in the _____ District of ___Massachusetts___ , there is now concealed *(identify the person or describe the property to be seized)*:

evidence, fruits, or instrumentalities of violations of Title 18, United States Code, as more fully described in Attachment B, incorporated by reference as if fully set out herein.

The basis for the search under Fed. R. Crim. P. 41(c) is *(check one or more):*

☑ evidence of a crime;

☑ contraband, fruits of crime, or other items illegally possessed;

☑ property designed for use, intended for use, or used in committing a crime;

❑ a person to be arrested or a person who is unlawfully restrained.

The search is related to a violation of:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 371 | Conspiracy |
| 18 U.S.C. §§ 1343 & 1346 | Honest Services Wire Fraud |
| 18 U.S.C. §§ 1503(a) &1505 | Obstruction of Justice & Obstruction of Proceeding Before Dept. or Agency |

The application is based on these facts:

see attached Affidavit of Special Agent Kerwin John in Support of an Application for Search Warrant.

☑ Continued on the attached sheet.

❑ Delayed notice of _____ days (give exact ending date if more than 30 days: _____ ) is requested
under 18 U.S.C. § 3103a, the basis of which is set forth on the attached sheet.

*Applicant's signature*

DOJ-OIG Special Agent Kerwin John

*Printed name and title*

Sworn to before me and signed in my presence.

Date: **Oct 18, 2012**

*Judge's signature*

City and state: Boston, MA

U.S. Magistrate Judge Leo T. Sorokin

*Printed name and title*

| Print | Save As... | Attach | Reset |
|---|---|---|---|

**AFFIDAVIT OF SPECIAL AGENT KIRWIN JOHN
IN SUPPORT OF AN APPLICATION FOR A SEARCH WARRANT**

I, Kerwin John, being first duly sworn, hereby depose and state as follows:

**INTRODUCTION AND AGENT BACKGROUND**

1.       I am a Special Agent with the Department of Justice (DOJ), Office of the

Inspector General (OIG) and I am assigned to the New York Field Office.  I have been employed

with DOJ-OIG since May 2005 and was appointed as a Special Agent since September 2008.  In

such capacity I have been involved in investigations of criminal and administrative misconduct

by DOJ personnel, including employees of the Federal Bureau of Investigation (FBI), as well as

allegations of waste, fraud, and abuse regarding DOJ personnel and programs.  I have received

training in many subject areas, including public corruption and financial crimes.  I have also

conducted and/or assisted in investigations involving abuse of position and obstruction of justice

by federal law enforcement personnel and others.  I am familiar with the facts and circumstances

set forth below from my personal participation in the investigation including my review of

records and reports of other law enforcement officers involved in the investigation.

2.       I am currently investigating former FBI Special Agent Robert Lustyik, Jr., who

was assigned to a counterintelligence squad in the FBI's New York Division, for attempting to

influence the investigation by federal law enforcement officers and prosecutors in the District

of Utah of allegations of theft of federal funds, wire fraud and money laundering involving

Michael Taylor, an individual with whom Lustyik has a personal business relationship.

3.       On September 17, 2012, an amended criminal complaint was filed in the

District of Utah against Taylor charging him with 18 U.S.C. § 371 (Conspiracy); 18 U.S.C.

§§ 1343, 1346 (Honest Services Wire Fraud); 18 U.S.C. § 1503(a) (Obstruction of Justice); 18

Subject to Protective Order

U.S.C. § 1505 (Obstruction of Proceeding before Department or Agency); and 18 U.S.C. § 2 (Aiding and Abetting).  A Second Amended Complaint was filed against Taylor and Lustyik on September 28, 2012.  A copy of the Second Amended Complaint and the supporting affidavit is attached as Exhibit 1 and incorporated by reference.  Person Two in Exhibit 1 is Johannes Thaler.

4.      The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested warrants and does not set forth all of my knowledge about this matter.

## IDENTIFICATION OF THE ITEMS TO BE EXAMINED

5.      This affidavit is made in support of search warrants for:

a.      The first item to be searched is an imaged copy of a Verizon Wireless cellular telephone bearing serial number 9330160020 ("Device One").  The image of the Verizon Wireless phone is hereinafter referred to as "Image One."

b.      The second item to be searched is an imaged copy of a Dell Inspiron Laptop computer, model N5040, serial number 1CJ2LP1 ("Device Two").  The image of the Dell Inspiron Laptop is hereinafter referred to as "Image Two."

6.      The Images of the devices are currently in the custody of Department of Homeland Security, Immigration and Customs Enforcement, Homeland Security Investigations (HSI) office in Boston, Massachusetts.

7.      The applied-for warrants would authorize the forensic examination of the Images for the purpose of identifying electronically stored data particularly described in Attachment B.

2

                                    US00121496

## ITEMS TO BE SEIZED

8.      The items to be seized from Image One and Image Two, described in Attachment B, are evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. §§ 1343, 1346 (Honest Services Wire Fraud); 18 U.S.C. § 1503(a) (Obstruction of Justice); and 18 U.S.C. § 1505 (Obstruction of Proceeding before Department or Agency) involving Robert Lustyik, Michael Taylor or Johannes Thaler since January 1, 2010, including, without limitation, information relating to:

a.      All communications between or among Michael Taylor, Robert Lustyik, Michael Feldman, and Johannes Thaler;

b.      All records pertaining to any business relationship between or among Robert Lustyik, Michael Taylor, Michael Feldman, and Johannes Thaler;

c.      All records or communications consisting of or pertaining to Robert Lustyik's contact with Michael Taylor's business or business associates, including Johannes Thaler and Michael Feldman;

d.      All records or communications consisting of or pertaining to Robert Lustyik's contact with individuals concerning the investigation of Michael Taylor and/or AISC;

e.      All records or communications pertaining to Michael Taylor directly or indirectly providing Robert Lustyik or Johannes "Hannes" Thaler with anything of value;

f.      The existence and identity of any co-conspirators;

g.      The travel or whereabouts of the person or persons who have owned or operated the Devices; and

3

US00121497

h.  Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

## PROBABLE CAUSE

9.  Device One is the primary phone used by defendant Michael Taylor.  As set out in Exhibit 1, Taylor has been involved in an on-going conspiracy to obstruct a criminal prosecution of him and his company for contract fraud.

10.  Device Two is a laptop that belongs to Taylor.

11.  The images of the Devices are currently in the lawful possession of HSI.  They came into HSI's possession in the following way:  As set out in Exhibit 1, Taylor has been the subject of an investigation in the District of Utah for contracting fraud.  Taylor departed the United States for Lebanon on July 4, 2012.  HSI Special Agent Shaun Helt, a case agent on the Utah investigation, asked that a border search be done of Taylor when and if he returned to the United States.  On September 8, 2012, Taylor returned to the United States through Logan International Airport in Boston, Massachusetts, where he was detained by Customs and Border Protection (CBP) and a border search was conducted by CBP and HSI.   The search included the cellular telephone and laptop, described above.  HSI forensic computer technicians mirrored the cellular telephone and laptop, creating Image One and Image Two, and returned the devices to Taylor.  Therefore, while HSI might already have all necessary authority to examine the images, I seek this additional warrant out of an abundance of caution to be certain that an examination of the images will comply with the Fourth Amendment and other applicable laws.

4

US00121498

12.     At the time Device Two was seized from Taylor, he provided the password. Device One was not password protected.

13.     During the course of the investigation, we have learned that Taylor has routinely used Device One to contact Lustyik and Thaler.  Data obtained from Thaler's iPhone searched pursuant to a search warrant issued in the District of Connecticut, indicates that Taylor was using Device One to contact his co-conspirators.  Data obtained from Thaler's iPhone revealed a total of 8 telephone calls between Thaler's iPhone and Device One between August 21 and September 1, 2012.  Data obtained from Lustyik's personal Blackberry searched pursuant to a search warrant issued in the Southern District of New York indicates that Taylor was using Device One up until September 7, 2012, to communicate with Lustyik.

14.     Device One, the Verizon wireless telephone that was seized from Taylor at the border and whose image is identified herein as Image One, was returned to Taylor after it was imaged.  A Verizon wireless telephone was seized by me incident to Taylor's arrest on September 18, 2012, that used the same telephone number but was a different physical phone. As a result the data on Image One was not available to law enforcement as a result of the search conducted on the cellular phone seized from Taylor at the time of his arrest.

15.     As set out in the amended complaint, Exhibit 1, Taylor routinely emailed Thaler and Lustyik, including during the time when he was outside the United States and in possession of Device Two (the laptop) prior to returning on September 8, 2012.  Specifically, paragraphs 106-12 detail emails sent by or received by Taylor to and from his co-conspirators while he was outside the United States.

5

Subject to Protective Order

16.     Pursuant to a search warrant, DOJ-OIG searched Johannes Thaler's iPhone.

The following are text messages between Taylor's co-conspirators on September 8 and 9,

2012, following the seizure of Taylor's Devices by HSI:

> Thaler: MT just called. He's back home. Customs grabbed his phone and laptop.
> He wants you to call him on his sons
>
> Lustyik:  Great. Now I go to jail too
>
> Thaler: U gonna call?
>
> Lustyik:  I'm so fcuked. I told him not to travel w electronics
> Lustyik;  Plus he was skyping the deal tonite !!! N now he doesn't have his
> fcuking laptop
>
> Thaler:  I'm sure he has something at home he can use
>
> Lustyik:  It has all the relevant #s on it. He fcuked up
>
> Thaler:  I would think Ric [a reference to a DEA agent Taylor has been working
> with] has the info also
> Thaler: Is this deal still going to happen or are we done?
>
> Lustyik:  I don't know. Seems to still be happening. I meet w head of DEA
> tomorrow so I will know. MT mightve gotten me jammed up n sent to jail so he
> better come thru
>
> Thaler:  That would really suck
>
> Lustyik:  He really fcuked up.
> Lustyik:  You might have to save me and testify that only you r doing business w
> him.

Thus, upon finding out about the seizure of Taylor's devices by law enforcement, the initial

reaction by Taylor's co-conspirator, a seasoned FBI Special Agent is that the seizure would

result in his going to jail.

17.     The United States was prepared to search the Devices, including seeking a

warrant to the extent necessary, following the seizure of the Devices at the border.  However, in

response to the border seizure of his Devices by HSI, on September 14, 2012, Taylor sought, via

6

a sealed complaint, a temporary restraining order (TRO) in the District of Utah seeking to prevent law enforcement from searching the Devices. A TRO was granted the same day, restraining the United States from searching the Devices. On September 24, 2012, the United States moved to dismiss the TRO on the grounds that the Court lacked subject matter jurisdiction and that Taylor had failed to state a claim for which relief can be granted, including trying to enjoin a criminal investigation. Taylor filed no opposition to this motion. On October 9, 2012, the TRO action against the United States was dismissed on the basis that the Court had no subject matter jurisdiction. However, the United States Attorney's Office was not notified that the order was issued until October 15, 2012.

## TECHNICAL TERMS

18.     Based on my training and experience, I use the following technical terms to convey the following meanings:

   a. Wireless telephone: A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals. These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones. A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone. In addition to enabling voice communications, wireless telephones offer a broad range of capabilities. These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing

7

dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b.  Digital camera:  A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film.  Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader.  Removable storage media include various types of flash memory cards or miniature hard drives.  Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet.  An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination.  Most Internet service providers control a range of IP addresses.  Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

8

Subject to Protective Order

d.  Internet: The Internet is a global network of computers and other electronic devices that communicate with each other.  Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

**ELECTRONIC STORAGE AND FORENSIC ANALYSIS**

19.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time.  Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device.  This information can sometimes be recovered with forensics tools.

20.   Based on my training, experience, and research, I know that there is probable cause to believe that things that were once stored on Device Two may still be stored on Image Two, for at least the following reasons:

a.  Based on my knowledge, training, and experience, I know that computer files or remnants of such files can be recovered months or even years after they have been downloaded onto a storage medium, deleted, or viewed via the Internet. Electronic files downloaded to a storage medium can be stored for years at little or no cost.  Even when files have been deleted, they can be recovered months or years later using forensic tools.  This is so because when a person "deletes" a file on a computer, the data contained in the file does not actually disappear; rather, that data remains on the storage medium until it is overwritten by new data.

b.  Therefore, deleted files, or remnants of deleted files, may reside in free space or slack space—that is, in space on the storage medium that is not currently being

9

used by an active file—for long periods of time before they are overwritten.  In addition, a computer's operating system may also keep a record of deleted data in a "swap" or "recovery" file.

c.  Wholly apart from user-generated files, computer storage media—in particular, computers' internal hard drives—contain electronic evidence of how a computer has been used, what it has been used for, and who has used it.  To give a few examples, this forensic evidence can take the form of operating system configurations, artifacts from operating system or application operation, file system data structures, and virtual memory "swap" or paging files.  Computer users typically do not erase or delete this evidence, because special software is typically required for that task.  However, it is technically possible to delete this information.

d.  Similarly, files that have been viewed via the Internet are sometimes automatically downloaded into a temporary Internet directory or "cache."

21.      Based on my training and experience, I know that Device One has capabilities that allow it to serve as a wireless telephone and digital camera.  In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

22.      *Forensic evidence*.  As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrant, but also forensic evidence that establishes how the Devices were used, the purpose of its use, who used it, and when.  There is probable cause to believe that this forensic electronic evidence might be on the Images of the Devices because:

10

US00121504

a. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file). Virtual memory paging systems can leave traces of information on the storage medium that show what tasks and processes were recently active. Web browsers, e-mail programs, and chat programs store configuration information on the storage medium that can reveal information such as online nicknames and passwords. Operating systems can record additional information, such as the attachment of peripherals, the attachment of USB flash storage devices or other external storage media, and the times the computer was in use. Computer file systems can record information about the dates files were created and the sequence in which they were created.

b. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

c. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

d. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is

11

Subject to Protective Order

US00121505

evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves.  Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

e.   Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

23.   *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the Images consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the Images to human inspection in order to determine whether it is evidence described by the warrant.  Some or all of the examination may take place outside the District of Massachusetts.

24.   *Manner of execution.*  Because this warrant seeks only permission to examine Images already in law enforcement's possession, the execution of this warrant does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrant at any time in the day or night.

## TAINT REVIEW

25.   To ensure that no attorney-client, attorney work product or other privileged material is improperly revealed to investigators and prosecutors as the result of this search, a taint review process has been established.  Specifically, the seized data will be searched for references to attorneys known or believed to represent Taylor.  Any documents or other data that

12

references such attorneys will be segregated for review by an attorney with the Department of Justice uninvolved in any of the criminal investigations or prosecutions of Taylor.  That attorney will review the segregated material for privilege.  Any items that are not privileged among the segregated material will be forwarded to investigators and prosecutors.  Any items that are determined to be privileged will remain segregated and kept from investigators and prosecutors.

## CONCLUSION

26.      I submit that this affidavit supports probable cause for search warrants authorizing the examination of the Images described in Attachment A to seek the items described in Attachment B.


Kerwin John
Special Agent
Department of Justice, Office of Inspector General


Subscribed and sworn to before me
on October 17, 2012.

LEO T. SOROKIN
UNITED STATES MAGISTRATE JUDGE

13

US00121507

## ATTACHMENT A

The property to be searched is:

a.      An imaged copy of a Verizon Wireless cellular telephone bearing serial number 9330160020.

b.      An imaged copy of a Dell Inspiron Laptop computer, model N5040, serial number 1CJ2LP1.

Subject to Protective Order

**ATTACHMENT B**

The items to be seized are evidence, fruits, or instrumentalities of violations of 18 U.S.C. § 371 (Conspiracy); 18 U.S.C. §§ 1343, 1346 (Honest Services Wire Fraud); 18 U.S.C. § 1503(a) (Obstruction of Justice); and 18 U.S.C. § 1505 (Obstruction of Proceeding before Department or Agency) involving Robert Lustyik, Michael Taylor or Johannes Thaler since January 1, 2010, including, without limitation, information relating to:

a.    All communications between or among Michael Taylor, Robert Lustyik, Michael Feldman, and Johannes Thaler;

b.    All records pertaining to any business relationship between or among Robert Lustyik, Michael Taylor, Michael Feldman, and Johannes Thaler;

c.    All records or communications consisting of or pertaining to Robert Lustyik's contact with Michael Taylor's business or business associates, including Johannes Thaler and Michael Feldman;

d.    All records or communications consisting of or pertaining to Robert Lustyik's contact with individuals concerning the investigation of Michael Taylor and/or AISC;

e.    All records or communications pertaining to Michael Taylor directly or indirectly providing Robert Lustyik or Johannes "Hannes" Thaler with anything of value;

f.    The existence and identity of any co-conspirators;

g.    The travel or whereabouts of the person or persons who have owned or operated the Devices; and

h.    Evidence of user attribution showing who used or owned the Devices at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history.

Subject to Protective Order



**AFFIDAVIT OF SPECIAL AGENT THOMAS M. HOPKINS**
**IN SUPPORT OF SECOND AMENDED CRIMINAL COMPLAINT**

I, Thomas M. Hopkins, being first duly sworn, hereby depose and state as follows:

1.       I am a Special Agent of the Department of Justice, Office of the Inspector General (DOJ-OIG), and am assigned to the New York Field Office, Boston, Massachusetts Area Office. I have been employed as a Special Agent with DOJ-OIG since July 1997.  Before joining the DOJ-OIG, I was employed as a Criminal Investigator with the Inspection Division of the Internal Revenue Service from March 1988 through July 1997, and as a Special Agent with the Department of State's Bureau of Diplomatic Security from November 1985 through March 1988. My duties with the DOJ-OIG include investigating allegations of criminal and administrative misconduct by DOJ personnel, including Federal Bureau of Investigation (FBI) employees, as well as allegations of waste, fraud, and abuse regarding DOJ personnel and programs.  I have received training in many subject areas, including public corruption and financial crimes.  I have also conducted and/or assisted in investigations involving abuse of position and obstruction of justice by federal law enforcement personnel and others.

2.       I am currently investigating allegations that Michael L. Taylor (TAYLOR) and others have committed and conspired to commit obstruction of justice and bribery of a federal law enforcement official in an effort to impede and derail an investigation into TAYLOR and others by federal law enforcement officers and prosecutors in the District of Utah, all in violation of 18 U.S.C. §§ 371 (Conspiracy); 1343 and 1346 (Honest Services Wire Fraud); 1503(a) (Obstruction of the Due Administration of Justice); 1505 (Obstruction of Proceedings before Departments, Agencies, and Committees); and 2.

1

3.     The facts in this affidavit come from my personal observations and review of records, my training and experience, and information obtained from other agents and witnesses. This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and does not set forth all of my knowledge about this matter.

4.     TAYLOR, who I know is a former member of the United States Army Special Forces, has previously operated as a law enforcement source for the Bureau of Alcohol, Tobacco, Firearms and Explosives (ATF).  I know this because in 2004, I assisted in a DOJ-OIG investigation in which TAYLOR admitted that, while working as a paid undercover source for the ATF in the 1990s, he provided a $44,000 no-interest loan as well as between $6,000 and $10,000 toward the purchase of a Harley Davidson motorcycle to an ATF agent with whom TAYLOR was working.  The activity resulted in the premature retirement of the ATF agent, who wrongfully accepted and failed to report the receipt of the loan and gift from TAYLOR.

5.     TAYLOR was and is the principal of American International Security Corporation (AISC), a company located in Boston, Massachusetts, that offers a range of security-related and other services to private and public clients both domestically and internationally.  In 2007, AISC was awarded a contract by the Department of Defense (DoD) to provide training and related services to Afghan army special forces in Afghanistan ("the DoD Contract").  AISC eventually received approximately $54 million in payments on this contract.

6.     From May 1988 until his retirement on or about September 20, 2012, Robert G. Lustyik, Jr. (LUSTYIK) was a Special Agent with the Federal Bureau of Investigation (FBI).  At all times relevant to this investigation until his retirement date, LUSTYIK was assigned to counterintelligence work in the New York Division, White Plains Resident Agency.

2

7.    Person Two was a personal friend of LUSTYIK, having attended the same high school at approximately the same time period as LUSTYIK.

8.    From at least June 2011 until the present, TAYLOR, LUSTYIK, and PERSON TWO had a business relationship involving the pursuit of contracts for (among other things) the provision of security services, electric power, and other goods and services in South Sudan, Iraq, and the United Arab Emirates (UAE), among other locations in the Middle East, Africa, and elsewhere.

9.    Beginning in or about mid-2010, the Defense Criminal Investigative Service (DCIS), the Internal Revenue Service (IRS), and the Department of Homeland Security were conducting an investigation into TAYLOR, AISC, and others regarding allegations of fraud in the award and performance of the DoD Contract, and of money laundering to conceal the source and ownership of the proceeds derived from the scheme.  From in or about October 2010 until on or about August 22, 2012, a Federal Grand Jury in the District of Utah was also investigating the same allegations. (Hereinafter, I will refer to these investigations collectively as "the Utah investigation").

10.    On or about September 13, 2011, the United States initiated a civil action seeking to forfeit certain assets and real property of TAYLOR, AISC, and others that were derived from or otherwise traceable to the DoD Contract fraud scheme.  As a result of that complaint, more than five million dollars in AISC's bank account was seized by the Government on September 8, 2011, alerting TAYLOR to the Utah investigation.  The complaint in the civil forfeiture action was unsealed on February 17, 2012.

**SUMMARY OF THE SCHEME**

3

11.     The emails and other evidence described in the paragraphs below lay out a criminal scheme in which TAYLOR, who was the target of a federal investigation, offered and promised things of value to an active-duty FBI agent, LUSTYIK, in exchange for official actions that both men hoped would block the investigation and shield TAYLOR from criminal liability.

12.     TAYLOR, recognizing that his business prospects and his livelihood would be imperiled if not destroyed by a criminal indictment of him and his company, cultivated LUSTYIK, an active-duty FBI agent, by promising a huge and continuing stream of things of value if LUSTYIK helped TAYLOR avoid prosecution in connection with the Utah investigation.

13.     As described in detail below, the things that TAYLOR provided or promised to LUSTYIK included, but were not limited to, a $200,000 cash payment; money purportedly intended to defray the medical expenses of LUSTYIK's minor child; and a share in the proceeds of (1) an anticipated contract to provide security for a 10 million barrel oilfield in South Sudan; (2) an anticipated power-generation contract in Iraq worth more than $50 million; and (3) an anticipated contract for security and surveillance equipment and services in the UAE worth more than $100 million.

14.     In exchange, LUSTYIK, while serving as an FBI agent, took and purported to take a series of official actions intended to frustrate, delay, or altogether quash the Utah investigation of TAYLOR.  As LUSTYIK told TAYLOR, their goal was to "ruin their offensive," "blow the doors off this thing," and "crush the Utah case agent."

15.     TAYLOR and LUSTYIK planned and took a variety of steps to achieve their goal, including (but not limited to) opening TAYLOR as an FBI confidential human source; attempting to persuade other current and former FBI and DOJ officials to intervene on

4

Subject to Protective Order

US00121513

TAYLOR's behalf; attempting to interview fact witnesses in the Utah investigation; interviewing associates of TAYLOR as potential character witnesses in the Utah case; and contacting the agents and prosecutors in Utah in an effort to dissuade them from charging TAYLOR or convince them to enlist TAYLOR's assistance as a cooperating witness.[1]

16.    At every step of the scheme, TAYLOR offered and promised LUSTYIK and PERSON TWO enormous financial gains, and tied those promises of financial gain directly to the success of their efforts to thwart the Utah investigation.  Throughout the scheme PERSON TWO, who was aware of the Utah investigation, served as a conduit between TAYLOR and LUSTYIK for both information and things of value, ensuring (among other things) that TAYLOR was kept informed of LUSTYIK's needs, and LUSTYIK of TAYLOR's.  It was important, as TAYLOR wrote in an email to PERSON TWO, to "make sure …[LUSTYIK] know[s]" about the financial benefits they stood to gain.  And he repeatedly reminded them that he could "make you guys more money than you can believe … provided they don't think I'm a bad guy and put me in jail."

17.    LUSTYIK, with assistance from TAYLOR and PERSON TWO, took steps to conceal the full extent of his relationship with TAYLOR from both the FBI and the federal law enforcement officers conducting the Utah investigation, including using his personal email address to communicate with TAYLOR regarding both their business relationship and LUSTYIK's efforts to influence the Utah investigation, using coded language in emails, establishing and utilizing "dead drop" email accounts to communicate with TAYLOR and

---

[1]   I have no evidence that any other personnel at the FBI or the DOJ were aware of or involved in the corrupt scheme with TAYLOR.

Subject to Protective Order

US00121514

PERSON TWO, and making material misrepresentations or omissions regarding the existence of the business relationship between him, TAYLOR, and PERSON TWO.

18.     In furtherance of the conspiracy, and in order to accomplish its objects, TAYLOR, LUSTYIK, PERSON TWO, and others committed overt acts in the District of Utah and elsewhere, including but not limited to the following:

19.     In or about June 2011, TAYLOR, LUSTYIK, PERSON TWO, and others were attempting to secure a contract with the government of an African nation to provide security and paramilitary training and services.

20.     On or about June 19, 2011, LUSTYIK sent an email from his personal email account[2] to a representative of the African nation regarding the proposed contract under the heading "Our Deal."   In the email, LUSTYIK told the representative that "[w]e are willing to provide you with 2 to 3 percent of any contract signed.   For example, 2 percent of a 20 million contract is 200 thousand US dollars."   When the representative of the African nation strongly and immediately rebuffed LUSTYIK's proposal, LUSTYIK replied that he had been "led to believe that [the representative] [was] a private businessman working closely with" the government of the African nation, and apologized for his "unpleasant mistake."

21.     Two days later, on or about June 21, 2012, LUSTYIK again used his personal email account to contact the representative of the African nation in an effort to set up a meeting between the representative and TAYLOR to discuss the contract.   When LUSTYIK received a response from an assistant in the representative's office asking him to call to schedule the meeting, he forwarded the email to TAYLOR, writing:  "And we r in!!!  I think you should call n

---

[2]   Except where otherwise noted herein, every email from LUSTYIK described herein was sent from LUSTYIK's personal email account.

6

     US00121515

say you are my boss and you are looking to meet [the representative] asap."   TAYLOR and LUSTYIK then exchanged emails about how to proceed, with TAYLOR eventually preparing a letter proposal to present to the representative and sending it to LUSTYIK.   LUSTYIK in turn forwarded the letter proposal to PERSON TWO, saying "Here is letter, Price is lowered a lot to get in door."   PERSON TWO responded that he was unable to open the attachment, and asked LUSTYIK, "what's the #."   LUSTYIK replied, "Ur all about #s…2.5 mill.  We should get ten percent now."  I have seen no evidence that, TAYLOR, LUSTYIK, and PERSON TWO received a contract from the African nation.  As will be described in greater detail below, TAYLOR, LUSTYIK, and PERSON TWO continued their business relationship.

22.    On or about October 15, 2011, two days after the District Court in Utah denied AISC's hardship petition seeking the return of the monies that had been seized on September 8, 2011, from its bank account, TAYLOR sent an email to LUSTYIK with the subject: "Investigators."  The body of the email consisted of the names and agency affiliations of two of the Utah-based federal agents conducting the investigation into the DoD Contract.  TAYLOR also provided LUSTYIK the contact information for one of the two agents.

23.    Pursuant to their business relationship, on or about October 25, 2011, LUSTYIK and PERSON TWO exchanged emails regarding an oil deal they were pursuing with TAYLOR in South Sudan.  In the midst of this discussion, LUSTYIK informed PERSON TWO that "taylor is looking for a way to take care of me so I said u n I r working together on these and he said he will be sending money your way."  When PERSON TWO inquired about the amount of money TAYLOR was going to be sending, LUSTYIK responded, "He has 2 contracts they r about to sign.  I think he might want to give us 200 gs," an apparent reference to $200,000.  PERSON TWO responded in turn: "ok. Let me know what you want me to do with it."

Subject to Protective Order

US00121516

24.     That same day, on or about October 25, 2011, TAYLOR wrote to LUSTYIK and asked to speak with him by phone when LUSTYIK was free.  TAYLOR concluded the email with what appears to be a coded reference to the Utah investigation:  "I'm wondering if the other guy is trying to cook something up.  Not your buddy's outfit, the other that we are checking to see what authority they have.  He is the guy that is trying to make everything fit his theory."  I understand TAYLOR's use of the words "the other guy" to be a reference to one of the Utah-based investigators.

25.     The next day, on or about October 26, 2011, TAYLOR received an email from a business associate of his under the heading "Sudan deal."  In the email, the business associate informed TAYLOR that his company was "willing to commit to your security company as we discussed … and are also willing to offer a carried interest of 3%.  The carried interest could be very valuable as a for example a 10 Million barrel oilfield (small by Sudan standards) would yield a payout at 3% of somewhere around $10-15 Million depending on oil prices."  TAYLOR forwarded this email to LUSTYIK with the comment, "FYI."

26.     Two days later, on or about October 28, 2011, LUSTYIK communicated by email with a fellow FBI agent in San Diego.  LUSTYIK instructed this agent to "forward everything you got [on TAYLOR] to me."  LUSTYIK further indicated that he would "get Taylor open," presumably as an FBI confidential human source.

27.     Approximately one week later, on or about November 4, 2011, TAYLOR wrote to LUSTYIK, under the heading "Update," and told him, among other things, about the progress of the South Sudan oil deal they were pursuing and about another potential oil deal for the "KRG," the Kurdistan Regional Government in Iraq.  TAYLOR then asked, in apparent reference to the Utah investigation, if LUSTYIK had "hear[d] back from [his, i.e., LUSTYIK's]

8

Subject to Protective Order

US00121517

buddy" because TAYLOR had "heard news that was not great as to which way they are leaning." LUSTYIK responded: "Really? I will call u tonite. There is no way they indict you." Later in the exchange, LUSTYIK wrote to TAYLOR that "[w]e gotta figure out a way to lock down the SS gig," which I understand to be a reference to the South Sudan oil deal they were pursuing with PERSON TWO at that time.

28.     On or about November 8, 2011, TAYLOR sent LUSTYIK an email with the subject heading "Attorney." TAYLOR began the email by saying that he "wish[ed] I could do something to help you with the family," and then gave LUSTYIK the name of an individual TAYLOR identified as his lawyer, and suggested that "[i]t may be helpful to have [TAYLOR's lawyer] speak with you and the AUSA." TAYLOR also noted that "I told [TAYLOR's lawyer] I'm working with your company on a few projects." (Based upon my review of the evidence, TAYLOR's use of the word "company" is a reference to the FBI.) After once again asking for LUSTYIK's assistance with the Utah investigation, TAYLOR concluded the email by telling LUSTYIK that he had received a call from a business associate whom he described as "the oil guy we met in DC with the SS embassy." I understand "SS" to be a reference to South Sudan, and more broadly to the oil deal TAYLOR, LUSTYIK, and PERSON TWO were pursuing there. TAYLOR informed LUSTYIK that the business associate had informed him about a significant business opportunity with a large oil company operating in Iraq. TAYLOR ended the email by writing, "that could be a real good revenue project and fun to work."

29.     On or about November 22, 2011, TAYLOR emailed LUSTYIK an "Update" regarding a conference call his lawyers had the previous day with "the forfeiture lawyers," an apparent reference to the civil forfeiture action filed against him in Utah. TAYLOR described

9

                                                                 US00121518

the discussions his lawyers had with the government, but underscored to LUSTYIK that "these are not the criminal lawyers, they do forfeiture."

30.    Four days later, on or about November 26, 2011, TAYLOR emailed LUSTYIK regarding what appears to be a voicemail message left by LUSTYIK for TAYLOR: "I received the message when I was in the movie with my wife.  That was a great message, let's hope it happens and we will have the best Christmas ever.  Tell your children to be ready to be spoiled by Uncle Mike.  Waiting for the call in the AM."

31.    The next day, on or about November 27, 2011, TAYLOR emailed PERSON TWO to tell him that "[LUSTYIK] called me earlier this evening.  He say [sic] this thing I'm dealing with is over and I should have my funds returned before X-Mas."

32.    On or about December 2, 2011, however, TAYLOR sent an email to LUSTYIK indicating that "this thing [he was] dealing with" was not over.  In that email, TAYLOR told LUSTYIK that there was "[n]othing new on my end which is why I worry."  He further expressed concern that LUSTYIK is "so busy that you can't make all the things happen that you want and you don't have help."  After apologizing for being "such a nag and a pain," TAYLOR ended the email by noting that "I have so much to do with [PERSON TWO] that I'd love to be able to focus on which also makes me feel like garbage."  Based upon my review of the email and other evidence, TAYLOR is here referring to the business opportunities he was then pursuing with PERSON TWO and LUSTYIK—and strongly suggesting that LUSTYIK's assistance with the Utah investigation would allow TAYLOR to ensure the success of those business pursuits, with attendant financial benefits to TAYLOR, LUSTYIK, and PERSON TWO.

10

Subject to Protective Order

33.     On or about December 20, 2011, TAYLOR wrote a series of emails to PERSON

TWO about brokering the sale of 4 million barrels of oil per month from Iraq to a Chinese

refinery.  TAYLOR further instructed PERSON TWO to "[m]ake sure you let the big guy know

about this.  We want him retired in 6 months to work with us.  I'll make you guys more money

than you can believe. [P]rovided they don't think I'm a bad guy and put me in jail."  PERSON

TWO responded, "The big guy knows," before forwarding TAYLOR's email to LUSTYIK and

telling him to "[c]heck this out."   In these and other emails, TAYLOR and PERSON TWO

regularly refer to LUSTYIK as "the big guy."

34.     Nine days later, on or about December 29, 2011, PERSON TWO and TAYLOR

exchanged emails regarding an oil deal they were pursuing.  After receiving information about

the deal forwarded to him by TAYLOR, PERSON TWO responded by asking TAYLOR, "Of

[sic] this actually happens.  Which it looks like it will.  What is our commission?  I need to get

the big guy motivated and maybe put in for early retirement."  TAYLOR wrote back, "I don't

know yet.  I expect to know in a few days."

35.     On or about January 10, 2012, TAYLOR emailed LUSTYIK regarding apparent

efforts by TAYLOR's counsel to settle the civil forfeiture case in Utah.  LUSTYIK wrote back

that he "cannot believe you are even forced to ask me my opinion on this."   LUSTYIK

continued:  "All I can do is pledge my promise that I will bust my ass to make sure any future

business endeavor erases this from your memory," and added, "I will not stop in my attempt to

sway this your way."

36.     Two days later, on or about January 12, 2012, LUSTYIK caused an employee at

the FBI's Washington, D.C., operations center to run TAYLOR's name in a law enforcement

database that tracks (among other things) the border entry and exit information for individuals

11

Subject to Protective Order                                                  US00121520

traveling to and from the United States.  The attempt to run TAYLOR's name in that database was unsuccessful, however, because the individual conducting the search was not authorized to have access to the records the search identified.

37.     In or about February 2012, one of the Utah-based federal agents investigating the alleged DoD Contract fraud involving TAYLOR contacted LUSTYIK regarding the law enforcement database query.  LUSTYIK told the agent, in substance, "How are you going to indict Taylor? He is a real patriot and we are trying to work him as a source."  In subsequent conversations with the same agent, LUSTYIK expressed doubt that TAYLOR had committed a crime and, when asked whether he was trying to shut down the Utah investigation, replied negatively but then suggested that it might come to that.  At no time did LUSTYIK tell any investigator or prosecutor from Utah about his business and financial relationship with TAYLOR.

38.     On or about February 2 and 3, 2012, LUSTYIK and another FBI agent conducted interviews in Boston, Massachusetts, of a former Assistant United States Attorney who had prosecuted a drug smuggling case in the late 1980s and early 1990s, during which TAYLOR testified as a key government witness, as well as a retired FBI agent who worked on that same case.  On or about January 30, 2012, three days before the interview of the former AUSA, TAYLOR emailed LUSTYIK the former AUSA's name and contact information, identifying him as "the prosecutor that was in charge of the case I worked on."

39.     These interviews were the first of what would become a series of six interviews conducted by LUSTYIK and another FBI agent over the ensuing two months.  Each of the interviews involved now-retired federal law enforcement agents or prosecutors who had dealings with TAYLOR over the course of their careers.  Based on my review of the email and other

12

US00121521

evidence, TAYLOR helped LUSTYIK to identify individuals LUSTYIK should interview, and their purpose in doing so was to create reports that could be used to dissuade Utah from indicting TAYLOR.  The email and other evidence indicates that TAYLOR and LUSTYIK believed that if they generated enough of these interview reports, the Utah-based agents and prosecutors would be forced to drop their case.

40.     The FBI 302 reports of these interviews are overwhelmingly positive and they appear to exclude significant derogatory information about TAYLOR.   To cite just two examples:  First, email evidence indicates that as of October 2011, LUSTYIK was aware that an FBI field office "hate[d]" AISC, and yet LUSTYIK did not interview anyone in that office about TAYLOR and the only reference to his relationship with the office is a passing reference by one of the retired agents that he had heard that the office had wrongly "blackballed" TAYLOR. Second, despite the fact that many of the interviews include extensive discussion of TAYLOR's prior work as an undercover source on a significant drug-trafficking investigation, LUSTYIK did not mention in the interview reports or in his conversations with the Utah investigators the fact that TAYLOR had made improper cash payments to one of the agents involved in that investigation.

41.     A week after the interviews discussed above, on or about February 9, 2012, TAYLOR sent LUSTYIK an email with the subject heading "Dead Drop," in which he wrote, "Our site is AISC04@aol.com and the password is Giants2012."   LUSTYIK forwarded TAYLOR's email to PERSON TWO, saying "Here it is.  See even we can teach him new tricks." PERSON TWO responded, "I'm surprised he let you use Giants," to which LUSTYIK replied, "It was based on the bet."

13

US00121522

42.    Over the ensuing weeks, TAYLOR, LUSTYIK, and PERSON TWO used the AISC04@aol.com account (and other accounts they subsequently set up) as "dead drops," password-protected email accounts into which all three could and did exchange documents and information related to their common business activity, efforts to impede the Utah investigation of TAYLOR, and other matters—and do so without having to send each other emails to and from their personal email accounts.  In my experience, this is accomplished by sharing the username and password with all the participants, who then sign into the account and post as draft emails messages or information that they wish to share with the others, without having to send those emails.  The individual who left the draft message in the "dead drop" then notifies the other individuals that there is a message in the "dead drop" and they, in turn, log in, read the message, and delete it.  By not sending the emails to and from each other, the participants in a "dead drop" account thereby avoid leaving a record of their activity.

43.    Based upon my review of the evidence and my training and experience, I understand the discussion in the emails above about the use of the word "Giants" as the password (or a part thereof) to the "dead drop" account to be a reference to the professional football team of the same name.  LUSTYIK, a native and resident of the New York suburbs, apparently was a fan of the New York Giants, while TAYLOR, a native of Massachusetts, was a fan of the New England Patriots, commonly referred to as the "Pats."  Based on the email and other evidence I have reviewed, I understand that the names of these teams were used by TAYLOR, LUSTYIK, and PERSON TWO as the basis for the passwords to the "dead drop" account, and as a shorthand reference to the account itself.  Thus, when TAYLOR, LUSTYIK, or PERSON TWO wanted to alert each other that there was material in the "dead drop" to be reviewed, they would send emails to each other with the simple message "Go Giants" or "Go Pats."

14

Subject to Protective Order

44.     Three days after the establishment of the "dead drop" account, on or about February 12, 2012, TAYLOR sent LUSTYIK a lengthy email regarding what he described, in apparent reference to the Utah investigation, as "the collateral damage that investigation is doing."   That same day, LUSTYIK forwarded TAYLOR's email to PERSON TWO, writing simply, "We better hurry up."   Based upon their business relationship and my review of the emails and other evidence, I understand that LUSTYIK was expressing to PERSON TWO the need to "hurry up" and secure those business opportunities that they could in the short term in the event that the Utah investigation—and the threat it posed to their business dealings with TAYLOR—could not be derailed.

45.     On or about February 15, 2012, TAYLOR and LUSTYIK again corresponded over email about the Utah investigation, with LUSTYIK providing TAYLOR an update on the steps he was taking, including having someone he referred to as "our ausa" contact "their ausa" to say that "it has to go away now."   TAYLOR responded, "Let me know when I can breath [sic] and sleep.   I hope ausa tells him," before adding, in apparent reference to their business relationship:   "We have so much work to do, meaning fun work that I want to focus on and will get you out of there."   LUSTYIK in turn assured TAYLOR that he was "trying my best."

46.     On or about March 1, 2012, LUSTYIK and another FBI agent participated in a video teleconference with two of the prosecutors overseeing the Utah investigation to discuss the FBI's use of TAYLOR as a confidential human source.   In the course of the teleconference, LUSTYIK offered to provide the Utah prosecutors with the FBI 302 reports documenting his interviews of former federal law enforcement officials who had worked with TAYLOR in the past.

15

47.     On or about March 5, 2012, TAYLOR, who evidence indicates was in Beirut, Lebanon, at the time, exchanged emails with PERSON TWO regarding an impending trip by PERSON TWO and two other associates to Lebanon.  The purpose of the trip was to meet up with TAYLOR, and together with him attend a series of meetings with Lebanese government officials and others regarding business opportunities, including a contract for the construction of a wind-turbine farm to generate electric power.  In the midst of their discussion of the business opportunities, PERSON TWO wrote to TAYLOR: "A while back, you mentioned something about helping out the big guy with his [minor child's] doctor bills.  I would love to surprise him with a little something upon my return.  He's been busting his ass trying to clear up your predicament and I think it's just a matter of time because they really have no case from what he's been telling me."

48.     That same day, on or about March 5, 2012, LUSTYIK wrote to TAYLOR to tell him that he, LUSTYIK, would be interviewing a second former AUSA about TAYLOR, and to inquire of TAYLOR whether there was "any specific direction I should take" during the interview.

49.     Two days later, on or about March 7, 2012, LUSTYIK wrote to TAYLOR that he had spoken with the second former AUSA about TAYLOR, and would be conducting two more interviews of retired agents the next day before traveling to "HQ on Monday."  (Based upon my experience and my review of the emails, I believe "HQ" refers to FBI headquarters in Washington.)  LUSTYIK also told TAYLOR that he had heard from one of the case agents on the Utah investigation earlier that day: "Seems we sent them into a reevaluation of M[ichael] T[aylor]… based on our [video teleconference].  We have now developed enough to get our HQ to intervene and that's what I will be selling Monday."  "Sounds fantastic," TAYLOR (who was

16

US00121525

in Lebanon at the time) wrote in response the very next day. TAYLOR added that "[t]hings here are going very well, [and] we are sitting on some major revenue generators, the wind turbines are a great idea here and are being received in the most positive light as well as in Iraq."

50.     On or about March 8 and 9, 2012, LUSTYIK and another FBI agent interviewed, respectively, a retired Customs agent and a retired FBI agent regarding their past dealings with TAYLOR.

51.     On March 9, 2012, LUSTYIK emailed TAYLOR regarding the interviews he and another agent had just conducted that day and the day before, telling TAYLOR that "[w]e got some huge info that will make it impossible for utah [sic] to indict u now." When TAYLOR asked what the information was, LUSTYIK responded, "Go Giants!!!" an apparent reference to the password for the "dead drop" email account that had earlier been established to allow TAYLOR, LUSTYIK, and PERSON TWO to exchange information without having to send emails to one another.

52.     On or about March 12, 2012, LUSTYIK exchanged emails with PERSON TWO, apparently about an earlier conversation they had had offline. "I got excited," wrote LUSTYIK. "When you said money tomorrow I thought u meant from what ur doing or for [LUSTYIK's minor child]? Damn." PERSON TWO responded: "That is what I said. From M[ichael] T[aylor]. Don't know how much." PERSON TWO was in Lebanon at the time attending meetings with TAYLOR and others in pursuit of various business opportunities.

53.     On or about March 16, 2012, LUSTYIK and another FBI agent met a second time with the second former AUSA to discuss TAYLOR, a meeting that was subsequently memorialized in an FBI 302.

17

Subject to Protective Order                                                                                          US00121526

54.     On or about March 18, 2012, TAYLOR sent LUSTYIK two emails, each containing links to the website of an investment firm based in UAE.  In the first email, TAYLOR informed LUSTYIK that "[t]his guy wants to do business with us in a major way."   In the second, TAYLOR described the individual who "wants to business with us" as "third in line to the crown," and provided a link to the individual's professional biography on the investment firm website.

55.     On or about March 19, 2012, TAYLOR (who was still in Lebanon at the time) had several email exchanges with LUSTYIK and PERSON TWO.   In the first exchange, TAYLOR related to LUSTYIK a conversation his attorney had with one of the prosecutors on the Utah investigation that TAYLOR apparently perceived as a positive development. LUSTYIK responded, "See Buddy.  I'm not BSing you.  When our ausa spoke w/ [the Utah AUSA] he began to panic because the woman at main Justice [sic] read my interviews . . . EVEN if they did indict . . . they lose huge now."  Later in the exchange, LUSTYIK added (referring to the Utah investigation) that he was "all over this" and that he had the Utah investigators "going in all kinds of directions now."

56.     Also on or about March 19, 2012, TAYLOR sent LUSTYIK a second email, this one under the heading "Pay," in which he wrote: "By the way-hurry up and pay me if you can, this is expensive here."   Based on my training and experience, and my review of the emails and other evidence, TAYLOR is here referring to the payments that the FBI customarily makes to confidential human sources for their services.  LUSTYIK responded:  "Yes sir.  I'm trying." TAYLOR, in turn, wrote back:  "Funny, I know you are.  Very soon money will not be an issue, ever again for any of us."   LUSTYIK concluded the exchange by writing:  "Your lips to God's

Subject to Protective Order                                                                                          US00121527

ears.  Although I can retire in 2 months I believe it is in our best interests if I hang on until we have the Utah situation handled and the Network flowing correctly.  It's the right thing to do."

57.     Also on or about March 19, 2012, TAYLOR sent PERSON TWO an email with the subject "Basra Electric," an apparent reference to a power-generation contract TAYLOR was pursuing on their behalf in Basra, Iraq:  "We will produce 150MW of power for the contract.  They will pay us 7 cents per KW….Our cost is 64 to 74 million per year.  The revenue is about $134 million per year.  (Double check my numbers) …. That leaves a bunch of money after costs."  PERSON TWO responded to TAYLOR by noting that "[i]f our cost is $64mil, our net will be $58 mil per year."  TAYLOR concluded the exchange by writing "Not bad for a start up company."  TAYLOR copied LUSTYIK on that final email to PERSON TWO.

58.     The next day, on or about March 20, 2012, in an effort to convince the Utah prosecutors not to charge TAYLOR, LUSTYIK sent to one of the AUSAs handling the Utah investigation copies of four FBI 302s documenting the first four interviews he and another agent had conducted regarding TAYLOR.

59.     On or about March 24, 2012, TAYLOR sent LUSTYIK and PERSON TWO (who had just returned from Lebanon) an email outlining a series of oil and power-generation projects that he was pursuing on their behalf.  LUSTYIK wrote back: "Hey sounds like you guys really busted ur humps.  I'm excited to step into my next phase of life.  [PERSON TWO] really enjoyed himself.  I cannot thank you enough for including him in all of the meetings and festivities.  I am forever grateful to you…."  TAYLOR responded to LUSTYIK by noting that "[PERSON TWO] is one of us" and further describing the numerous projects they were pursuing.  The exchange continued the next day, when LUSTYIK wrote back to TAYLOR: "Hey Mike.  [PERSON TWO] told me what you did for [LUSTYIK's minor child] and I just

19

Subject to Protective Order

US00121528

wanted to thank you.  Unfortunately, he ended up needing to utilize the funds to cover expenses for the trip [to Lebanon] . . . . He was devastated to tell me and promised to fulfill the generosity. I just want you to know that I cannot thank you enough for the loan and I hope we can make enough money together that one day we are coaching football on the same sideline."

60.     The next day, on or about March 25, 2012, TAYLOR forwarded LUSTYIK and PERSON TWO an email from a business associate of TAYLOR's regarding a power-generation contract that TAYLOR, LUSTYIK, and PERSON TWO were pursuing in Iraq, adding the comment, "Looks like we may have found this."   LUSTYIK responded to TAYLOR by expressing hope that their business relationship would "pay off," and once again thanking TAYLOR for the "gesture of kindness," an apparent reference to TAYLOR's reference to the medical bills of LUSTYIK's minor child.  LUSTYIK added that "[i]t is kind of sad that after 24 years of government service all I have to show for it is a couple of boxes of awards somewhere in my basement and the bitter taste of knowing that 'the Bureau' is a family … a dysfunctional one. …. But…life moves on and I thank God every day that we are all friends."  "Watch and see," TAYLOR wrote back to LUSTYIK, "what we do together and how much fun we will have as we work, most important, watch how much joy and opportunity we give to our families." After some discussion about the Utah investigation, LUSTYIK concluded the exchange by writing to TAYLOR, "We r ready to blast Utah on 2 sides."

61.     On or about March 27, 2012, one of the federal agents handling the Utah investigation sent LUSTYIK an email to LUSTYIK's official FBI email account, thanking him for "sending us those interview reports on Taylor," and asked him to provide a list of any other individuals LUSTYIK had spoken to or interviewed regarding TAYLOR.  The agent further asked if anyone LUSTYIK had spoken to regarding TAYLOR had provided negative

20

Subject to Protective Order

US00121529

information on TAYLOR.  In response to the first request, LUSTYIK provided two additional names, the second former AUSA (who had been interviewed on March 16, 2012) and another retired FBI agent who had yet to be interviewed.  In response to the Utah agent's second question, LUSTYIK added that "[w]e haven't hit anyone yet who says anything negative about the guy."  He also informed the agent that TAYLOR had provided information that led to the capture of a significant terrorist, but did not specify which one.  It bears emphasis that LUSTYIK's statement to the Utah federal agent about not finding anyone who said anything negative about TAYLOR is contradicted by LUSTYIK's own emails.  For example, in October 2011 LUSTYIK had an email exchange with another FBI agent about TAYLOR and AISC in which he wrote, among other things, that a particular field office of the FBI "hates AISC" and that they "trash them up n down."  While LUSTYIK did not elaborate on the reason for the the field office's antipathy to AISC (TAYLOR's company), his statement clearly indicates he was aware of at least some negative information about TAYLOR and AISC.

62.    The next day, on or about March 28, 2012, LUSTYIK wrote to TAYLOR to inform him about the email he received from the agent in Utah:  "As an investigator, this [email] shows me that he is in panic mode.  He can't re-interview the people we've spoken with, and there really isn't anyone left for him to speak with. … What he is telling me is that he must have been chastised by [the prosecutor] because now they have NO witness list. … Your lawyer should press the issue and ask them to 'reconsider' your offer to cooperate. … [Another FBI agent] and I are meeting with [another retired FBI agent] next week.  He is your only 'critic' but I've led him to where we need him to be. … Now [he] is on the 'nice list.'"

63.    On or about April 3, 2012, LUSTYIK wrote an email to one of the agents handling the Utah investigation and informed him that he, LUSTYIK, was "sticking those other

21

US00121530

interviews in a fed ex box to you." LUSTYIK added that "[n]o lie MT has given us some huge info lately that basically stopped an assassination," but again did not elaborate. LUSTYIK closed his email by asking "Can't we just get him to be a C[ooperating]W[itness] for you guys??"

64.     That same day, on or about April 3, 2012, LUSTYIK and TAYLOR exchanged emails about a variety of topics, including the new website for Company A, a recently-formed entity under the auspices of which TAYLOR, LUSTYIK, PERSON TWO and others were pursuing various energy and power-generation projects around the Middle East, Europe, and elsewhere. In response to an email from LUSTYIK alerting him that the new website was up, TAYLOR wrote, "Oh yeh [sic], that's much better. Now we look like a real company—Thanks! We are cranking on this end. It would take me a day face to face with you to explain all of the projects we have in the fire right now. So, I'll just wait until we cash the first one and then explain." LUSTYIK forwarded TAYLOR's email to PERSON TWO, who responded (only to LUSTYIK): "There's so much going on. We just need to lock something down."

65.     On or about April 4, 2012, TAYLOR wrote to LUSTYIK to inform him that TAYLOR's attorney was trying to reach LUSTYIK to discuss a conversation the attorney had had with one of the prosecutors on the Utah investigation: "Based on what [the attorney] told me, [the prosecutor] needs to hear it from your USA [United States Attorney] or someone up high." TAYLOR concluded his email by telling LUSTYIK that he was "writing a proposal for the 150MW deal that we are going to sign in the next 3 to 4 days," a reference to a power-generation contract with the Iraq Ministry of Electricity that TAYLOR, LUSTYIK, and PERSON TWO were pursuing at the time. LUSTYIK then forwarded TAYLOR's email to

22

Subject to Protective Order                                                    US00121531

PERSON TWO with a two word message—"Read bottom"—drawing his attention to the proposal TAYLOR claimed to be working on.

66.    Two days later, on or about April 6, 2012, TAYLOR emailed LUSTYIK to tell him that TAYLOR's attorney had called one of the Utah AUSAs and the AUSA had "told [TAYLOR's attorney] I know there will be agents testifying on his behalf but they will be limited in what they can say. This statement tells me he is moving forward and didn't get the message your guys are sending him.  [TAYLOR's attorney] thinks it's going to have to come from up higher."  In response, LUSTYIK told TAYLOR "[w]e are continuing up the ladder.  If [the AUSA] wants to lose the case, he is a fool.  But I am getting every person possible to call him."

67.    LUSTYIK emailed TAYLOR again the next day and told him "[a]s far as Utah goes … I will not stop clearing you until I hear from [the prosecutor] myself that its done. I am committed to bringing my organization back to a place where the Truth mattered and we had Balls.  I present this to management as either u help or u r gutless.  No quit in me and I continue to fight for you."  TAYLOR expressed his gratitude to LUSTYIK, who then purported that "[w]e are at the higher HQ level now w an Assistant to the Director going to be briefed this coming week.  Can only go one step higher …."

68.    Five days later, on or about April 12, 2012, PERSON TWO and TAYLOR exchanged emails regarding a potential power-generation contract with the Iraq Ministry of Energy.  In the midst of this discussion, TAYLOR asked after the health of LUSTYIK's minor child, and PERSON TWO replied that the child was doing well.  PERSON TWO added that LUSTYIK was "worried about the debt that he's carrying for all the surgeries [on his child].  I

23

keep telling him that that will all be taken care of very shortly, once one of these deals gets done."  TAYLOR then assured PERSON TWO that "[w]e will get those bills squared away."

69.     On or about April 13, 2012, LUSTYIK emailed TAYLOR to update him on LUSTYIK's efforts on TAYLOR's behalf.  LUSTYIK assured TAYLOR that his efforts were continuing:  "I got it covered Boss.  No worries.  Just keeping u in the loop.  Now hurry the FCC [sic] up n get the MOE to sign a contract so I can get putts [sic] this FCC [sic] up place!!! (Kidding).  (Kind of)".  I understand that LUSTYIK is here referring to the power-generation contract that he, TAYLOR, and PERSON TWO were pursuing from the Iraq Ministry of Energy.  Moreover, I believe that "FCC" is a euphemism or shorthand for an expletive, while "putts" is a mistyping of the word "outta."  Thus, LUSTYIK was urging TAYLOR to get the Ministry of Energy contract signed so that LUSTYIK would have the ability, financially, to "get outta" his current employment with the FBI.

70.     On or about April 17, 2012, TAYLOR sent an email to LUSTYIK with the heading "No Word-What's Going On?"  LUSTYIK wrote back to TAYLOR:  "My SAC [Special Agent in Charge, generally the head of an FBI field office] is meeting w us at 130pm today and then calling [one of the prosecutors in Utah].  [An AUSA in another district] is waiting until that happens before he calls. . . .  Tomorrow I'm in Mass with [another retired FBI agent].  Even his 'negative' is good.  So sending that to Utah also."  Later in the exchange, after LUSTYIK described the Utah agents and prosecutors as "a joke," TAYLOR wrote that he does not "want to get indicted because people are a joke," to which LUSTYIK responded:  "The rate this is going, I will be indicted way before u ever are!!"  TAYLOR told LUSTYIK not to "talk like that [because] you scare the hell out of me.  We just want this to end once and for all and

24

US00121533

then leave the rest to me. You will be on vacation here [TAYLOR was in Lebanon at the time] with the family, me, [PERSON TWO] and [another friend]."

71.     In the email in the paragraph above, when LUSTYIK referred to the AUSA in another district, from my review of emails I understood him to be referring to a plan he had concocted to convince an AUSA in the state of New York to call the Utah AUSAs and tell them to shut down their investigation into TAYLOR. Because the United States Attorneys' Offices have jurisdiction over the geographical judicial district in which they are located, this would have been an unusual step. I have no evidence that such as call was made.

72.     As promised, the next day, on or about April 18, 2012, LUSTYIK and another FBI agent interviewed yet another retired FBI agent from Boston with whom TAYLOR had previously worked. Following the interview, LUSTYIK emailed TAYLOR about the interview, telling him: "[w]e got it all worked out. He truly is a huge fan of yours. I can't wait to send this to Utah. They have NO ONE. This was a huge day."

73.     On or about April 20, 2012, LUSTYIK emailed TAYLOR and, after telling him about several calls that were purportedly being made on TAYLOR's behalf (presumably to the Utah prosecutors and agents), asked: "Can you think of anyone else that we can neutralize with an interview? Someone who they might try to use against you that we could go speak with that would basically ruin their offensive? Where are Harris n Young?" At that time, Christopher Harris and David Young were, like TAYLOR, targets of the Utah investigation into the DoD Contract fraud scheme—and both were subsequently indicted along with TAYLOR and AISC on August 22, 2012. TAYLOR replied to LUSTYIK's request the same day, saying that "Young is in Tampa, Florida and you can get to him," but that he, TAYLOR, had heard that "Harris … is in Vietnam." After providing LUSTYIK with Young's contact information, TAYLOR went on to

25

US00121534

identify four additional fact witnesses in the Utah investigation for LUSTYIK to interview. LUSTYIK then wrote back to TAYLOR:  "I am going to interview Young and just blow the doors off of this thing."  I understand this to mean that LUSTYIK, with TAYLOR's assistance, was going to locate and interview another target of the Utah investigation—an individual who has now been charged along with TAYLOR—with the express purpose of undermining the case against TAYLOR.

74.     The next day, on or about April 21, 2012, LUSTYIK and TAYLOR again exchanged emails about LUSTYIK's efforts on TAYLOR's behalf.  In this midst of this exchange, TAYLOR wrote: "I can't begin to tell you how much I appreciate you!  But I sure can show you when it's done and over with.  Thank you!"

75.     On or about April 27, 2012, TAYLOR sent LUSTYIK an email with the subject heading "Bank Document," in which he wrote, simply, "Bank guarantee for 950 million euros." Attached to the email was a scanned document purporting to be a bank guarantee for 950 million euros issued on March 8, 2012.  Later that day, TAYLOR sent an apparent follow-up email to LUSTYIK regarding "this matter that I sent you the documents on."   TAYLOR continued: "They [sic] people say their funds are clean however I don't know that as fact.  I'm trying to determine where the source is from and as soon as I do I'll let you know.  If clean then we make good money-if it's other than clear we need to do something about it."

76.     LUSTYIK then forwarded TAYLOR's initial email and the attachment to PERSON TWO, who asked, "What is this?"   LUSTYIK answered, "Our money for projects." When PERSON TWO asked LUSTYIK how he knew the purported bank guarantee sent to him by TAYLOR was "for our projects," LUSTYIK responded, "I'm guessing."

26

Subject to Protective Order                                                                                              US00121535

77.     Later that same day, on or about April 27, 2012, TAYLOR emailed LUSTYIK to ask if he knew "what if any [sic] has been done/agreed to" regarding the Utah investigation. LUSTYIK responded that he would know more by the following Monday when he claimed he would be "briefing the adic then."  ADIC is an abbreviation for Assistant Director in Charge, the title of the highest ranking FBI official in the New York Field Office.  TAYLOR then responded: "Do you believe it's really over? I think it's a good sign if you are allowed to pay me."  When LUSTYIK indicated his agreement with TAYLOR's assessment, TAYLOR, who was in Lebanon at the time, wrote: "It's 03:00 AM here, do you know how happy you have made me right now."

78.     On or about May 6, 2012, LUSTYIK sent to one of the prosecutors handling the Utah investigation copies of the FBI 302s documenting the final two interviews he and another agent had conducted regarding TAYLOR's past work with law enforcement.

79.     On or about May 7, 2012, TAYLOR sent an email to LUSTYIK informing him that TAYLOR "just got a call about a project we have been trying to get since last October and the call was to inform me that we got the contract in the Congo.  It's not a big one yet, about 10 men, but they said it's a test to see how we do.  If we do good then they will give us others in Africa which I think the next one is in Nigeria … It's a straight protection detail for their company executives who will be working in the Congo."

80.     LUSTYIK forwarded TAYLOR's email to PERSON TWO that same day.  In response PERSON TWO wrote, "I checked the box.  I see why MT is concerned."  (TAYLOR had previously asked LUSTYIK and PERSON TWO to check who had been accessing the AISC04@aol.com account the three men had been using as a "dead drop.")  PERSON TWO informed LUSTYIK that he had identified suspicious logins to the account.  In the ensuing

27

Subject to Protective Order

exchange, LUSTYIK told PERSON TWO "I don't want it to be Utah or someone affiliated with them" accessing the "dead drop."  He also expressed relief that, since it appeared that whoever was accessing the account was doing so using an iPhone, the source of the suspicious logins "[c]an't be the Bureau then," a clear reference to the FBI.  At the conclusion of the exchange, LUSTYIK suggested to PERSON TWO that they "make [a] whole new box n password n u call n pass it to him [TAYLOR]. N me."

81.    Five days later, on or about Mary 12, 2012, PERSON TWO emailed TAYLOR to tell him that the "big guy," referring to LUSTYIK, "says we have to change boxes.  I will print out what's in the current one and get it to him.  I will call you with new box tomorrow."

82.    Two days later, on or about May 14, 2012, PERSON TWO sent LUSTYIK the following five-word email:  "BME2012.  Same mail service. Horesmen80," which I understand to be the name and password for the new dead drop email account.

83.    That same day, TAYLOR and LUSTYIK again exchanged messages regarding the latter's efforts on TAYLOR's behalf.  TAYLOR urged LUSTYIK to stay in touch because "[i]t's about the only thing keeping me alive at this point, the hope of you making something happen with main justice."  Later in the exchange, LUSTYIK appeared to suggest one way in which the testimony of Witness One, an AISC employee, who TAYLOR and LUSTYIK learned had received a subpoena to testify before the Grand Jury in Utah, should proceed in a fashion helpful to TAYLOR:  "A lot of fight left either way Mike.  [Witness One] is allowed to say whatever [Witness One] wants.  They ask a question…[Witness One] starts every answer w. 'No way he did this.'"  In response, TAYLOR told LUSTYIK that one of the former AUSAs that LUSTYIK had interviewed regarding TAYLOR was going to represent Witness One:  "I just spoke with him and he thinks that's the best way to help me."  LUSTYIK concurred, responding:

28

US00121537

"That's a HUGE idea!!!"  TAYLOR then provided LUSTYIK with the former AUSA's current contact information, and LUSTYIK indicated his desire to speak with the former AUSA.

84.     On or about May 16, 2012, LUSTYIK received an email in his official FBI email account from his supervisor informing him that "we cannot have any unauthorized communications [with TAYLOR], period."

85.     Approximately one week later, on or about May 23, 2012, TAYLOR emailed LUSTYIK and said that the former AUSA representing Witness One (the AISC employee) was trying to contact LUSTYIK.  Despite his FBI supervisor's clear prohibition of unauthorized communications with TAYLOR, LUSTYIK responded to TAYLOR's email with additional information about his efforts on TAYLOR's behalf.  TAYLOR then responded, noting, among other things, the business prospects that he was still pursuing for himself, LUSTYIK, and PERSON TWO.  Specifically, he told LUSTYIK that the UAE was prepared to enter into contracts for security-related products and services that would yield "a total of $90 million per year."

86.     On or about May 25, 2012, the former AUSA emailed one of the Utah prosecutors to inform him that Witness One would exercise her Fifth Amendment rights and refuse to testify before the grand jury absent a grant of immunity.  TAYLOR received a copy of this email, and forwarded it to LUSTYIK that same day.

87.     On or about May 28, 2012, TAYLOR had an email exchange with PERSON TWO regarding their business pursuits, in the midst of which TAYLOR informed PERSON TWO that "[t]his project in the UAE is going to be big and it's real.  A partnership with the Crowned Prince is not a bad thing." PERSON TWO responded that "[t]he UAE sounds great,"

29

US00121538

adding that "[i]t seems there are a lot of possibilities coming up shortly.  It would be nice if something happened soon.  It would be a great 50th birthday present for the big guy."

88.    On or about May 29, 2012, TAYLOR emailed LUSTYIK to ask "Am I alive?" and to inform him that he had "to be in Utah on 21 June so I'll be back a few days before then." LUSTYIK responded that "[a]ll is good" and "[e]veryone is on board," before suggesting that TAYLOR "plan on a stop over in NY [be]fore Utah.  Hotel on Uncle Sam."  TAYLOR then informed LUSTYIK that his email was the "[b]est words I have heard in so long," and that he, TAYLOR, would "drive down and see you" because he "could use some doe [sic] to pay some medical bills."  When LUSTYIK promised to "have some [doe] waiting," and inquired about TAYLOR's medical expenses, TAYLOR informed him that "[m]y medical is for a sweet little [child]."

89.    On or about May 31, 2012, PERSON TWO told TAYLOR that "[t]he big guy says that the AUSA in Utah is officially interviewing him next week.  So, he needs your contact with him to be with me only (he doesn't check the box anyway – I give him the roster changes), until his return. He says it's a good thing, his being called there, but, he wants to stay cautious." I have no evidence that the interview described by PERSON TWO ever took place.  I understand the words "box" and "roster changes" to be coded references to their use of the "dead drop" email account: when new information was posted to the "dead drop," the three men would describe the updated information as a "roster change," continuing with the football-related language they used to refer to the dead drop account

90.    On or about June 3, 2012, despite PERSON TWO's admonition three days before, LUSTYIK wrote to TAYLOR regarding the former's efforts on TAYLOR's behalf:  "So we have got them running scared now.  Their investigators are panicked about our calls n meeting w

30

US00121539

[FBI General Counsel's Office] and main [sic] Justice." LUSTYIK implicitly referred to the interviews he had conducted on TAYLOR's behalf, writing: "[t]his will come down to the egos of the ausas. They won't want to lose. So since they will have 15 special agents as witnesses they will fold." TAYLOR then expressed his hope that LUSTYIK was correct, and added that he'd "really like to end this and rake in some serious doe on these projects here which is starting to happen."

91.    In the same email exchange, TAYLOR also informed LUSTYIK that he had a meeting in the UAE "with the crowned prince of Abu Dhabi who happens to be the Min of Defense as well. They say that are interesting in contracting with us for the Buckeye and perhaps wanting 3 systems. That is 90 million a year and about 35 million for us. They also say they want a partnership to sell it to the Gulf Countries which I have no problem with." The "Buckeye" that TAYLOR was seeking to sell to the UAE is an imaging system that can be mounted on a fixed-wing aircraft to allow its user to acquire ultra-high-resolution imagery for intelligence, surveillance, reconnaissance, and mapping activities. In fact, TAYLOR had purchased roundtrip airfare for himself to travel from Beirut to Abu Dhabi, for a 3-day trip, June 9 to 12, 2012.

92.    The next day, on or about June 4, 2012, as if to underscore the importance of his meeting in the UAE, TAYLOR excerpted the language quoted above from his June 3, 2012 email to LUSTYIK and re-sent it to LUSTYIK with a one line message: "$35 million profit per year is ours on this."

93.    On or about June 6, 2012, LUSTYIK sent a text message to one of the agents handling the Utah investigation telling him that LUSTYIK was going to FBI headquarters in Washington, D.C., to talk to his "Unit Chief before he goes to Main Justice" regarding

31

US00121540

TAYLOR.  LUSTYIK further told the agent that he "heard you are looking to indict right before July 5th" and "[i]f that is correct please let me know and I will tell our U[nit]C[hief] and the meeting will switch gears to accommodate."  The Utah agent replied to LUSTYIK's text by reminding him that the information he sought was protected by the rules governing grand jury secrecy.

94.     On or about June 7, 2012, LUSTYIK sent a follow-up text to one of the Utah agents informing him that "[e]ven though HQ is hot on this.  The speed (or lack there of) is controlled by me.  All I ask is for guidance."

95.     On or about June 7 and 8, 2012, LUSTYIK and another FBI agent traveled to FBI headquarters in Washington, D.C. to participate in meetings at which TAYLOR's suitability as a source was assessed.

96.     On or about June 11, 2012, TAYLOR sent an email to LUSTYIK and PERSON TWO under the subject heading "Signed Deal in UAE" and attaching what TAYLOR describes as "the signed deal with the company of the crowned [sic] prince in Abu Dhabi" for the Buckeye surveillance and security system.  TAYLOR added that he had just landed back in Beirut from his trip to the UAE, and had "received a call that their Minister of Defense wants 6 systems.  Each system sells for $30 million, each system give [sic] us $20 million profit.  If I sold if [sic] for less they would not be excited about it."

97.     Later that same day, TAYLOR sent an email to LUSTYIK informing him that "[my lawyer] just called me and said they are going to indict me on 28 June.  He doesn't know what for but that's what is happening."  Almost simultaneously, TAYLOR sent an email to PERSON TWO to tell him the same news, while adding, "I guess that's the end of life for me."

32

US00121541

98.    That same day, on or about June 11, 2012, one of the agents handling the Utah investigation spoke with LUSTYIK by telephone.  LUSTYIK provided the agent with some information about how he came to know TAYLOR and said that the FBI would likely not stand in the way of an indictment of TAYLOR because "that Bureau is long gone," or words to that effect.  LUSTYIK nevertheless opined that TAYLOR would likely call current and former FBI agents, including LUSTYIK himself, as character witnesses.

99.    Also on or about June 12, 2012, LUSTYIK sent a text message to one of the agents handling the Utah investigation, using his official FBI-issued blackberry device, and told the agent, if TAYLOR were indicted, "[t]he only thing I'm interested in is what kind/how they will handle bail?"  When the agent responded, "currently undetermined, is there any input from your side- I can pass it on- of course the AUSAs have final say", LUSTYIK wrote back (again using his FBI-issued blackberry device): "I just don't even know what to ask for.  We of course want him to be able to continue to assist us, but because its classified and all overseas, I just don't know how we would go about doing this? ... Like normally a guy in this position can 'work off' charges w these other cases.  He is helping us catch a Top Ten Terrorist for which he will most likely get 5 million reward...I guess I should make the check out to Utah?"

100.    On or about June 12, 2012, PERSON TWO emailed TAYLOR to ask whether there was "a time frame for any of the deals we have on the table" because he was "hoping to have a surprise for the big guy [meaning LUSTYIK] on his birthday on the 24th."  TAYLOR responded that "[t]he best one is the Buckeye," and PERSON TWO agreed that it "would be a nice 50th present for" LUSTYIK—adding that LUSTYIK "hasn't mentioned [his minor child's] bills lately, but I know that's weighing on him."  TAYLOR replied that "[w]hen Buckeye hits we will be all set.  Of course provided I'm not in jail."

33

101.    On or about June 21 and 22, 2012, LUSTYIK sent a series of three text messages to one of the agents handling the Utah investigation.  In these messages LUSTYIK informed the Utah agent that LUSTYIK was going to be "meeting w DOD next wed" about TAYLOR and asked the Utah agent to notify his co-case agent, who was an investigator with the DoD. LUSTYIK further stated that the meeting was going to be "in our office in W[hite]P[lains]," would involve six individuals from DoD, and would be "[t]otally operational in nature."   In closing, LUSTYIK added that "[t]hey will be debriefing MT.  Re our mutual joint op."  Given the timing and tone of these messages, and given LUSTYIK's direction that the agent inform his co-case agent who worked at the DoD about this upcoming meeting, I believe this message was an attempt by LUSTYIK to influence one of the case agents by signaling that LUSTYIK was going to speak with individuals within that agent's own department, the DoD, about TAYLOR and the Utah investigation.

102.    On or about June 26, 2012, LUSTYIK emailed TAYLOR that he, LUSTYIK, was "out schmoozing the DOD guys.   They r gonna crush [the DoD case agent on the Utah investigation].  They r going to convince their boss to call [one of the AUSAs handling the Utah investigation]. I will call u right before lunch tomorrow.  I'm gonna keep these guys out all night if I have to."  TAYLOR responded that he "like[d] that they will crush [the Utah case agent]."  I have no evidence that anyone from DoD called any of the AUSAs on the Utah investigation.

103.    The next day, on or about June 27, 2012, TAYLOR emailed LUSTYIK to inform him that TAYLOR "need[ed] to leave for the Buckeye deal on 5 July.  I want to do this before they charge me on 5 Aug so I can stand a chance to battle them."  LUSTYIK responded the next day, urging TAYLOR to "[t]ake [PERSON TWO] with u to UAE.  He is losing his mind." Based upon my review of emails and other evidence, LUSTYIK is referring here to the fact that

34

US00121543

PERSON TWO was under financial stress, at least in part because his business pursuits with LUSTYIK and TAYLOR had yet to come to fruition.

104.    LUSTYIK nevertheless remained confident that their business ventures would soon pan out, as evidenced by an email he sent on or about June 30, 2012, in which he told a friend: "If you haven't heard the rumors....I've made us all stinking rich!!!! So you and I need to discuss what you want to do with like a million dollars I will be giving you by the end of august. For 30 years I've sacrificed to get to this point .... and now [PERSON TWO] and I are days away."

105.    Two days later, on or about July 2, 2012, LUSTYIK sent yet another text to one of the agents handling the Utah investigation.  In it, LUSTYIK wrote that "we r going to be doing another set of interviews" regarding TAYLOR, and asked the agent if the Utah team had interviewed Witness Two.  Witness Two was the individual who helped draft the bid that AISC submitted to win the DoD contract and is therefore an important witness in the Utah investigation.  Moreover, Witness Two was represented by counsel, and had emailed TAYLOR back in May to inform him that Witness Two had been subpoenaed to testify before the Grand Jury in the Utah investigation.

106.    On or about July 22, 2012, TAYLOR (who was in Lebanon at the time) exchanged several emails with PERSON TWO regarding a series of business opportunities TAYLOR was pursuing for LUSTYIK, PERSON TWO, and himself—including the Buckeye contracts in the UAE as well as oil contracts in Iraq.  PERSON TWO then forwarded his exchange with TAYLOR to LUSTYIK with this comment:  "This is what he sent me today.  I don't think he knows for sure when we'll start getting paid.  My best guess would be 2-3 weeks."  LUSTYIK replied:  "I got this.  What I'm saying is, by asking, he will offer," in essence urging

35

Subject to Protective Order

US00121544

PERSON TWO to ask TAYLOR for money in the confidence that TAYLOR would respond positively to any such request.

107.    On or about July 26 and 27, 2012, TAYLOR and LUSTYIK exchanged emails about LUSTYIK's efforts with respect to the Utah investigation.  In the midst of this exchange, TAYLOR noted that "[t]he more time I get over here [in the Middle East] the more business I can get done.  I expect the flood gates to open after Ramadan."

108.    On or about July 31, 2012, TAYLOR emailed LUSTYIK to tell him that "[w]e are about a week or so away from signing 3 large projects worth more than $80 million" and that "I'm trying to get them done before 5 Sept."—the date a tolling agreement TAYLOR had in place with the U.S. Attorney's Office in Utah was due to expire.  Apparently unclear about which contracts TAYLOR was referring to, LUSTYIK forwarded TAYLOR's email to PERSON TWO with a "?" appended to the top of the email.    PERSON TWO told LUSTYIK that TAYLOR was "about to sign the Buckeye deal and the oil drilling deal."  LUSTYIK then asked, "Will we get any money from it?  And when?"  To which PERSON TWO replied, "Hope So." LUSTYIK concluded the exchange by urging PERSON TWO to "ask him" for money:  "Call him.  He will tell you.  He knows we need money.  I said it in an email."

109.    On or about August 5, 2012, LUSTYIK emailed TAYLOR to tell him that he, LUSTYIK, had heard from one of the Utah case agents who, according to LUSTYIK, was "panicked" about the contents of TAYLOR's FBI file and the effect it could have on the Utah case.  LUSTYIK then informed TAYLOR that he was turning down a job in the private sector because taking the job would leave him "out of the loop so….lets hope you are released of this ridiculous burden soon."  After LUSTYIK proposed a plan to "make some quick coin" by brokering gold sales to a friend of LUSTYIK's, TAYLOR responded by telling LUSTYIK that

36

"Quick coin is the easy part of this. Right after Ramadan it all starts rolling for us. 40 drill sites, Oil well service which is starting now and the Buckeye. You will have more coin than you know what to do with. You were wise to turn down [the private sector job]."

110. The next day, on or about August 6, 2012, TAYLOR and LUSTYIK continued to exchange emails about LUSTYIK's proposed gold deal. In the midst of the exchange, LUSTYIK wrote to TAYLOR that he "want[ed] to make good" and that he "cannot thank you enough for all you have done and are doing." TAYLOR responded: "Are you nuts-all you have been trying to do for me. Shame on you, don't you thank me. I just wanted to help our country and get this shit off my back—it's killing my family and me." The exchange concludes with LUSTYIK writing, "Let's just get Utah over with and get stinking rich," to which TAYLOR replied: "Getting stinking rick [sic], we are well on the way with that so I have the ball."

111. On or about August 15, 2012, TAYLOR learned that an additional extension of his tolling agreement with the Utah U.S. Attorney's office would not be forthcoming and he would be indicted on August 22, 2012. That same day, he emailed LUSTYIK to alert him. LUSTYIK responded that he was already "on the other line with" one of the Utah case agents and would get back to TAYLOR after he finished speaking with the agent.

112. The next day, on or about August 16, 2012, LUSTYIK emailed TAYLOR to tell him that "[t]here is a serious disconnect somewhere," that "I've got to call [a supervisory AUSA in the Utah U.S. Attorney's Office]," and that the former AUSA (who was representing AISC employee Witness One) would be "calling the Director" (presumably a reference to the FBI Director). I have no evidence that these calls actually took place.

113. On August 22, 2012, a Federal Grand Jury in the District of Utah returned a 72-count indictment charging TAYLOR, AISC, and others with government procurement fraud,

bribery of a public official, wire fraud, and money- laundering offenses in connection with the DoD Contract.

114.    On September 5, 2012, PERSON TWO asked LUSTYIK how TAYLOR's case looked, an apparent reference to the Utah investigation.  LUSTYIK responded that it "may be moved to NY shortly . . . It'll be dropped then."  When PERSON TWO asked how that would happen, LUSTYIK responded, "[v]alue of info he provides . . . I'm busting my ass to get it done. . ."

115.    Three days later, on September 8, 2012, when TAYLOR returned to the United States from Lebanon, was stopped at the border, and was subjected to a border search of certain of his electronic media, PERSON TWO told LUSTYIK, "[TAYLOR] just called.  He's back home.  Customs grabbed his phone and laptop.  He wants you to call him on his sons number [number provided]."  LUSTYIK responded, "Great.  Now I go to jail too . . . I'm so fcuked.  I told him not to travel w electronics . . ."  PERSON TWO and LUSTYIK then discussed whether TAYLOR would be able to participate in a Skype discussion of a business deal that had been planned for that day, and LUSTYIK stated, "[TAYLOR] mightve gotten me jammed up n sent to jail so he better come thru . . ."  LUSTYIK additionally told PERSON TWO, "You might have to save me and testify that only you r doing business w him."

116.    On September 12, 2012, LUSTYIK asked PERSON TWO, " . . . did u ask M[ichael] T[aylor] about any money coming in?"  PERSON TWO responded, "He's still waiting on deals to close.  It seems everything is on hold."  LUSTYIK asked, "But did u blatantly ask for money?  He wants to give us (me) money for [LUSTYIK's minor child]."  PERSON TWO replied, "I didn't ask for money directly.  I only asked about the deals.  I didn't know he was giving money for [LUSTYIK's minor child]."  LUSTYIK then informed PERSON TWO, "All

38

Subject to Protective Order

US00121547

coded.  I'm trying to get u some breathing room.  [LUSTYIK's minor child] has surgery [date omitted]."   When PERSON TWO later told LUSTYIK he talked to TAYLOR, who didn't mention anything about sending money, LUSTYIK stated, "No worries.  He will."  These emails suggest that repeated references made by the coconspirators to money for the medical bills of LUSTYIK's minor child are, in fact, coded references to corrupt payments by TAYLOR to LUSTYIK and PERSON TWO.

117.   On September 17, 2012, PERSON TWO asked LUSTYIK about TAYLOR's scheduled appearance before this court on September 18, 2012.  LUSTYIK informed PERSON TWO, "He gets arrested . . . Its what happens when ur indicted."  When PERSON TWO asked, "Is that house arrest? He still has to go to trial right?"  LUSTYIK replied, "He will post bail n be free yes."

118.   On September 18, 2012, the day TAYLOR made his initial appearance in this case, LUSTYIK informed PERSON TWO, "I just got suspended and may be arrested today based on helping capt.  Let him know asap !!!"  The Government is in possession of evidence that LUSTYIK and PERSON TWO have referred to TAYLOR as "Captain America."

119.   As a result of my review of both the above-described evidence, as well as other evidence I have obtained from other agents or witnesses, I have probable cause to believe that, from at least October 2011 through the present, in the District of Utah and elsewhere, TAYLOR, LUSTYIK, and PERSON TWO, aided and abetted by each other, committed and conspired to commit offenses against the United States, that is, to:

    a.  directly and indirectly, corruptly give, offer, and promise a thing of value to LUSTYIK, a public official, with intent to influence an official act, that is promising to pay LUSTYIK money in exchange for actions taken by LUSTYIK to impede and

<div align="center">39</div>

US00121548

otherwise obstruct the Utah criminal investigation into TAYLOR, in violation of 18 U.S.C. § 201(b)(1);

b. knowingly and with the intent to defraud, devise and intend to devise a scheme and artifice to defraud and deprive the citizens of the United States and the FBI of their right to the honest and faithful services of LUSTYIK, while he worked for the FBI, through bribery and the concealment of material information, and to use the interstate wires in furtherance, in that LUSTYIK accepted and agreed to accept a stream of things of value from TAYLOR and PERSON TWO, in exchange for a stream of official action by LUSTYIK, in violation of 18 U.S.C. §§ 1343, 1346, and 2; and

c. corruptly influence, obstruct and impede or endeavor to influence, obstruct and impede the due administration of justice in a federal grand jury in the Central Division of the District of Utah by using LUSTYIK's official position as an FBI agent to undermine and block the investigation of Taylor, and to persuade the Utah law enforcement agents and prosecutors not to charge TAYLOR, in violation of 18 U.S.C. §§ 1503(a) and 2; and

d. corruptly influence, obstruct and impede, or endeavor to influence, obstruct and impede, the due and proper administration of the law under which a pending proceeding was being had, namely a federal criminal investigation being jointly conducted by the U.S. Department of Defense, the U.S. Department of Homeland Security, and the Internal Revenue Service, by using, and aiding and abetting the use of, LUSTYIK's official position as an FBI agent to persuade the Utah agents and prosecutors not to charge TAYLOR and by interviewing potential witnesses and

40

-28-2012 FRI 22:21    DOJ OIG BOSTON                     FAX:6177483995         P.001
8/2012  20:02  Remote ID  U.S. Courts - Utah                                  D 1/1

generating reports in an effort to undermine the criminal case against TAYLOR, in

violation of 18 U.S.C. §§ 1505 and 2;

and in furtherance of the conspiracy and to effect the objects of the conspiracy TAYLOR,

LUSTYIK, PERSON TWO, and others committed overt acts in the Central Division of the

District of Utah and elsewhere, as described in this Affidavit.

Respectfully submitted,

Thomas M. Hopkins
Special Agent
United States Department of Justice
Office of the Inspector General

Subscribed and sworn to before me
on September 27, 2012,

UNITED STATES MAGISTRATE JUDGE

41

Subject to Protective Order

US00121550