Daniel Marino (admitted *pro hac vice*)
Tillman J. Finley (admitted *pro hac vice*)
Elyse MacNamara (admitted *pro hac vice*)
MARINO FINLEY PLLC
1100 New York Avenue, NW Suite 700W
Washington, DC  20005
Telephone:  (202) 223-8888
Facsimile:  (877) 239-2146

*Attorneys for Michael Taylor*

---

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH
## CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:12-CR-00502 |
| Plaintiff, | Judge Tena Campbell |
| v. | **REDACTED** |
| DAVID YOUNG, *et al.*, | |
| Defendants. | |
| UNITED STATES OF AMERICA, | Case No. 2:12-CR-00645 |
| Plaintiff, | Judge Tena Campbell |
| v. | **REDACTED** |
| ROBERT G. LUSTYIK, JR.; *et al.*, | |
| Defendants. | |

## SENTENCING MEMORANDUM AND OBJECTIONS TO PRESENTENCE REPORT

Defendant Michael Taylor hereby submits this consolidated Sentencing Memorandum (including objections to the Presentence Reports) in anticipation of his sentencings in the above-captioned cases, both scheduled to take place at 3:00 p.m on Monday, March 30, 2015.

## I.      INTRODUCTION

Michael L. Taylor is many things to many people.  He is a loving father to three young

men, a devoted husband to his beloved wife, and now a caretaker for the only father he has ever

known.  In addition, Mr. Taylor is a proud veteran, an able businessman, and a generous and

supportive employer.  Though important and deeply meaningful to him, Mr. Taylor's family and

work are only part of his deep and enduring impact on the world around him.  As demonstrated

by the plethora of letters the Court has received from many of the individuals who have known

and loved Mr. Taylor,[1] he is a surpassingly generous and community-minded individual.  As a

coach, mentor, colleague, neighbor, and friend Mr. Taylor has influenced the lives of countless

individuals for the better.  Those whose lives have been touched by Mr. Taylor consistently

describe him as honest, caring, loyal, empathetic, and inspiring.  Mr. Taylor's life and

relationships are awash in examples of the kind of love, kindness, and generosity that all of us

aspire to but few of us actually live out.

To be sure, Mr. Taylor is not perfect.  He stands before the Court for sentencing on these

matters as the result of serious failings in judgment regarding his business associations and

activities.  He allowed himself to receive what he should have appreciated was sensitive

information regarding the status and evaluation of proposals for a government contract prior to

the award of the contract, albeit after the proposals had been submitted and with no ultimate

impact on the outcome of the procurement.  And Mr. Taylor then compounded matters by

cooperating with an FBI acquaintance to advocate for him to the investigators and prosecutors

looking into the procurement while incentivizing the agent financially by taking steps to help

---

[1] The collection of letters is being provided to the Court, counsel for the government, and the Probation Officer
under separate cover.  Some of the letters are cited herein by the name of the author, but they are not separately
attached as exhibits to this Memorandum.

him with business projects in which he or his friends were involved and communicating with him regarding Mr. Taylor's own business efforts and the prospect of the agent coming to work for or with Mr. Taylor upon his retirement from the FBI.

Mr. Taylor accepts responsibility for his role in this conduct and well understands that he has no one to blame but himself for the consequences. Those consequences have been devastating. The business Mr. Taylor spent more than 20 years building from scratch lies in ruins, his professional reputation is forever tarnished, and the financial security he had spent so long establishing for his family has been dealt a significant blow. To top it all off, Mr. Taylor spent approximately 14 and a half months (from his arrest in September 2012 until his release in November 27, 2013) in pretrial confinement at local county jails in the Salt Lake City area—a place he had never been before and far from his family in Massachusetts—and another month of home confinement with electronic monitoring.

Since being released in November 2013, Mr. Taylor has complied fully with everything asked of him, including being a model supervisee for the Probation Office in his home district and participating in multiple meetings with the prosecutors in both cases for lengthy debriefings. Mr. Taylor's pleas and cooperation precipitated guilty pleas by the four other individuals charged as co-defendants, each to more charges or more extensive conduct than that to which Mr. Taylor pled. Accordingly, Mr. Taylor has accepted responsibility, provided substantial assistance to the government, and demonstrated his ability and willingness to return to his community as a productive and law-abiding citizen.

Based upon all of the facts and circumstances, we respectfully request that the Court accept the plea agreements in these cases and sentence Mr. Taylor to time served without imposing a fine, restitution, or a period of supervised release.

## II.    PERSONAL BACKGROUND

### A.    Youth and Early Years

Mr. Taylor was born on October 21, 1960 in Staten Island, New York.  Although he never knew his biological father, his step-father, Robert Taylor, adopted him in 1970 when he was 10 years old.  As a child, Mr. Taylor and his family lived in various places, from Arizona to Africa, as Mr. Taylor's step-father was an Army Non-Commissioned Officer.  Robert Taylor served as a career soldier and is now a retired, disabled veteran.  Mr. Taylor grew up with a brother (now deceased) and a sister.  By the time Mr. Taylor was in the eighth grade, the family had settled in Fort Devens, Massachusetts.

### B.    Military Service

Mr. Taylor did not go to college upon graduation from Ayer High School in Massachusetts, but instead followed in his step-father's footsteps and enlisted in the United States Army.  At the time of his original enlistment, Mr. Taylor was the distinguished honor graduate of basic and advanced training.  After basic and advanced training Mr. Taylor was allowed to participate in an experiment the U.S Special Forces command was conducting which allowed new members in the Army to try out for the Special Forces.  Historically, any person trying out to be a member of Special Forces had to have served at least one tour of duty, which was four years of service, and be a sergeant.  Mr. Taylor participated in this experiment and was one of the few men to successfully complete the John F. Kennedy U.S Institute of Military Assistance, Special Forces School.  After successfully completing this school he was assigned to the 10th Special Forces Group at Fort Devens, Massachusetts.

From 1979 to 1983, Mr. Taylor served on active duty as part of a High Altitude-Low Opening ("HALO") Team.  HALO is a technique of parachuting from an aircraft at 30,000 to

40,000 feet by first free-falling for an extended period of time and waiting to open the parachute until one is at a low altitude, just about 2,000 feet.  While serving in the Special Forces, Mr. Taylor was always on-call for world-wide deployment.  Some of his responsibilities included Special Atomic Demolition Munition ("SADM") missions.  SADMs, sometimes referred to as "suitcase nukes," were man-portable nuclear weapons fielded by the United States during the Cold War.  They were a crucial part of the government's strategic plan in the event of a Soviet invasion of Western Europe.  Public sources report the SADM team was trained and prepared to parachute into the Fulda Gap (a lowland area between the former East German border and Frankfurt Am Main considered to be an obvious route for a Soviet ground assault on Germany) where they would use the SADMs to destroy, irradiate, and/or otherwise compromise key routes, power plants, bridges, dams, and so forth and then quickly exfiltrate.  Mr. Taylor was one of the elite Special Forces personnel entrusted with this critical and (at the time) highly secretive work and he held a Top Secret security clearance.

Mr. Taylor's other principal service while on active duty related to the Middle East. After the assassination of the Lebanese president-elect in September 1982 and the Israeli invasion of Lebanon, Mr. Taylor was selected among his Special Forces peers to be on the first Special Forces team deployed into Beirut, Lebanon.  This assignment consisted of numerous combat operations in conjunction with the Lebanese Forces who they trained, assisted, and advised in combat operations.  It was through this work that Mr. Taylor began what would become a lifelong relationship with the Christian community in Lebanon.

In November 1983, Mr. Taylor left active duty, receiving an honorable discharge at the rank of E-6.  He served as a reservist for approximately ten years.  He was activated in 1991 during the first Gulf War, but ultimately was unable to deploy due to the request of the

Department of Justice as he was at the time working as an undercover operative in the midst of a four-year major international drug trafficking investigation (*see* details *infra* at § II(D)(1) and in Classified Supplement).

Mr. Taylor's military service remains the professional accomplishment of which he is proudest. It has been the defining experience of his life and he has never failed to answer the call from his country. In 1991, when Mr. Taylor received a telegram recalling him to active duty to serve in the Gulf War, Mrs. Taylor recalls that "After reading the telegram he simply put it down on the kitchen table and without hesitation, kissed our two sons who were 20 and 9 months of age and started packing his military gear to deploy." (*See* Lamia Taylor Letter.)

Mr. Taylor is known in his community as an "honorable and true patriot" respected "for his service to our country." (*See* Elizabeth Ann T. Sweeney Letter; *see also* Barbara Auterio Letter; Irvin H. Eatman Letter; Juan Garcia Letter; Paul G. Giovacchini Letter; Chief Robert E. Hayden Letter; Robert L. Rubin Letter; Christopher Stone Letter; Francesca Ricci Letter.) The discipline and hard work instilled in him through his military service is something that Mr. Taylor "demonstrates in his life and that he shares with young men … as a strong male role model at a time when that is so lacking in our society." (*See* Elizabeth Ann T. Sweeney Letter.) According to Mr. Rubin, "I know [Mr. Taylor's] military background and heroism not from stories he has told, but from the dozens of people he has worked with over the years who have told me these anecdotes." (*See* Robert L. Rubin Letter.)

### C.     Civilian Career

#### 1.     Return to Lebanon

After briefly working as an investigator with the office of the Massachusetts Attorney General, Mr. Taylor returned to Lebanon as a private contractor providing military training to

Lebanese Christian forces.  Through this work and his previous time in Lebanon on active duty,

Mr. Taylor established contacts throughout Lebanon and the Middle East with a variety of

individuals from all manner of backgrounds.  He learned to speak Arabic.  And it was during this

period that he continued his courtship of his future wife, Lamia.  The Taylors were married in

1985.

###    2.    Mr. Taylor Establishes and Grows an International Business

After the conclusion of Mr. Taylor's work in Lebanon, the Taylors returned home to

Massachusetts in 1985.  In 1990, they purchased a four-bedroom home in Harvard,

Massachusetts where they still live today.  Putting his military and contracting experience to use,

Mr. Taylor worked for various American security companies providing personal security and

other services.  In 1988, Mr. Taylor and a partner established North America Security

Consultants, Inc.

In September 1994, however, Mr. Taylor struck out on his own and started American

International Security Corporation ("AISC").  From 1994 through 2011, Mr. Taylor grew AISC

into a successful business serving both private sector and governmental customers.  AISC

offered security consulting and protection services, both domestically and internationally

(including in Iraq and Afghanistan).

Its wide range of clients included everything from large international concerns such as

airlines, oil companies, and media companies with security needs around the world to local

institutions or events like hospitals and the circus.  Among AISC's many clients were the

American Broadcasting Corporation ("ABC"), WABC (a New York radio station), 20th Century

Fox, Air Canada, Delta Airlines, Feld Entertainment Inc. (a live show production company

whose productions include, among others, the Ringling Bros. and Barnum & Bailey Circus and

Disney on Ice), Lawrence Memorial Hospital, New England Baptist Hospital, Marathon
Petroleum, The New York Times Company, and Signature Flight Support (the world's largest
provider of support services for business and private aviation).

In addition, AISC performed a variety of security, training, and maintenance work for the
U.S. government as a subcontractor on various projects.  Such work included projects in support
of the military's efforts in Iraq, specifically (1) providing property bookkeeping and weapons
maintenance services and training Iraqi nationals under a subcontract on a $20 million BPA for
Iraqi Protection Details; (2) serving as a subcontractor providing security logistics and weapons
support on a $6 million security contract for the U.S. Department of Justice - Iraqi Special
Tribunal & Mass Grave Exhumation conducted by the Regimes Crime Liaison Office
("RCLO"); and (3) establishing an armory and performing contractor-furnished equipment
property control as a subcontractor on an $11 million security program for the NATO Military
Training Academy Headquarters in Iraq.  Contracting Officers, Contracting Officer
Representatives, and the Prime Contractor uniformly rated AISC's performance on these
contracts as "excellent" or "perfect."  (Exh. F at pp. 1-2.)  In particular, raters noted that "[t]hey
have a very strong management team who come from the States regularly to check on and
support their personnel in the field."  (*id.* at p. 2.)

AISC consistently provided high quality work for its customers.  For example, in his
letter to the Court Robert L. Rubin provides an account of how he came to know and respect Mr.
Taylor professionally based upon his first-hand experience with Mr. Taylor's work.  (*See* Robert
L. Rubin Letter.)  As Mr. Rubin recounts, he engaged AISC to represent the interests of his
former employer (a large security contractor for the U.S. government) on several projects in the
Middle East and, "[i]n one particular instance, we were engaged by armed criminals who sought

to take us hostage.  In that instance, Mr. Taylor was smart, decisive and thoughtful in his direction of the team that caused a very dangerous situation to end safely without any loss of life."  *Id*.  "In yet another situation, Mr. Taylor tireless[ly] advocated for the fair treatment of one of **my** host country nationals employees who had been injured in our service, eventually bringing that individual to the United States for treatment."  *Id*. (emphasis in original).

Mr. Taylor and AISC have a reputation for being straightforward, respectful, and fair. (*See* Robert L. Rubin Letter.)  In fact, after AISC assisted Mr. Rubin's corporation in obtaining the award of the aforementioned RCLO prime contract relating to the mass killing of Iraqi citizens by Saddam Hussein, government senior staff informed Mr. Rubin that "they gave us the assignment because of *Mr. Taylor's* candid nature and honest reputation – which according to them he had lived up to and exceeded at every opportunity.  This critical work was successfully completed at a dozen different locations around [Iraq], without injury or incident and with respect to the local tribal elders, because of Mr. Taylor's leadership and personal involvement." *Id*. (emphasis added).

AISC also periodically provided services for various rescue operations, including spousal kidnappings that were done in conjunction with the FBI, Department of State and American embassies.  In many of these cases, Mr. Taylor went beyond the realm of work and arranged meetings for the mothers involved with others who have gone through similar situations, "to help them deal with their grief on a personal level.  He became a friend and confidant to them as well as a savior."  (*See* Barbara Auterio Letter.)

In one instance, Mr. Taylor and AISC assisted in the safe return of a young girl whose father abducted her to Lebanon in 1993, an operation that finally ended successfully four and a half years later in 1997.  (*See* Kathy Patterson Letter.)  According to the mother, "I know that my

connection with Michael was more than just a job that his heart and soul guided him step by step to always do the right thing.  For Michael it was not about the money as the dollars paid to his company occurred in the first years, we continued to work together for four more years and there was not another penny provided to him.  Yet we spoke numerous times at any time of the day." *Id*.  Although he never personally met Ms. Patterson's daughter, Mr. Taylor sent her greeting cards and money upon her High School graduation and her marriage.  *See id*.  In another instance, Mr. Taylor returned a mother's consultation fee after working more than three years on her case "because she was so upset he could not help her anymore."  *Id*.

By mid-2011, AISC had grown to a profitable business with more than $5 million in its bank account and was on its way to a productive year in which it would generate nearly $2.2 million in revenue exclusive of the company's work with the U.S. Army in Afghanistan from 2007 to 2010.  According to one former AISC employee, "The discipline, honor, honesty, loyalty and commitment ingrained in [Mr. Taylor by the Special Forces] carried over when he became owner of AISC.  I have never known Michael to be anything other than a trustworthy, fair, honest and hardworking human being."  (*See* Juan Garcia Letter.)

### D.    Work as Law Enforcement Source and Intelligence Asset

Since leaving active duty military service, Mr. Taylor has on several occasions responded to requests for assistance from various U.S. law enforcement and intelligence agencies.  Mr. Taylor was—and is—viewed by many current and former agents in the DEA, FBI, and other agencies as a unique, important, and effective source in the United States' battles against narcotics trafficking, money laundering, and terrorism.  Mr. Taylor has an extensive network of sources throughout the Middle East and North Africa, which has enabled him to make contacts, obtain information, and even infiltrate operations at the behest of the government.  Some

representative examples are detailed below and in the Classified Supplement to Mr. Taylor's
Sentencing Memorandum.

### 1.    Undercover Investigative Work

During 1988 through 1991, Mr. Taylor worked in the primary undercover role assisting a
multi-agency investigation into an international money laundering and hashish trafficking
conspiracy.  The U.S. Customs Service, ATF, IRS, and FBI[2] were jointly investigating a group
of men engaged in the importation into the United States of large amounts of hashish grown in
the Bekaa Valley of Lebanon.  Using his contacts in Lebanon and his Arabic language abilities,
Mr. Taylor was able to make contact and develop relationships with some of the conspirators.
He traveled to Lebanon and filmed footage of the Syrian-controlled drug fields where the hashish
was produced and provided detailed information to the government regarding the traffickers and
their plans.

In September 1991, the investigation culminated with the seizure of more than 6,000
pounds of hashish (with a street value in excess of $100 million) which the group attempted to
import into the United States, and which was destined for Canada.  Convictions of numerous
participants in the conspiracy followed, all of which would not have been possible without Mr.
Taylor's assistance.  (*See* Letter of Paul Kelly.)  Further details and supporting documents are
provided in the Classified Supplement.

### 2.    Supernote Interdiction

In 1992, Mr. Taylor assisted the Customs Service and Secret Service in connection with
the investigation of a supernote[3] scheme in which individuals in Iran and Lebanon appeared to be

---

[2] The investigation also included Canadian law enforcement agencies.

[3] Supernotes are very high quality counterfeit U.S. hundred-dollar bills.

involved.  The government had Mr. Taylor travel to Beirut for the purpose of attempting to discover more about what was going on.  Mr. Taylor did so and ultimately was able to find out where and how the supernotes were being manufactured.  According to sources Mr. Taylor was able to identify and cultivate, the bills were being created by a group of Iranians who had worked for the Shah prior to the Iranian Revolution in 1979 utilizing information and materials they had obtained from the United States prior to the fall of the Shah.  Mr. Taylor arranged for one inside source to agree to travel to London to meet with investigators and accompanied him to the meeting.

### 3.   ▮▮▮▮▮▮▮▮▮▮▮ and Other DEA Assistance

In 2012, at the time of his arrest, Mr. Taylor was the key player and critical link in one of the most important DEA operations in history.  ▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

_____

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮

▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮



███████████████████████████████████████

████████████████████████████████████████████

████████████████████████████████████████████

██████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

███████████████████████████████████████████

████████████████████████████

### E.    Family Responsibilities and Current Living/Business Situation

Mr. Taylor and his wife, Lamia, have been married for 30 years and have three sons, Rudy, Oliver, and Peter.  Since the day they met, Mrs. Taylor has "had no doubt … that this guy loves his country … [which he calls] the greatest country on God's earth.  The two most important things in Michael's life are his family and country."  (*See* Lamia Taylor Letter.)  All three boys graduated from high school and are currently pursuing college educations.

Mr. Taylor lost his mother—and his step-father lost his wife—to cancer in October 2001. (*See* Robert Taylor Letter.)  Mr. Taylor's step-father, a disabled Veteran, is now 75 years old and suffers from diabetes and limited mobility.  *See id.*  Mr. Taylor, who has always been a dutiful and loving son, lives near his step-father and, according to Robert, "is the person in life I rely on for everything," as Mr. Taylor checks on Robert every day "to insure that I am OK," take Robert to the doctor, and performs household tasks and improvements to help his step-father get by.  *Id.* Accordingly, Mr. Taylor is a critical source of care and assistance for his ailing step-father—the only father he has ever known.

The past three years "have been the most trying and difficult times for [the Taylor] family." (Lamia Taylor Letter.)  After Mr. Taylor's release following almost 15 months in confinement at a county jail, "it took months to adjust to daily life, physically and mentally."  *Id*. Mr. and Mrs. Taylor have just begun "feeling some sense of normalcy" now, a feeling that would swiftly be drained should Mr. Taylor be required to face further incarceration.  *See id*.

Following the initiation of a civil forfeiture proceeding in September 2011 and the return of the indictment in the *Young* case in August 2012, and faced with skyrocketing legal fees and the seizure in its entirety of AISC's bank account, Mr. and Mrs. Taylor have had to exhaust their available home and business equity, sell off their stock and an interest in a Dunkin' Donuts franchise, sell some of their properties at approximately half of their worth, and borrow heavily from Mrs. Taylor's relatives.

At the same time, AISC's business has been destroyed completely.  In 2012, AISC's revenue dropped to just over $600,000, a significant drop of more than 70%.  Because of the negative associations and bad press for AISC resulting from the litigation, a new company, Security Assistance Group, LLC ("SAG"), was formed but business slowed even further in 2013 (the combined 2013 revenue for AISC and SAG was less than $200,000).  The profits to the Taylors from these businesses are now essentially nothing.

In addition to the legal fees and the precipitous decline in business, the Taylors have done everything in their power to avoid disrupting their boys' college educations.  They added to their debt to pay college tuitions and living expenses for their sons.  During the course of the litigation, the Taylors took on nearly $2 million total in debt.  Despite all of these financial difficulties and burdens, "[w]hen [Mr. Taylor] came back from Utah and was given some of his money back the first thing he did was give to his local church."  (*See* Barbara Auterio Letter.)

15

Since the forfeiture case was settled and dismissed and Mr. Taylor was released from custody in late 2013, the Taylors' financial circumstances have improved.  Their vehicles were returned, they received $2 million of the seized money back, and they recently received a substantial refund of previously over-paid taxes.  However, the business that Mr. Taylor spent his life building remains in ruins.

Despite all of these difficulties and obstacles, Mr. Taylor has attempted to seek out new business opportunities and other potential ways to provide for his family.  One idea he is pursuing is the development of a vitamin water drink.  Working with a chemical engineer that he had come to know through one of the players he coached in high school, Mr. Taylor researched and experimented with formulations for a drink with the objective of creating a drink with minimal calories, no sugar, and all natural ingredients.  The result was a 5-calorie vitamin drink that is a cross between performance and health drinks that tastes much better than what is presently on the market.  It is called "Vitamin 1 Performance Drink."  (*See* Exh. S.)

Mr. Taylor has proceeded through the process of getting the labeling and nutrition detail compliant with FDA requirements, hiring a graphic designer to prepare a label, and made arrangements with a label-printing company in Illinois and a bottling company in Florida.  The label received final approval earlier this month and the first production is scheduled for the first week of April.  It is anticipated that the first shipments to stores in the New England area will go out soon and Mr. Taylor will begin the process of marketing the drink to stores in other parts of the country.

It is clear that Mr. Taylor is committed to rebuilding his life and business, or at least building a new business.

### F.    Community Involvement

Mr. Taylor is heavily involved in his community, seeking to help out as much as he can, not for any kind of personal recognition or gain but simply to benefit the people of his community.  (*See* Barbara Auterio Letter; Irvin H. Eatman Letter; Josh Flannery Letter; Paul G. Giovacchini Letter; Henry C. Horne Letter; Don W. Parker Letter; Daria Petrilli-Eckert Letter; Francesca Ricci Letter; Christopher Stone Letter; Elizabeth Ann T. Sweeney Letter; Kathleen Wallace Letter.)  Mr. Taylor "has supported and helped many individuals, organizations and schools over the years.  He has done this quietly without fanfare or recognition.  He helps because he cares."  (*See* Kathleen Wallace Letter; *see also* Irvin H. Eatman Letter ("All of his acts of kindness and generosity are done without fanfare or publication, he does it because he genuinely cares about others").)

In particular, many people look to Mr. Taylor as a strong role model for young men and others in his community.  (*See* Francesca Ricci Letter; Christopher Stone Letter; Elizabeth Ann T. Sweeney Letter.)  Mr. Taylor's actions speak for themselves and lead those around him to consider him a role model, as he gives "so much of himself in small and large ways, impacting so many individuals and families in our community."  *Id*.

Mr. Taylor helps build his community and provides assistance in tasks as small as helping to plow a driveway to bringing tools to help with home improvement to much larger undertakings such as assisting to clear downed trees following a windstorm or snowstorm.  (*See* Daria Petrilli-Eckert Letter; Elizabeth Ann T. Sweeney Letter; Stephen C. Sweeney Letter.)  Describing one instance in which Mr. Taylor cleared the roads of trees so his neighbors could make their morning commute, one neighbor explains that Mr. Taylor's actions will never be found "in any newspaper or publication, and Michael makes a myriad of efforts such as this one,

17

not for the sake of recognition, but out of the fondness for the people in his community." (*See* Stephen C. Sweeney Letter.)

Over his numerous years coaching youth and high school football, Mr. Taylor "has taught many young men the fundamental skills of football; but, more importantly he has taught them respect, dedication and teamwork …. I know this firsthand because my son was lucky enough to have Mike as his coach for several years." (*See* Kathleen Wallace Letter.)  In addition to coaching football, Mr. Taylor has served as a mentor to the young men in his neighborhood and community.  (*See, e.g.,* Henry C. Horne Letter.)  Mr. Taylor has assisted these youths "in all aspects of their lives – academics, social, and emotional." (*See* Henry C. Horne Letter.)  Mr. Taylor has coached those in his community "not just on the field but also about life – being a man, handling responsibilities and being an upstanding citizen ….  [N]ot only with words, but by walking his talk and demonstrating positive living through the concept of community based philanthropy." (*See* Francesca Ricci Letter.)  One parent reports that "[o]ne of my sons even wrote about life lessons learned from Michael for his college essay, that 'anything is possible if you work hard for your goals and believe in yourself.'" (*See* Elizabeth Ann T. Sweeney Letter.)

Many of the youths Mr. Taylor has coached and/or mentored have been "from dysfunctional families or broken homes struggling to make ends meet." (*See* Elizabeth Ann T. Sweeney Letter; *see also* David M. Dolan Letter; Anthony Knight Letter, Jeffery Lark Letter.) Mr. Taylor "guided and encouraged many young lads who otherwise would have gone astray." (*See* David M. Dolan Letter.)  Mr. Taylor has had such a positive impact on these young men that "many of these kids continue to stop by and visit with Michael and Lamia, sharing their successes and seeking continued guidance." (*See* Elizabeth Ann T. Sweeney Letter.)

Mr. Taylor has even assisted many of these young people in obtaining scholarships so they may pursue a higher education and strive to continue improving themselves. (*See* Anthony Knight Letter; Jeffrey Lark Jr. Letter; Don W. Parker Letter; Francesca Ricci Letter; Stephen C. Sweeney Letter.) Mr. Taylor is known "for helping student [athletes] get in to colleges and get a free education by playing football." (*See* Jeffrey Lark Jr. Letter.) In one year alone, "out of the 15 football players in my son's graduating class of 60 students, 9 of those boys went on to a NCAA Division I or an Ivy League school to play a sport with either a full or partial scholarship" thanks in no small part to Mr. Taylor's tutelage. (*See* Francesca Ricci Letter.)

It is not only football players that Mr. Taylor has mentored, however. (*See* Josh Flannery Letter; Paul G. Giovacchini Letter.) Mr. Taylor helped student-athletes from other sports, particularly those "who were not as privileged as some of our other students. Our school was its own little community and the things he did to help some of our underprivileged students was amazing to me." (*See* Josh Flannery Letter.) "We know Mike to be a tremendous mentor, supporter and friend of many young people whose lives he has improved. We have felt his influence firsthand as Mike has had a greater positive impact on both our sons than anyone outside our family." (*See* Paul G. Giovacchini Letter.) Mr. Taylor helped foster Mr. Giovacchini's son Nick's interest in Middle Eastern politics, sharing his knowledge of the region and introducing Nick to contacts from the military, CIA, other governmental bodies, and more. *See id.*

Mr. Taylor's sterling reputation as a coach and mentor is so widespread that it even extended to a young man in Dallas, Texas, who contacted Mr. Taylor in the hopes that Mr. Taylor would recruit him for his high school team. (*See* Jeffrey Lark Jr. Letter.) Although Mr. Taylor had never met this young man, who lived far away from Mr. Taylor's community, Mr.

Taylor helped Mr. Lark get into "Cushing Academy in Massachusetts and paid for my full

tuition.  I needed another year of high school and Coach Taylor was able to get me admitted to

Bridgeton Academy, a post graduate school in Maine, and again, out of the goodness of his heart,

paid for my full tuition."  *See id*.  In addition, Mr. Taylor helped Mr. Lark "get recruited by some

of the top college football programs in the nation."  *See id*.

Mr. Taylor consistently goes above and beyond for those in his community, as well as

those brought into his community.  (*See, e.g.,* Anthony Knight Letter.)  Although Mr. Knight

reports that he "was on a one-way train heading to disaster" and "becoming more self-destructive

by the day," Mr. Taylor took a chance on him and helped him receive a high school scholarship

and counseling.  Mr. Taylor even assisted Mr. Knight in finding a new school after he was

expelled from Mr. Taylor's prep school.  *See id*.  "Despite the fact that I would never play for

him again, and no longer attended the school he worked at, for weeks he consulted and vouched

for my true character and found a school that would take me.  He never gave up on me."  *Id*.  Mr.

Knight credits Mr. Taylor with helping him towards the college degree he is about to receive and

says that he will "be a productive citizen in my country because of Coach Taylor.  Though I no

longer need his help like I used to, he never [ceases] to amaze me. . . . He'll never give up on

us."  *Id*.

Mr. Knight's experience is not unique, as Mr. Taylor "made it a point to be available [to]

each and every boy that wanted/needed his assistance or advice, day or night … provid[ing] them

the necessary ear and perspective so they could grow and mature with good decisions."  (*See*

Henry C. Horne Letter.)  Mr. Taylor "used his personal resources to provide equipment and

meals for players in need of financial support," even as a volunteer coach for a high school team

seeking a suitable replacement for the previous coach's sudden departure.  (*See* Paul G.

Giovacchini Letter.)  Mr. Taylor even paid the tuition of a female student athlete—
anonymously—when he found out her father had become unemployed and that she might be
unable to return to school as a result.  (*See* Josh Flannery Letter.)

Mr. Taylor has opened his home to these young people, in addition to his wallet.  (*See*
Barbara Auterio Letter.)  He has given numerous students "a place to stay when school was out
and they had no place to go," and also allowed a seriously injured student to stay at his home
"until the young man recovered."  *Id*.  Furthermore, while this student was recovering, Mr.
Taylor "took him to his doctors' appointments and even purchased him a scooter so he could get
around campus."  *Id*.

It is not only students to whom Mr. Taylor extends his generosity—when a single mother
in his home town lost her apartment and belongings to a fire, Mr. Taylor "helped her find an
apartment, paid the first few months' rent and took her shopping to furnish her new apartment …
from furniture to toiletries."  *Id*.  Mr. Taylor even paid for an alarm system to be installed in Ms.
Auterio's home after a break-in because she could not afford one.  *Id*.

Even while confined in county jail during the pendency of this matter, Mr. Taylor sought
to assist those around him.  (*See* Paul G. Giovacchini Letter.)  Mr. Taylor called Mr. Giovacchini
not "on his own behalf, but to see if I could assist him in helping a young inmate at the facility
who Mike had ascertained had once met my brother.  That is classic Mike – at a time of great
personal need he is trying to help someone else."  *Id*.  Given how much of himself Mr. Taylor
gives to his community and any others who need his assistance, it is no wonder that, in the words
of one family friend, losing "a person with Mike's capacity, from the community, even for a
little while, would be truly detrimental."  (*See* Daria Petrilli-Eckert Letter.)  "When it comes to
character and contributing to a community, Michael is as good as they come.  If every

community had more people like Michael Taylor, I feel that this world would be a better place."
(*See* Josh Flannery Letter.)

## III.   PLEA AGREEMENTS

Pursuant to written plea agreements subject to Rule 11(c)(1)(C), Mr. Taylor pled guilty to
(1) a one-count Information (*Young* Doc. 501) charging him with obtaining source selection
before the award of a federal agency procurement in violation of the Procurement Integrity Act,
41 U.S.C. §§ 2102(b) and 2105; and (2) Count 2 of the *Lustyik* Indictment charging him with
participating in a scheme to defraud the public of its right to the honest services of former FBI
Special Agent Robert G. Lustyik, Jr. in violation of 18 U.S.C. §§ 1343 and 1346.

Under the terms of both agreements, Mr. Taylor and the government have agreed that the
sentence imposed shall not exceed 24 months, no fines or restitution will be imposed, and the
sentence imposed in each case shall run concurrent to any sentence imposed in the other case.
(*See Young* Doc. 504; *Lustyik* Doc. 536; Transcript of 11/27/2013 Hearing at 21:22-22:2.)  In the
*Young* case, the government further has agreed to recommend a sentence of time served (*Young*
Doc. 505 § 6) and, in the *Lustyik* case, the government has agreed to recommend a sentence
between time served and 24 months (*Lustyik* Doc. 507).

## IV.   NATURE AND CIRCUMSTANCES OF THE OFFENSES

In their descriptions of "The Offense Conduct," both Presentence Reports contain lengthy
factual recitations that are in several material respects inaccurate or incomplete.[6]  Neither report

---

[6] The *Young* PSR also contains recitations regarding a number of points that are irrelevant even if accurate.
Specifically, ¶¶ 7, 9, and 12-14 contain (in whole or in part) statements regarding the separate activities of Mr.
Young and Mr. Harris and/or Mr. Harris alone in which Mr. Taylor had no involvement, of which Mr. Taylor had no
knowledge, and which form no part of the conduct to which Mr. Taylor has admitted.  For the record, Mr. Taylor
had no involvement in or knowledge of (1) Mr. Harris' structuring of financial transactions, (2) Mr. Harris' issues
with the IRS, or (3) the transfer of any money between Mr. Harris and Mr. Young or any entity associated with Mr.
Young.  Both Mr. Harris and Mr. Young have confirmed as much (*see* Exhs. D & E) and there is no evidence
whatsoever of Mr. Taylor's knowing involvement in any of this.  As such, we object to consideration of or inclusion
of any of these allegations.

incorporates, or even references, the actual factual bases for the two convictions set forth in the Statements filed by the parties in connection with Mr. Taylor's guilty pleas. Defense counsel articulated specific, detailed objections noting each of the factual errors and misstatements on a sentence-by-sentence basis and providing supporting documents.[7] The Probation Officer refused to address any of this, claiming our attempt to make sure the Court was provided with an accurate and complete statement of the actual offense conduct "appears to be an attempt to try this case through the presentence report." (*See Young* Doc. 647-1 at p. 1; *see also Lustyik* Doc. 991-1 at pp. 1-2.)

However, the Probation Officer did not make any determination on any of these factual points and instead deferred to the Court for judgment. (*Id.*) Accordingly, we hereby incorporate by reference all of the specific objections previously articulated to the Presentence Reports. We set forth below the actual facts as pertains to these events and object to any differing or less-than-complete descriptions of the facts contained in the Presentence Reports.

A.    The 2007 Afghan Contract

In late May 2007, Mr. Taylor was contacted by David Young and asked if his company, AISC, would be interested in bidding on a weapons maintenance and property book management training/mentoring contract for the United States Army at the Combined Joint Special Operations Task Force-Afghanistan (CJSOTF-A) (the "Procurement"). Mr. Taylor responded affirmatively and AISC was among four companies that received a copy of a solicitation for the contract on

---

[7] We note that many of the errors relate to points that should not be subject to any reasonable dispute. For instance, the *Young* PSR states that CSTC-A solicited the contract at issue in that case in "March of 2007" (¶ 8)—it was solicited in June 2007—and states that AISC "had never performed work involving training or maintenance" (¶ 10)—in fact, AISC had just completed performing as a subcontractor on a government contract in Iraq doing exactly that. In addition, among other things, the PSR incorrectly states that Mr. Harris "establish[ed] AISC's bid" (¶ 10), misstates the amount of AISC's price as stated in the proposals it submitted to the Army (both of them) (¶ 10), misstates the number of modifications to the original contract and the total number of contracts awarded to AISC (¶¶ 11-12), and misstates the number of payments made to AISC by the Army (both under the contract and in general under any contract or modification) (¶12).

June 9, 2007.  Specifically, the Request for Proposal ("RFP") sought a company to provide Afghan National Army Commando Kandaks (*i.e.*, battalions) with two "weapons maintenance trainers/mentors" and one "property book trainer/mentor" (along with an interpreter/translator) for a period of six months.  (Exh. A at p. 3 & Attachment 3 [Statement of Work].)  The Army solicited the contract using a limited source modification approach, which it justified on the basis of the immediacy of the need (*i.e.*, to have the personnel in place by July 15, 2007), the importance of the Army's policy of Afghan self-sustainment, and the fact of the "short-term/bridge" nature of the six-month contract with full and open competition contemplated for the follow-on effort.  (Exh. B [Justification and Approval].)

Mr. Taylor engaged Robert Rubin and his company, Cyrus Strategies, to prepare the technical proposal and the cost proposal for the response to the RFP.  Mr. Rubin prepared the technical proposal using the June 9, 2007 RFP and he prepared the cost proposal using his own model employing a build-up of costs burdened with overhead and G&A, plus an expected profit rate.  (Exh. L at 0102314 [6/25/2012 Memorandum of Interview].)  Mr. Rubin did not use any information from Mr. Young or, for that matter, Mr. Harris in preparing either of these aspects of the proposal.  Indeed, he was not even introduced to Mr. Harris until *after* he had already prepared the technical proposal.  (*See* Exh. J [6/18/07 1:50:16 PM EDT Rubin Email to Taylor Sending Technical Proposal] & Exh. K [6/18/07 6:41 PM EDT Rubin Email to Harris Introducing Self].)  AISC's original proposal stated a price of $799,000.

Mr. Taylor and AISC proceeded to arrange potential staffing for the contract effort.  As the Procurement related to special forces efforts (active-duty U.S. special forces were to be imbedded with Kandaks), Mr. Taylor's background and then recent contracting experience in Iraq made this effort a natural fit for AISC.  As a result of a suggestion made by Mr. Young to

Mr. Taylor on or after June 11, 2007, Mr. Taylor ultimately lined up Christopher Harris and his

company, Harris & Associates, to work as the country manager on the contract.[8]  Accordingly,

while it is true that Mr. Young suggested Mr. Harris to Mr. Taylor, he did so *after* the solicitation

had been issued, AISC had received the RFP, and AISC had begun working on its proposal.  (*See*

Exh. T [6/11/2007 Young Email to Taylor].)

On June 22, 2007, AISC and one other company, Procurement Services International

("PSI"), submitted their responses to the RFP.  The following day, however, the Army amended

the solicitation so as to clarify that the contract was for just one Kandak.  (Exh. U.)  AISC

revised its response accordingly and submitted an amended proposal on June 26, 2007, this time

stating a price of $699,840.  (Exh. G at p. 40 [of .pdf file].)  The CO, Captain Christopher

Marquis, emailed Mr. Taylor directly later that night and asked for clarification regarding "your

stated price, $899,782.00," to which Mr. Taylor responded correcting him and explaining that

"[o]ur stated price is $699,840.00."  (Exh. M.)

The Army then proceeded to perform evaluations of the proposals received from AISC

and PSI.  During this period (*i.e.*, after the bids were submitted but before the contract was

awarded), Mr. Taylor received information related to the Procurement through Christopher

Harris, who he thought was located in Afghanistan at the time (though, as it turns out, he may

actually have been in Paris), and through David Young, who he understood was knowledgeable

regarding the government's requirements for the Procurement but who he thought had left

Afghanistan.  Specifically, Mr. Taylor received information regarding the technical evaluation

process that was underway, that one other contractor had submitted a proposal, that the other

---

[8] AISC and Harris & Associates ultimately entered into a Services Agreement in October 2007, which had an effective date of July 7, 2007.  (Exh. C.)  This agreement between Mr. Taylor and Mr. Harris' respective companies was the only agreement between them.  There was no agreement to which Mr. Young was a party, and the Services Agreement said nothing about Mr. Young or any entity associated with him.

contractor's proposal had a significantly lower price than AISC's,[9] and that the other proposal did not cover some points.

In the course of the Army's evaluations, PSI's proposal, though priced lower than AISC's, was found not to be technically acceptable and was rated "unacceptable" by the Government.  (*See* Exh. F [Summary of Past Performance]; Exhs. N [Summary of Technical Evaluations]; Exh. O [Memo for File Re: Contract Award].)  By the express terms of the RFP, this disqualified PSI from competition for the contract.  (*See* Exh. A at p. 7 ("A rating of unacceptable will remove a proposal from competition."); *see also id.* at p. 27 ("technical rating of 'unacceptable' will automatically remove a proposal from competition").)  Specifically, PSI failed to submit any past performance information, it admitted that it had never before done the kind of work at issue, and its one-page technical proposal was incomplete and riddled with typos.

On July 4, 2007, Major Todd Cox (the COR) calculated an independent price estimate of $875,000 using MPRI labor rates.[10]  (*See* Exhs. H & I.)  That same day, Captain Christopher G. Marquis (the CO) prepared a Memorandum summarizing the results of the Procurement.  (Exh. O.)  Specifically, "[e]ach proposal was evaluated in accordance with the specifications and standards listed in the solicitation."  (*Id.* ¶ 6.)  AISC's offer was rated "acceptable."  "PSI was rated unacceptable."  (*Id.* ¶ 7.)  The proposals were then evaluated for past performance.  AISC received an overall past performance rating of "exceptional."  No past performance information was submitted for PSI, and it received a past performance rating of "unknown."  (*Id.* ¶ 8.)

---

[9] Mr. Harris had told Mr. Taylor that the other bidder's price was approximately $450,000, which turned out to be inaccurate.

[10] The PSR confusingly refers to the government's price estimate as both $875,000 and "less than $1 million."  The government's price estimate was $875,000, arrived at by Major Cox on July 4, 2007.  The "less than $1 million" was an operating assumption that dictated the particular procurement procedure the Army took and the level of warrant (or authority) that was required to sign off on the solicitation.  For CJSOTF-A to control the Procurement, they could not spend more than $1 million on the effort.  If more than that was to be spent, a higher level of contracting authority was required.  This limitation was implicit from the source of the solicitation and was not protected or sensitive information of any kind.

AISC's "price was determined to be reasonable, based on competition and an Independent Government Estimate," AISC "was determined to be responsible," and the Source Selection Authority, in this case Captain Marquis, therefore, awarded the contract to AISC.  (*Id.* ¶¶ 9-11.)

The next day, July 5, 2007, the Army awarded the contract to AISC, albeit at a price of $899,781.96.  The Army awarded the contract to AISC because AISC was the only company that had submitted a technically acceptable proposal in response to the RFP.  As such, the Government could not have awarded the contract to PSI irrespective of its price and its significantly lower price likely was merely an indication of its lack of understanding and/or expertise regarding the performance called for by the contract.[11]  (*See* Exh. R [Lovitky Decl.] ¶ 7.)  Where Captain Marquis got the $899,781.96 amount in which he awarded the contract remains a mystery.

AISC proceeded to move personnel into place and perform the contract to the Army's full satisfaction.  AISC ultimately was paid only $599,854.64 under the original contract as it was subsumed by eight later modifications and, eventually, five other entirely different contracts for similar and expanded services.  Each such modification and contract award was the subject of a separate, independent procurement action—none of which involved Mr. Young or even the CO (Captain Marquis) or the COR (Major Cox) that had been involved in the Procurement at issue here and all of which involved independent determinations of the need or lack of need for open competition, the quality of AISC's performance, AISC's ability to continue the work or do other work, and the reasonableness of AISC's prices.

---

[11] Moreover, it also should be noted that even if PSI's proposal had been technically acceptable, AISC still might have been awarded the contract.  The RFP provided that proposals would be evaluated under the so-called "trade-off" process under FAR 15.101-1 as opposed to FAR 15.101-2's Lowest Priced Technically Acceptable Proposal ("LPTAB") approach.  (*See* Exh. A at p. 7.)  Accordingly, AISC's clearly superior technical capability and past performance could well have outweighed PSI's lower price and resulted in the award of the contract to AISC despite the price differential.

### B.      The Utah Investigation

In April 2011, FBI Special Agent Michael McCall visited AISC's office regarding Mr. Harris, specifically asking why AISC was wiring his company money.  AISC showed Agent McCall the contract with Harris & Associates and explained about his role in the company's work in Afghanistan.  At around the same time, Mr. Taylor met then-FBI Special Agent Robert Lustyik at a spring football game at Bryant University in Rhode Island.  The two discussed their respective international and intelligence-related work and Mr. Lustyik mentioned to Mr. Taylor that he planned to retire soon from the FBI.  Over the course of the next several months, Mr. Taylor and Mr. Lustyik began to discuss the possibility of Mr. Lustyik working or partnering with Mr. Taylor in connection with various international business deals using contacts that they both had overseas.

In July or August 2011, Mr. Taylor approached Mr. Lustyik about the possibility of the FBI utilizing certain intelligence information as detailed in the Classified Supplement.  Mr. Lustyik took the materials and listened to the information Mr. Taylor provided but did not express any particular enthusiasm for the network at that time.

In the fall of 2011, *Mr. Lustyik* approached Mr. Taylor about using his contacts to help get security work in South Sudan and suggested Mr. Taylor meet his friend, Zak Fellah.  Mr. Fellah led Mr. Taylor to believe he could obtain security contracts for AISC and required a payment of $10,000 for his time and expenses, which Mr. Taylor paid.  Mr. Fellah arranged a meeting with the Vice President of South Sudan while he was visiting the United States.  During the meeting with the Vice President, he suggested to Mr. Taylor that they had interest in having oil corporations invest in plots of land to discover oil.

28

After this meeting, Mr. Taylor contacted a friend in the oil business and asked him if his company would be interested in this area of the world. Mr. Lustyik set up a meeting for the oil company employees with the Ambassador of South Sudan. It was at this time that Mr. Lustyik introduced Johannes Thaler to Mr. Taylor. Mr. Lustyik informed Mr. Taylor that "Hannes" would be very helpful in such projects as he used to work for the NSA and had a photographic memory. (Neither statement about Mr. Thaler was true—his background was as a shoe salesman at Macy's.) Mr. Taylor agreed to attend the meeting with the Ambassador of South Sudan and the oil company executives in hopes of obtaining a security contract for the potential project. Nothing came of those efforts though.

In September 2011, however, the government seized in excess of $5,000,000 from AISC's bank account (the same corporate account the company had had for more than 10 years). As a result, Mr. Taylor learned that he and/or his company were being investigated by federal authorities in the District of Utah for possible criminal charges. In particular, Mr. Taylor became aware that investigators were looking into the procurement of the original six-month contract in Afghanistan in 2007. Mr. Taylor told Mr. Lustyik what had happened, specifically mentioning that the government had seized $5 million of his money. Mr. Lustyik instantly volunteered to contact the Utah prosecutors and investigators and quickly became much more interested in the intelligence-related information and possibilities Mr. Taylor could provide.

At Mr. Lustyik's request, on or about October 15, 2011, Mr. Taylor provided him with the names of the law enforcement agents and prosecutors in Utah involved in the investigation. In addition, Mr. Lustyik advised Mr. Taylor that he was vetting him as a source, therefore, Mr. Taylor should keep him informed of any business efforts he was working on and any intelligence or law enforcement work he was doing. Mr. Lustyik set up a "dead drop" email account for Mr.

Taylor to use in providing him intelligence reports and instructed him on how to use this process. Mr. Lustyik formally opened Mr. Taylor as an FBI confidential human source ("CHS") in approximately January 2012,[12] though Mr. Lustyik had told Mr. Taylor he was vetting him as a source months earlier.

Indeed, in the fall of 2011, Mr. Lustyik specifically asked Mr. Taylor if he could find out any information regarding the whereabouts of certain individuals, which information Mr. Taylor ultimately obtained and provided.  In 2012, Mr. Taylor also furnished Mr. Lustyik with information regarding a plot which was validated by other intelligence agencies.  Further details are provided in the Classified Supplement.

As Mr. Lustyik had requested, Mr. Taylor kept him up to date on potential business projects he was pursuing or working on.  Among these matters were a potential lead on a wind-power generation contract in Iraq, a contract for the sale of security and surveillance equipment and services in the United Arab Emirates, and a request Mr. Taylor had received from a former special forces friend to approach Iraq's State Organization for Marketing of Oil ("SOMA") about the possibility of obtaining any excess oil they might have as he had a contact in China who was looking to purchase some.  In connection with these (and other business projects of his own in which Mr. Lustyik sought to involve Mr. Taylor) Mr. Lustyik often made comments to the effect that "if one of these projects hits, I'm out of here."  Consistent with their ongoing discussions, Mr. Taylor understood this to mean that Mr. Lustyik was interested in and willing to come to work for or with him after he retired from the FBI.  Mr. Taylor was agreeable to that and did not dissuade Mr. Lustyik's enthusiasm.

---

[12] It is Mr. Taylor's understanding that Lustyik additionally tried to open him as a CHS in the State of New York as well, even though Mr. Taylor did not have a residence in that state.

Mr. Lustyik continued to seek to involve Mr. Taylor in business matters relating to his friends or contacts.  In particular, Mr. Lustyik sought to involve Mr. Taylor in the efforts of a company called Blue Meadow Energy, which had been started by Mr. Lustyik's friend, Michael Feldman.  Mr. Feldman, Mr. Lustyik, and Mr. Thaler were pushing a wind turbine venture.  Mr. Lustyik introduced Mr. Taylor to Mr. Feldman, and Feldman asked Taylor about his contacts in Lebanon and whether he could get them a meeting with the Energy Minister there.

Mr. Taylor agreed to help and arrangements were made for Mr. Feldman and Mr. Thaler to travel to Lebanon in March 2012.  Prior to the trip, Mr. Taylor told them to have bank account and wiring information for the company ready in case they were able to secure a deposit if the meeting with the Energy Minister went well.  On February 15, 2012, Mr. Thaler provided Mr. Taylor with bank account wire information which Mr. Taylor believed and understood to be for Blue Meadow Energy's bank account (an account on which Mr. Taylor had understood that Mr. Thaler had signature authority).  As it turned out, the account was Mr. Thaler's personal bank account.

Mr. Feldman and Mr. Thaler traveled to Lebanon in March 2012.  At that time, Mr. Feldman was trying to develop specific cost estimates for the project and determine how much money he would need to raise from investors.  In connection with his work on a spreadsheet, Mr. Feldman and Mr. Taylor discussed what an appropriate salary would be for a Security Manager for the project—a position that it was contemplated Mr. Lustyik would fill after he retired from the FBI.

During a business development meeting with some of Mr. Taylor's contacts in Lebanon, Mr. Thaler mentioned in conversation the medical situation and associated bills of Mr. Lustyik's young daughter (which Mr. Taylor had heard about before).  Mr. Taylor's contacts were

sympathetic to the situation and proceeded to send a total of $10,000 to the bank account number

Mr. Thaler had provided.  Mr. Thaler, however, did not send this money to Mr. Lustyik or his

daughter, but instead used the money to pay for travel expenses associated with the business

development trip to Lebanon.  Mr. Taylor later personally reimbursed his contacts for the

$10,000 they had sent, concerned that his contacts had made the contributions as a gesture in

hopes of developing a business partnership with Blue Meadow Energy (a venture which Mr.

Taylor had come to view as fraught with peril and unlikely to lead to anything).

 Mr. Lustyik told Mr. Taylor that he took steps in his official capacity as an FBI agent to

undermine the investigation.  Mr. Taylor provided him with information on former federal agents

who had been his handling agents in a prior case in which he was a confidential human source

(CHS) originally so that Mr. Lustyik could vet him as a source, but Mr. Lustyik later said that he

also could use those interviews for the purpose of generating material that was favorable to Mr.

Taylor, and passing that material along to the Utah prosecutors.  As Mr. Taylor understood it,

conducting these interviews was one of the ways that Lustyik acted in his official capacity to

help with the investigation, the idea being that the prosecutors in the District of Utah would learn

about them and be convinced not to pursue charges.  Attorneys for Mr. Taylor—David Kehoe

and Steven Brooks—were aware of Mr. Lustyik's efforts and provided support in their own

right.

 In March 2012, after Lustyik had conducted some of the interviews of Mr. Taylor's

former handling agents, Mr. Lustyik informed Mr. Taylor that he had conducted a video

teleconference with the prosecutors who were overseeing the investigation to inform them of

those interviews and of Taylor's value as a CHS.  Mr. Taylor understood this to be part of

Lustyik's effort, in his official capacity as an FBI agent, to help him with the investigation.  Mr.

Taylor understood that Mr. Lustyik was doing so in part because of potential financial benefit to him from the business opportunities they had discussed because he recognized that those opportunities would not be fruitful if Mr. Taylor was charged with crimes in Utah.

## V.    SENTENCING GUIDELINES

The PSRs calculate Total Offense Levels of 23 (*Young*) and 27 (*Lustyik*), resulting in guideline ranges of 46-57 months (*Young*) and 70-87 months (*Lustyik*).  As detailed below, these offense levels are reached through incorrect calculations of the amount of loss and the improper application of certain specific offense characteristics in the *Lustyik* case.  The correct Total Offense Levels are 4 (*Young*) and 15 (*Lustyik*), with resulting guideline ranges of 0-6 months (*Young*) and 18-24 months (*Lustyik*).

### A.    *Young* PSR Guidelines Calculation Objections

The PSR purports to apply a 20-level increase based upon the amount of loss exceeding $7 million.  The PSR provides no explanation or rationalization for this figure, and the Addendum states only that the defendants are each "held accountable for only their share of the profits," which is presupposed to be $8 million.  This surmise is incorrect both factually and legally.  Under the applicable law and the actual facts of the one contract implicated by the offense (*i.e.*, the 6-month, one-Kandak contract awarded to AISC on July 5, 2007), no offense-level increase based upon the amount of loss is appropriate.

The offense here related to procurement of a legitimate government contract, a contract which AISC actually performed in accordance with the government's requirements and to Army's complete satisfaction.  This case, therefore, does not involve a simple theft of government property or conduct which caused the government to pay false or fraudulent invoices where it can be said that the government suffered a direct loss equal to the value of the stolen

33

property or the amount of funds improperly disbursed.  Rather, this case involves an actual

government contract that was actually performed by AISC and under which the government

received the actual services for which it contracted (*i.e.*, the benefit of its bargain).  Under such a

scenario, the loss *is not* the total amount paid by the government or even the ultimate profit of

the contractor.  Instead, the amount of loss, if any, is the *additional* amount the government paid

in excess of what it otherwise would have paid for the performance.  *United States v. Lara*, 956

F.2d 994, 997-98 (10th Cir. 1992) (affirming district court's calculation of loss as equal to the

difference between falsified bids submitted to government by construction company for payment

and actual amount of unaltered bids).

Accordingly, under the approach expressly approved by the Tenth Circuit in *Lara*, the

question is not how much the government paid under the contract at issue (or how much it paid

to a given individual or entity in total), what the profit was under the contract, or what each

individual defendant's "share" of that profit was.  The question is what amount did the

government pay for the services or goods provided *in excess of* the amount it would have paid

had the violation not occurred.  Under the facts of this case, the excess amount is zero.

### 1. The Procurement Integrity Act Violation Did Not Impact the Outcome of the Procurement

It is important to recognize that just because a violation of the Procurement Integrity Act

occurred in connection with the procurement of a given contract, that does not mean that the

government necessarily suffered any loss or that the outcome of the procurement process was

actually impacted in any way.  The PIA is violated merely by the disclosure or obtainment of

protected information, irrespective of whether that information was actually used to any end and

irrespective of whether the procurement decision was affected.  The violation at issue here (*i.e.*,

receipt of source selection information regarding the procurement of the contract which could

34

provide a competitive advantage prior to the award of the contract) does not require as an element of the offense or any other component thereof:  (1) that any competitive advantage was, in fact, conferred by the information; (2) that the defendant ever used the information; (3) that the defendant gained financially in any way by use of the information; (4) that the defendant ever received any money from the government; (5) that the contract even was awarded to the defendant; or (6) that the government suffered any monetary loss at all.  *See* 41 U.S.C. § 2102(b).

In fact, Mr. Taylor's receipt of procurement-related information had no impact on whether or at what price the contract was awarded to AISC.  Indeed, the government "readily concede[s]" that "[g]iven the limited number of potential bidders, the nature of the bidding process, and the quality of the AISC bid proposal in contrast to the competing bid, AISC may likely have won the contract award without receiving the protected information."  (Doc. 585 at p. 3 [Government's Sentencing Memorandum Re: Young].)  When the Technical Evaluation Team ("TET") charged with evaluating the technical proposals submitted by AISC and PSI reviewed the PSI proposal, it simply followed the paragraphs of the SOW which went out in the RFP to all offerors.  The technical evaluation plan made clear that all an offeror had to do to be deemed technically acceptable was to "address[ ] each requirement of the SOW, as listed in paragraphs 4 and 5 of the SOW" and provide "a realistic outline of how the offeror will accomplish the work."  (Exh. N.)  Each of the evaluators concluded, understandably, that PSI failed to address *any* of the requirements of the SOW.  (*Id.*)

Any observer, not to mention a governmental TET, would easily conclude from reviewing the requirements of the RFP and PSI's one-page, typo-riddled "technical proposal," as well as their price, that PSI lacked the background to perform this requirement, lacked the understanding to respond properly to it, and, quite clearly, did not even care about it.  It would

have been shocking had the TET determined the PSI proposal to be technically acceptable.[13]  As

it turned out, the TET determined unanimously that PSI's proposal was not technically

acceptable.  Once that happened, under the terms of the RFP, PSI's proposal was automatically

removed from the competition.  There *was* no competition anymore.  Whatever information

AISC received—*it made absolutely no difference*.  It provided no competitive advantage to AISC

because, due to PSI's ineptitude, *there was no competition*.

Even worse, PSI never even submitted *any* past performance information, even though it

was required as the third part of its proposal, and even though they knew that past performance

counted at least as much as price in the trade-off analysis which the government said it would

use.  Captain Marquis even followed up with PSI to ask what had happened to the Part III—Past

Performance section of the proposal, because he did not have it.  PSI responded by stating that

they *had no history of past performance to submit*.  (Exh. Q [6/27/2007 Gray Email to Marquis].)

By contrast, the CO received past performance submittals regarding AISC from two different

customers (a CO and a COR) and a prime contractor relating to two contracts that had concluded

in 2006 and a third that was ongoing, all of which involved property bookkeeping, two of which

involved weapons maintenance, and one of which specifically involved training Iraqi nationals

for property bookkeeping and weapons maintenance functions (*i.e.*, exactly what the RFP was

calling for with respect to the ANA Kandaks).  (Exh. F [Marquis Memo Summary of Past

Performance].)  AISC received perfect, across-the-board ratings of "excellent" from all three

reviewers along with glowing comments about the company's performance and management

abilities.  (*Id.*)  Accordingly, AISC had recent and relevant past performance that was rated

---

[13] Obviously, PSI was not surprised either.  PSI was fully aware that AISC won this contract at a price which was more than double what PSI proposed because Captain Marquis was not only required to publicize the result by the FAR Part 5, but he also informed PSI of this information in writing on July 7, 2007.  Despite the price difference, PSI never protested this award—for obvious reasons.

"Excellent." PSI had "no relevant past performance." (*Id.*) Yet another reason that PSI's proposal could not be considered even if it had not already been automatically removed from consideration.[14]

Accordingly, presented with only one acceptable proposal (AISC's) and because the Army already had determined there was an unusual and compelling urgency for the services being procured, nothing else could have come of this process. By the terms of the RFP, PSI was automatically disqualified and the contract could not have been awarded to PSI. (*See* Exh. R, Declaration of Jeffrey A. Lovitky ¶ 7.) The regulations required the CO to determine whether AISC's offered price was fair and reasonable, and he specifically determined that it was on July 4, 2007. (*Id.* ¶ 8.) Going back and re-bidding would not have been possible and would have defeated the entire purpose of exempting the matter from full and open competition in the first place. There was only one award decision the CO could have made. The only award Captain Marquis could have made was to AISC. No other option was available in light of the exigencies and the critical situation on the ground.

### 2. The Procurement Integrity Act Violation Pertained Only to the July 5, 2007 Contract Award—Not Any Other Contract or Contract Action

The PIA violation that occurred in late June 2007 in connection with the procurement of the six-month contract awarded on July 5, 2007 had nothing to do with the series of subsequent, independent decisions to modify the pilot contract or to award other contracts all made months or years later by different contracting officials and with no involvement whatsoever by Mr. Young. No illegal transactions or other improprieties occurred in connection with any of these independent procurement actions in 2008, 2009, or 2010. In each instance, Army officials

---

[14] Moreover, PSI even failed to submit, until a day late, required representations and certifications, further disqualifying its proposal.

independently evaluated AISC's performance, the conditions on the ground, and the Army's mission and budget objectives and each time decided to modify the pilot contract or to award a new contract to AISC. Each of these subsequent actions involved different—from the July 5, 2007 contract—contracting officers, reviewing officials, contracting officers' representatives and, in fact, different contracting activities altogether.

Specifically, on October 29, 2007, Major Dave W. Simmons issued a Purchase Request describing an "Emergency!!" and "SHORT NOTICE REQUIREMENT" to modify AISC's contract to accommodate "a need to fully staff 2 Kandaks (5 and 8 personnel, respectively) and bring 2 additional armorers to work at Camp Morehead with the incoming Kandak (arriving 10 November)." (Exh. V at p. 3.) The Principal Assistant Responsible for Contracting for Afghanistan (PARC-A), the highest level contracting official in Afghanistan, then approved and issued a modification, which a new CO, Captain Devin Banks, signed on December 8, 2007, adding an option year, increasing the scope of the contract, and increasing the price to just over $14 million.

By this point, we note, Captain Marquis, the CO who had awarded the pilot contract, and Major Todd Cox, the COR, had both returned to the United States and were no longer involved in the administration of the contract. Defendant Young, for his part, had moved on from Camp Morehead even before the pilot contract was awarded in July 2007. In late October 2007, *Defendant Young actually was back in the United States*.

Captain Banks later signed three additional modifications asking AISC to do more work and/or for a longer period of time. Then, as the modified and extended contract was about to expire, on May 10, 2009, another CO, Kathy A. Salas, signed a Determination and Findings concluding that it was "in the Government's best interest to extend services under contract

38

W91B4M-07-C-0007, awarded to American International Security Corporation for a period of two months, from 16 May – 15 Jul 09, in the amount of $3,386,748.96." (Exh. W.) According to Ms. Salas' findings, "[t]he requirements package for the follow on contract has not yet been finalized and funding has not been received. A new contract cannot be prepared before the expiration of services." (*Id.* ¶ 1(a).) Because the government "did not adequately plan for the continuation of services," AISC's price "remains fair and reasonable" and "it is doubtful that a better price could be obtained," "[t]here would be considerable costs and time involved in re-procuring these services," and AISC "has performed well," Ms. Salas determined that exercise of a two-month extension was "the most advantageous method to the Government" and would "allow time to solicit and award a follow on contract". (*Id.* ¶¶ 1(e), 2.)

Two months later though, on July 11, 2009, an entirely new contract was awarded to AISC, contract number W91B4M-09-P-0614. A new Justification and Approval for Other Than Full and Open Competition was done, explaining that a "bridge contract is required to ensure continuity of services until the follow on contract can be awarded" and that the Performance Work Statement for the follow on contract "has been delayed due to changes in the requirements." (Exh. X ¶ 5(b).) It was further explained that an interruption in services would negatively impact the government by potential "force protection issues for US and Afghan forces," significant repair and replacement costs for equipment, and "serious damage" to the Commando mission through lack of support and potential loss of property. (*Id.* ¶ 5(c).) Further, "[c]ompetition was not sought for this action because the Performance Work Statement is not completed and an effective solicitation, competition, and award cannot be accomplished until potential offerors understand what the requirement is." (*Id.* ¶ 6.) The new J&A was certified by Ms. Salas as the CO and LCDR Stephen H. Taylor, the new COR, and LTC Kerry H. Costello

39

from Camp Morehead, and it was approved by the Assistant Command Judge Advocate, the Deputy PARC-A, and the Chief of the Kabul Regional Contracting Center.  (*Id.*)

In October 2009, AISC was awarded a third contract, Contract No. W91B4M-10-C-0001. Yet another Justification and Approval for Other Than Full and Open Competition was done, this time explaining that "[c]ompetition was not sought for this action due to the lack of time to solicit and evaluate offers and the improbability of any contractor having the required personnel readily available to execute said services or to mobilize them by 16 October 2009."  (Exh. Y ¶ 6.)  In addition, the government did a new price reasonableness determination, comparing the price for the new contract with both the pricing on AISC's previous contracts and other proposed prices and labor rates the government had found reasonable in connection with other acquisitions.  (Exh. Z.)  This was all done by a new CO, Edward G. Flores and the contract itself was signed by yet another CO, Jimmy Ober.

In March 2010, the third contract was modified so as to extend it for two additional months, a contract action involving another CO, Randy Solomon.  In June 2010, a fourth contract was awarded to AISC, Contract No. W91B4M-10-C-0056, with Geoffrey Levine serving as the CO.  The long contemplated follow-on contract ultimately was awarded to Raytheon as a sole-source contract without bidding with a period of performance of 15 October 2010 through 14 October 2011.  However, because Raytheon was unable to fully staff the contract right away, in September 2010 the government awarded a fifth contract to AISC, Contract No. W91B4M-11-C-0002, to bridge the gap until December 2010 when Raytheon anticipated it could fully man its contract.  Captain John W. Kendall was the CO.

Accordingly, after the original July 5, 2007 award, all subsequent modifications and other contract awards involved completely separate groups of government officials having no overlap

40

at all with the procurement or award of the July 5, 2007 contract, each making their own determinations as to the need for open competition given the exigencies and circumstances on the ground, the quality of AISC's performance, the ability of AISC to continue the work or do additional work, and the reasonableness of AISC's prices.  These assorted contract actions involved seven different COs and review, certification, and approval by numerous other officials all the way up the chain of command in Afghanistan.  None of those contract actions were acquired through or impacted by any illegal transactions.  Therefore, neither the amounts paid under all of these other contracts nor any profits thereon are properly considered as an part of the loss associated with the June 2007 PIA violation (which did not impact the award of even the July 5, 2007 contract in any event).

> **B.**   *Lustyik* **PSR Guidelines Calculation Objections**

> **1.**   **USSG § 2C1.1(b)(1) – More than One Incident of Bribery**

Mr. Taylor objects to the application of USSG § 2C1.1(b)(1).  The offense did not involve extortion nor did it involve more than one incident of bribery.  The only payment made even purportedly to or for the benefit of Mr. Lustyik was the $10,000 Mr. Taylor's contacts in Lebanon sent to Mr. Thaler's account for payment of medical expenses for Special Agent Lustyik's daughter, and which Mr. Taylor later reimbursed.  Even that payment never made its way to Mr. Lustyik in any event, but was used by Mr. Thaler for travel expenses.

Moreover, even if other payments had been made or even if one considered the vague prospect of future payments, they were all related and therefore should be treated as a single bribe under Application Note 2 to USSG § 2C1.1.

### 2.      USSG § 2C1.1(b)(2) – Amount of Payment

The appropriate increase under § 2C1.1(b)(2) is two levels because the amount of the only payment was more than $5,000, but not more than $10,000.  *See* USSG § 2B1.1(b)(1)(B). No basis or explanation is provided for applying the 12-level increase for an amount in excess of $200,000.

## VI.     APPROPRIATE SENTENCE

In light of *United States v. Booker*, 543 U.S. 220 (2005), courts must consider the impact of the factors enumerated in 18 U.S.C. § 3553(a), in addition to the advisory Sentencing Guidelines, when imposing a sentence.  *See United States v. Montgomery*, 439 F.3d 1260, 1262 (10th Cir. 2006) (court may depart downward from advisory guideline range so long as sentence is reasonable based upon factors of 3553(a)); *see also United States v. Jones*, 460 F.3d 191, 194 (2d Cir. 2006) (affirming district court's non-Guidelines sentence that was based on "gut feeling" about defendant).

Consideration of these factors aids sentencing courts in achieving a sentence that is "sufficient *but not greater than necessary* to comply with the purposes."  18 U.S.C. § 3553(a) (emphasis added).  The factors referenced in § 3553(a)(1) include the nature and circumstances of the offense and the history and characteristics of the defendant.  The statute also requires, in subsection § 3553(a)(2), that the Court evaluate (a) the seriousness of the offense, promoting respect for the law, providing just punishment, (b) affording adequate deterrence, (c) protecting the public from further crimes by the defendant, and (d) providing the defendant with effective rehabilitative measures.  These factors are addressed in turn below.

### A.        The nature and circumstances of the offense

As detailed more fully in Section IV, Mr. Taylor pled guilty to improperly obtaining source selection information prior to the July 5, 2007 contract award and depriving the public of the honest services of FBI Special Agent Lustyik in order to slow the ongoing investigation of the procurement of that contract.  While these are serious offenses, there are mitigating circumstances with respect to Mr. Taylor.

First, the Procurement Integrity Act violation was technical in nature and no impact on the Army's procurement decision and resulted in no loss to the government.  The information that was improperly obtained came to Mr. Taylor after the bids had been submitted, albeit before the contract was awarded, and due to the inferior quality of the only competing bid AISC was going to be awarded the contract under any circumstance.  (*See supra* at §§ IV(A) & V(A)(1).)  Additionally, as reflected at Mr. Young and Mr. Harris' sentencing hearings, Mr. Taylor had no involvement in, or knowledge of, any of the payments to Mr. Young or the money laundering activities with which the other defendants in *Young* were charged.   (*See also* Exhs. D & E.)

With respect to the honest services charge, Mr. Taylor does not deny that, upon learning of the *Young* investigation, he was in communication with Mr. Lustyik, with whom he had previous business discussions, and discussed slowing, if not stopping altogether, the investigation into the June 2007 procurement.  The unlawfulness, however, was a product of the contemporaneous business discussions between the two and the resulting financial incentive Mr. Taylor was providing to Mr. Lustyik.  Engaging with the investigators and prosecutors in an attempt to head off an indictment was perfectly permissible—indeed Mr. Taylor's lawyers were involved in such activity as were other intelligence and law enforcement agencies.  The problem arose from Mr. Taylor's poor judgment in failing appreciate the conflict inherent in Mr.

Lustyik's activities given their business discussions. Mr. Taylor, therefore, should have simply thanked Mr. Lustyik for his support but asked him to refrain from any advocacy efforts with respect to the Utah investigation.

While this demonstrated poor judgment on Mr. Taylor's part for engaging with an agent while continuing separate business discussions, Mr. Lustyik and others had legitimate reasons to try to slow the investigation so that Mr. Taylor could finish providing requested operational assistance and intelligence to the DEA and the FBI regarding money laundering, drug distribution, and support for terrorists. Accordingly, while Mr. Lustyik was tainted and should not have been involved in any of this these efforts did have a legitimate animating purpose behind them.

While the offenses are no doubt serious, they are largely a product of bad decision-making and a failure by Mr. Taylor to see the big picture and appreciate the ramifications of everything that was occurring and the particular circumstances of the players involved. Mr. Taylor did not maliciously intend to violate the law. In both cases, Mr. Taylor was the first to acknowledge and take full responsibility for his conduct and he has been exceedingly cooperative with the government, factors that support a sentence of time served.

**B.      The history and characteristics of the defendant**

As detailed previously, Mr. Taylor has led a productive and generous life, bettering both himself and the world around him. Mr. Taylor holds a high school degree, attended Harvard University for some time, served his country as part of the United States Army prior to being honorably discharged, ran and operated several fruitful businesses, and has had a successful marriage for 30 years, during which he raised three upstanding sons.

In addition to his personal successes, Mr. Taylor has also been an asset to his community, working frequently and closely with law enforcement and the intelligence community, coaching youth and high school sports, and being actively involved in his community.  In addition to his accomplishments on paper, Mr. Taylor, as evidenced by the abundance of letters from varying points in his life, is very well liked and respected by those who know him.  The crimes Mr. Taylor has willingly pled to are, to put it mildly, extremely out of character, and therefore more than merit a below-guidelines sentence.[15]

**C.      The need for the sentence imposed …**

**1.      <u>To reflect the seriousness of the offense, promote respect for the law, and provide just punishment for the offense</u>**

A sentence of time served, *i.e.*, 14 and a half months plus one additional month home confinement with monitoring, would sufficiently reflect the seriousness of Mr. Taylor's offense, promote respect for the law, and provide just punishment for the offense.  Although his punishment must be serious enough to promote respect for the law, it does not need to be unduly punitive to accomplish this goal.  It must be sufficient, but not more than necessary.  18 U.S.C. § 3553(a).

When evaluating the adequacy of the term of imprisonment imposed, it is important to keep in mind that whatever sentence the Court imposes will necessarily be more severe than it would appear at first glance.  The reason for this is that Mr. Taylor already has served nearly 15 months of imprisonment, meaning that he cannot, by definition, receive good-time credit or any

---

[15] *See United States v. DiMattina*, 885 F. Supp. 2d 572, 581-82 (E.D.N.Y. 2012) (finding the defendant's characteristics, including the fact that this was his first criminal conviction, he had no substance abuse history, had been continuously employed since graduating high school, was a hardworking businessman, had been married to his wife nearly nineteen years, and raised three children, in addition to receiving support from multiple letters praising his good character, confirmed that the crime of extortion for a contract bid resulted from aberrant behavior and warranted a below-guidelines sentence of 12 months.).

other benefit associated with his behavior and activities while confined.  Therefore, a sentence of time served today is actually *more severe* than a sentence of 16 to 18 months imposed upon a defendant who has spent no or much less time in pretrial confinement.

Furthermore, it should be noted that not all forms of incarceration are created equal. Whatever sentence the Court imposes, Mr. Taylor ultimately will have served most, if not all, of that sentence in jail-type conditions.  Given the non-violent nature of the offenses at issue and the type of sentence contemplated by the agreed-upon range, a defendant ordinarily would serve his sentence in a minimum-security facility near his home with possible alternatives to confinement towards the end of the period.  Here though, Mr. Taylor already has served nearly 15 months in local county jails all the way across the country from his home and family.   Mr. Taylor was surrounded there by a vast array of individuals with extensive criminal backgrounds, many of whom were charged with violent crimes.

Mr. Taylor was also subject to the less-than-favorable conditions of a county jail where his emotional and physical health visibly deteriorated.  For over a year Mr. Taylor was denied contact with any visitors other than his lawyers, including his wife and children who traveled great distances to visit, despite the fact that he was charged with non-violent crimes.  He was continuously subjected to the ongoing mental agony of not knowing how long he would he held in county jail as his trial date was repeatedly continued and co-defendants remained out on bail. Worst of all, Mr. Taylor was held in a facility that is neither intended nor equipped for stays as lengthy as Mr. Taylor's and therefore lacked quality medical care, recreational facilities, and intellectual and community programs that prisons, especially federal prisons, would offer.  Mr. Taylor spent 14 and a half months in what effectively was a holding cell.

Moreover, the sentence the Court imposes on Mr. Taylor will not be the only form of punishment he must endure for his conduct.  In addition to the nearly 15 months Mr. Taylor spent in county jail over 2,000 miles from his home, he lost all access to the bulk of his financial resources for more than two years resulting in significant financial strain on Mr. Taylor's family, forcing them to sell multiple assets and exhaust lines of personal and home equity credit to pay living expenses, keep the business going, and fund Mr. Taylor's defense.  Furthermore, Mr. Taylor is now a convicted felon, which has destroyed his professional reputation and tarnished his well-respected name, which is not only a source of personal embarrassment, but will have a great impact on business.

Aside from the material impact this case has had on Mr. Taylor's life, it has also placed an exorbitant emotional strain on Mr. Taylor personally, on his marriage, his step-father, and on his family.  While the sentence imposed may only range from time served to 24 months, Mr. Taylor will continue to pay for his crime for the rest of his life.

Therefore, considering the punishment Mr. Taylor has already endured in the last three years, and the punishment he will continue to face, an imposition of time served does more than make clear that procurement integrity is vital, even if a violation is immaterial, and that one must be scrupulous to avoid any suggestion of impropriety or improper motives when engaging with law enforcement about pending investigations.  While considering what period of confinement, if any, would be a just punishment that reflects the severity of the crime and promotes respect for the law, it is important to evaluate the totality of nature of the imprisonment Mr. Taylor already has served:  nearly 15 months of hard jail time, an additional month home confinement with an ankle monitor, the financial and emotional cost he has paid, and the burden he will carry for the

rest of his life as a convicted felon.  The punishment Mr. Taylor has already endured, and will

continue to endure, in this case has been considerable.

Finally, to remove Mr. Taylor from the life he has spent rebuilding over the last year and

a half and send him back to confinement for a few months would not create a more just

punishment or a more valuable lesson.  If anything, it would be counterproductive.  Mr. Taylor

has served his just punishment and is ready to move forward.

### 2. To afford adequate deterrence to criminal conduct and protect the public from further criminal activity

At the age of 54, statistically, Mr. Taylor is incredibly unlikely to commit another crime

in his lifetime, [16] and most certainly does not need to be incarcerated for a few additional months

in order to protect the public from further crimes.  To the contrary, the statistical unlikelihood

that Mr. Taylor will commit another crime justifies a downward departure in sentencing.  *See*

*United States v. Saenz-Nunez*, 2011 WL 6013477, at *4 (D.N.M. Nov. 28, 2011) (noting that the

defendant's lower likelihood of recidivism at the age of 53, combined with criminal history,

justified a 4-level departure from the guidelines).

Even aside from the numbers, the punishment that Mr. Taylor has endured in this case

has afforded more than adequate deterrence to future criminal conduct.  These events and cases

have changed the entire course of Mr. Taylor's life.  Mr. Taylor has lost much more during this

criminal process than he ever would have gained from the crimes committed.  As his personal

history demonstrates, Mr. Taylor is not one who is enticed by a life of crime.  The crimes he

committed stem from a series of poor decisions surrounding questionable circumstances, not an

---

[16] According to the United States Sentencing Commission Report released in May 2004, Category 1 offenders over 50, like Mr. Taylor, have only a 6.2% recidivism rate.  *See* U.S.S.C., Measuring Recidivism: The Criminal History Computation of the Federal Sentencing Guidelines at 30, Exh. 9, http://www.ussc.gov/publicat/Recidivism-General.pdf.

active disrespect for the law.  Mr. Taylor has owned his mistakes and has demonstrated over the last year since he was released that he is moving forward as a law-abiding member of society. He has also had the opportunity to witness first-hand how difficult it is to rebuild a life from the ground up.

While the personal and professional losses stemming from this case will specifically deter Mr. Taylor from future crimes, a sentence of over a year in prison, loss of millions of dollars, and a federal felony conviction will also serve to deter general crimes by the community at-large. The fact that Mr. Taylor received a prison sentence of over a year in jail when there was no real loss attributed to his crime in *Young* sends a very strong message about the seriousness of procurement integrity, as does being scrupulous to avoid improper motives when engaging with law enforcement about pending investigations, as in *Lustyik*.  Adding additional prison time as a deterrent would be marginal, as it is the certainty of the punishment, not its severity, which deters crimes.

### 3.   To provide the defendant with needed training, care, or other treatment

Mr. Taylor has no history of substance, domestic, or physical abuse, and therefore does not require any treatment or care.  Any training the court may deem necessary would most certainly be better obtained outside of prison.

### 4.   To avoid unwarranted sentence disparities

The co-defendants in *Young*, Mr. Young and Mr. Harris, have been sentenced to 42 and 24 months, respectively, after pleading guilty to *both* violation of the Procurement Integrity Act *and* money laundering.  Mr. Taylor, the least involved of the three defendants, deserves a lesser sentence of 14 and a half months as he had no involvement in any of the money laundering,

structuring, or tax evasion elements of the Mr. Young and Mr. Harris' crimes, as was confirmed at their sentencing hearings.

While similar offenders engaged in similar conduct should be sentenced equivalently, disparate sentences are allowed where the disparity is explicable by the facts on the record. *United States v. Davis*, 437 F.3d 989, 997 (10th Cir. 2006).  Mr. Young and Mr. Harris stand guilty of two distinct areas of misconduct while Mr. Taylor only engaged in one.  Moreover, he was the first to plead guilty and his decision to do so and cooperate with the government led to the co-defendants' guilty pleas in short order.

With respect to Mr. Lustyik and Mr. Thaler, Mr. Taylor also should receive the least punishment of the three.  Mr. Lustyik held a position of public trust and should have known better what was proper and improper in this context.  Moreover, Mr. Lustyik, enlisting Mr. Thaler, was the initiator and driver of much of the conduct and he practiced some manner of deception even on Mr. Taylor, lying to him about Mr. Thaler's background, the beneficiary of bank accounts, and other matters.  Mr. Taylor should have appreciated the improper situation he allowed to develop and fester, but the dominant tenor of the relationship was an attempt by Mr. Lustyik to take advantage of Mr. Taylor.

### D.     Supervised Release

Pursuant to 18 U.S.C. § 358, the Court *may*, but is not required to, "include as a part of the sentence a requirement that the defendant be placed on a term of supervised release after imprisonment ...."  The purpose of supervised release, as described by the United States Sentencing Commission, is to facilitate the reintegration of a defendant into the community, an

option that district courts should use for "those, and only those, who need[] it."[17]  Supervised

release, according to the Commission, should not be equated with parole, or an alternative means

of punishment, but instead is merely meant to assist in societal transition.  *Id.*

Mr. Taylor does not fall into the category of a defendant that necessitates facilitating his

reintegration into society.  In fact, he has been doing just that for over a year since his release,

without incident.  While supervised release is not intended to be a form of punishment, it would

inhibit Mr. Taylor's ability to move forward with his life, which is an added punishment in itself.

As the Court well knows, Mr. Taylor travels often, and adding the extra step requiring Mr.

Taylor to request or report his travels to a supervisor would be an enormous burden, and creates

unnecessary opportunity for violation of the Court's condition.

Section 3583(c) further requires that the Court consider the factors analyzed above from

§ 3553.  When considering these factors, there are no extenuating circumstances that would

warrant the Court imposing an additional requirement of supervised release when Mr. Taylor has

already demonstrated flawless behavior under his current supervised release.  In fact, the Court

has an opportunity to compensate Mr. Taylor for his good behavior, cooperation with the

government, and the nature of the time served by Mr. Taylor in county jail rather than a federal

prison.

**CONCLUSION**

Considering the factors outlined above and the various mitigating circumstances detailed,

Mr. Taylor respectfully requests that the Court impose a sentence of time served, no fine, no

restitution, and no supervised release.  If the Court does decide to impose a term of imprisonment

---

[17] U.S.S.C., Federal Offenders Sentenced to Supervised Release, July 2010,
http://www.ussc.gov/sites/default/files/pdf/training/annual-national-training-
seminar/2012/2_Federal_Offenders_Sentenced_to_Supervised_Release.pdf

greater than time already served, Mr. Taylor respectfully requests that the Court recommend to the Bureau of Prisons that he serve whatever additional time may be necessary at a minimum-security facility close to his home in Massachusetts.

Dated:  March 23, 2015                     Respectfully Submitted,

                                           /s/Daniel Marino
                                           Daniel Marino (admitted *pro hac vice*)
                                           Tillman J. Finley (admitted *pro hac vice*)
                                           Elyse MacNamara (admitted *pro hac vice*)
                                           MARINO LAW PLLC
                                           1100 New York Avenue, NW Suite 700W
                                           Washington, DC  20005
                                           Telephone:  (202) 223-8888
                                           Facsimile:  (877) 239-2146

                                           *Attorneys for Michael Taylor*