RAYMOND HULSER, Acting Chief
Peter Koski, Deputy Chief
Maria N. Lerner, Trial Attorney
U.S. Department of Justice
Criminal Division, Public Integrity Section
1400 New York Ave. NW, 12th Floor
Washington, D.C. 20530

M. KENDALL DAY, Acting Chief
Ann Marie Blaylock Bacon, Trial Atty
U.S. Department of Justice
Criminal Division, Asset Forfeiture and
    Money Laundering Section
1400 New York Ave. NW, 10th Floor
Washington, D.C. 20530

CARLIE CHRISTENSEN, Acting U.S.A. (#633)
Karin Fojtik, A.U.S.A. (# 7527)
U.S. Attorney's Office, District of Utah
185 South State Street, Suite 300
Salt Lake City, Utah 84111-1506
Telephone:  801.524.5682
Facsimile:   801.524.6924

## IN THE UNITED STATES DISTRICT COURT

## DISTRICT OF UTAH, CENTRAL DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>                Plaintiff,<br><br>v.<br><br>MICHAEL L. TAYLOR,<br><br>               Defendant. | Case No.  2:12-cr-645 (TC) (DBP)<br><br><br>**GOVERNMENT'S SENTENCING MEMORANDUM** |

On November, 27, 2013, defendant Michael Taylor pleaded guilty to honest services wire fraud for his participation in a bribery scheme in which he agreed to give a 24-year veteran of the FBI money, a job, and equity in multimillion dollar contracts in exchange for that FBI agent impeding a grand jury investigation into defendant Taylor.  The United States and defendant Taylor entered into a plea agreement pursuant to Rule 11(c)(1)(C) of the Federal Rules of Criminal Procedure.  Under the terms of the plea, the parties agreed that defendant Taylor's sentence would not exceed 24 months of incarceration.  The United States, by and through undersigned counsel, respectfully submits this sentencing memorandum in aid of the Court's sentencing and recommends that defendant Taylor be sentenced to no more than 24 months in prison and ordered to pay a fine of $125,000.

Case 2:12-cr-00645-TC   Document 1011   Filed 03/23/15   Page 2 of 25

I.      **FACTUAL BACKGROUND**[1]

      A.      *Hatching of the Bribery Scheme*

Almost three years ago, in about October 2011, defendant Michael Taylor and defendant

Robert Lustyik, a veteran Special Agent for the Federal Bureau of Investigation ("FBI") Taylor

had met just months before, concocted a scheme to make Lustyik wealthy beyond his dreams.

That scheme also involved Lustyik putting an end to a grand jury investigation being conducted

in the District of Utah.

      The grand jury in Utah was investigating Taylor, his company American International

Security Corporation ("AISC"), and others regarding allegations of fraud in the award and

performance of a Department of Defense contract, and of money laundering to conceal the

source and ownership of the proceeds derived from the contract.  Four federal law enforcement

agencies were involved in that investigation:  the Department of Defense's ("DoD") Defense

Criminal Investigative Service ("DCIS"), the Department of Homeland Security ("DHS"), the

Internal Revenue Service ("IRS"), and the Army Criminal Investigative Division.

      Just a month before Taylor and Lustyik worked out their scheme, over $5,000,000 of

Taylor's assets had been seized in a related matter.  In the weeks after his money was seized,

Taylor forwarded Lustyik the contact information for two of the agents working the

investigation.  Exh. A-3.  Taylor wanted Lustyik to reach out to them to convince them not to

seek criminal charges against Taylor.  *Statement by Defendant Taylor in Advance of Plea of

Guilty*, Doc. 536 at 4 (hereinafter "Taylor's Plea").  Moreover, Taylor dangled substantial carrots

in front of Lustyik for his help:  a six-figure salary after he left the FBI, and a share in the

proceeds of several multi-million dollar business deals he was pursuing.  *Id.*  The *quid pro quo*

---

[1]      The sentencing memoranda for Lustyik, Michael Taylor, and Johannes Thaler
contain the same Factual Background section.

was not only obvious, but in many cases, flagrant and brazen.  For example, in an email

conversation discussing Taylor's case, where Lustyik told Taylor "there is no way they indict

you," Lustyik later told Taylor, in the same email thread, that they have to "lock down" an oil

drilling contract in the South Sudan.  Exh. A-13.

    B.    *Lustyik Recruits Thaler into the Bribery Scheme*

    Lustyik readily accepted the prospect of the millions Taylor dangled before him, and he

recruited one of his most trusted friends to assist him — his co-defendant Johannes Thaler, with

whom he had been friends since childhood.  Lustyik understood that the scheme he concocted

with Taylor was illegal.  Exhs. A-143, A-164, A-165, A-167.  *See also* Exh. A-91 (April 17,

2012 email from Lustyik to Taylor:  "The rate this is going.  I will be indicted way before u ever

are !!").  Lustyik needed insulation so that the bribes could not easily be traced back to him, and

so that he would have some modicum of plausible deniability.  Exhs. A-113, A-131, A-136.

    Lustyik needed someone whom he could trust unconditionally — someone who would

even be willing to lie for him if Lustyik's scheme were found out.  Exh. A-165.  In that respect,

he chose wisely in Thaler, because Thaler did just that:  when interviewed by Special Agents of

the Office of the Inspector General, Thaler denied that Lustyik had any involvement in the

business dealings between him and Taylor, Exh. B at 13-14, and denied that Taylor had paid

money intended to be given to Lustyik.  Exh. C at 30–31.

    That Thaler's primary purpose was as a conduit between Lustyik and Taylor, rather than

a business partner for Taylor, is clear by the fact that Thaler was entirely out of his element in the

sorts of business deals Taylor was pursuing, *see, e.g.,* Exh. A-3 ("I don't know anything about oil

or South Sudan"), and Taylor himself stated that Thaler added little value.[2]  Moreover, Thaler

was fully aware of his role — not only did Lustyik keep Thaler regularly apprised of Taylor's

criminal troubles, but Thaler clearly understood he was to solicit and accept bribe money from

Taylor on Lustyik's behalf.  A number of text and email conversations confirm this:

- In an email discussion between Lustyik and Thaler dated October 25, 2011, Lustyik told
  Thaler "taylor is looking for a way to take care of me so I said u n I r working together on
  these and he said he will be sending money ur way . . . He has 2 contracts they r about to
  sign.  I think he might want to give us 200 gs."  Thaler responded "ok.  let me know what
  you want me to do with it."  Exh. A-7.  Indeed, in a later text message exchange, dated
  March 7, 2012, when Lustyik asked Thaler if Taylor had provided money for Lustyik,
  purportedly to cover surgeries for Lustyik's minor daughter, Thaler responded "Just did.
  10 tomorrow 200 later."  Exh. A-49.  The next day, on March 8, 2012, Lustyik pressed
  Thaler:  "Any word on that 200 for [Lustyik's daughter] cause half is to Uncles Hannes."
  Exh. A-52.

- In a text message conversation between Lustyik and Thaler dated December 28, 2011,
  Lustyik asked Thaler:  "Like r we making money? Like soon? . . . Like Mike said
  'hannes, u n bob r about to make money' ?"  Thaler responded "Yes."  Exh. A-25.

- On March 3, 2012, Lustyik texted Thaler:  "We have to craft an email to MT in which u
  ask him if u should be expecting to bring anything back for your friends daughter wo my
  friend knowing….as if he is surprising me."  Exh. A-45.  Thaler did just that; the very
  next day, Thaler emailed Taylor, stating "A while back, you mentioned something about
  helping out the big guy [Lustyik] with his daughters doctor bills.  I would love to surprise
  him with a little something upon my return.  He's been busting his ass trying to clear up
  your predicament . . ."  Exh. A-46.

---

[2]        Indeed, when this bribery scheme began, Taylor had no idea who Thaler was —
in an October 27, 2011 email to the secretary of an Ambassador to the United Nations, Taylor
misidentified Thaler as "Hannes Tee."  Thaler's email address is *hannestee*@yahoo.com.  Taylor
then forwarded that email to Lustyik, and asked "What is the last name of Hannes?"  Exh. A-8.

- On March 6, 2012, Lustyik texted Thaler:  "Don't forget to mention to MT how hard I'm working on getting his shit pushed aside and how tough I'm having it with [Lustyik's daughter]'s recent surgeries.  Keep me in the loop . . . As soon as u have a handle on the funds let me know.  Thx."  Exh. A-47.

- On May 28, 2012, Thaler emailed Taylor, stating "[i]t seems that there are a lot of possibilities coming up shortly.  It would be nice if something happened soon.  It would be a great 50th birthday present for the big guy."  Exh. A-110.

- On July 31, 2012, Lustyik emailed Thaler, "Will we get any money from [a surveillance equipment deal Taylor was working on] ? And when?"  Thaler responded, "Hope so."  Lustyik instructed Thaler, "You should ask him ? Call him.  He will tell you.  He knows we need money.  I said it in an email."  Exh. A-152.

- On September 12, 2012, several days after Taylor had been stopped at the border upon returning from a trip to Lebanon, and his electronics were seized as part of a border search, Lustyik texted Thaler, "Also did u ask MT about any money coming in?"  Thaler responded, "He's still waiting on deals to close.  It seems everything is on hold."  Lustyik responded, "But did u blatantly ask for money? He wants to give us (me) money for [Lustyik's daughter]."  When Thaler responded, "I didn't ask for money directly . . . I didn't know he was giving money for [Lustyik's daughter]," Lustyik replied "All coded. I'm trying to get u some breathing room . . ."  Exh. A-166.

C.      *The Quid — Tens of Millions of Dollars Promised to Lustyik and Thaler*

To ensure Lustyik was properly motivated to do whatever was necessary to keep him from getting indicted, Taylor offered Lustyik and Thaler an equal share in the proceeds of contracts he was pursuing, which, if he were successful in obtaining them, would have brought in tens of millions of dollars for all three of the defendants. Exh. E at 4-5.  Taylor regularly kept Thaler and Lustyik apprised of his progress on these various business deals, and indeed both Lustyik and Thaler took an interest in the details of some of these contracts.  More importantly, Taylor was often very explicit about conditioning his promised millions on the success of

Lustyik's efforts in obstructing the grand jury investigation in Utah.  In a text exchange dated January 31, 2012, Lustyik relayed to Thaler the promise Taylor made:  "When Im clear u will be [all] set. (Frm taylor)."  When Thaler asked "[w]hen is that ?", Lustyik responded "[f]orever." Exh. A-30.

Other examples abound.  On December 20, 2011, Taylor emailed Thaler to apprise him of an oil deal Taylor was pursuing.  When Thaler asked how much oil was at stake, Taylor responded, "4 million barrels per month.  If they can only do 2 million barrels I can get the other 2 million from the Congo.  *Make sure you let the big guy know about this.*  We want him retired in 6 months to work with us.  *I'll make you guys more money than you can believe.  provided they don't think I'm a bad guy and put me in jail.*"  Exh. A-19 (emphasis added).  Thaler responded to Taylor, "[t]he big guy knows," and the next day, Thaler forwarded that email chain to Lustyik, stating "[c]heck this out."  Exh. A-20.  Just a few days later, in a text message exchange on December 28, 2011, Thaler provided Lustyik with more information on this deal: "5 mill per Month.  It looks like the oil deal is going to happen . . . Once [Individual 1] gets the oil company name they sign a contract and write a check for the 60 million barrels . . . This deal is almost $5 billion [a year]."  Exh. A-25.  *See also* Exh. A-50.

On February 9, 2012, Taylor emailed Lustyik asking for an update on his case:  "Dying to know how it's going.  Also, I worked things out with Hannes for your baby."  Exh. A-31.  The same day, Lustyik texted Thaler, "I'm clearing up MT very well."  When Thaler responded, "[j]ust talked to him.  He told me to bring my bank wire transfer numbers to Lebanon," Lustyik

explained "YES.  He is giving me money "for [Lustyik's daughter]'s surgery"[3] . . . Hopefully

100gs."  Exh. A-32.

     While Taylor did not give Lustyik the hoped-for $100,000, he did give Lustyik $10,000,

through Thaler.  On February 11, 2012, Lustyik texted Thaler, "[w]e get acct # to taylor while he

is there n money goes in."  Thaler responded "I can get him the wire transfer acct #s on

Monday."  Exh. A-33.  That is precisely what Thaler did.  Exh. A-36.  When Thaler traveled to

Lebanon in early March 2012 to accompany Taylor to meetings relating to various Middle East

business deals Taylor was attempting to obtain, Lustyik pestered Thaler several times to ask

Taylor about getting the money for his daughter's "surgery."  Exhs. A-47, A-49, A-51, A-52, A-

55.  On March 15, 2012, Thaler confirmed that Taylor had provided the expected bribe:  "Capt

[Taylor] put 10 in the account today."  Exh. A-59.  On March 19, 2012, Thaler's bank records

show a transfer from Lebanon into Thaler's savings account in the amount in $10,000.  The bank

records indicate the transfer was made by a known associate of Taylor's and the purported

purpose of the transfer appears as "Consultancy Fees."  Exh. A-61.

     Another bribe offered to Lustyik and Thaler by Taylor was the proceeds from a contract

Taylor sought with Basra Electric to produce 150MW of power.  Thaler calculated the net

revenue to be $58 million per year, and Taylor replied to Thaler and Lustyik, "[n]ot bad for a

start up company."  Exh. A-66.  Had that deal gone through, Lustyik and Thaler would have

expected to each receive almost $20 million a year from it.

     Lustyik and Thaler expected a lucrative salary from Taylor.  While Thaler was in

Lebanon with Taylor, Lustyik asked Thaler, "[h]ey what's my salary?"  Thaler responded

"$300g for u."  When Lustyik asked Thaler what his (Thaler's) salary would be, and when it

---

[3]    The quotes surrounding the reference to Lustyik's daughter's surgery were inserted by Lustyik.

would start, Thaler responded, "[m]ine is the same.  Should start at the end of March . . .That's our salary for Lebanon, not for being in the company or anything else."  Exh. A-55.  A few days later, while Thaler was still in Lebanon, Lustyik asked again, "[w]hat deal was getting us the 300 gs salary n where did it go?"  Thaler responded "[t]he 300 is from the Leb wind farm."  Exh. A-60.  On March 18, 2012, Lustyik lamented his dilemma in a text to Thaler:  "I can leave [the FBI] in June. But I'm afraid to if capt gets indicted n I'm not an agent I'm no help. Has he mentioned giving me-u a salary?"  Exh. A-62.  Lustyik admitted at his plea hearing that he was expecting Taylor to give him a job, *Plea Hr'g* at 44, and Taylor confirmed that he and Lustyik had discussed giving him a salary.  Exhibit E at 10.

Another bribe that appeared near fruition, but for Taylor's legal troubles catching up with him, was a business deal to provide surveillance equipment in the Middle East.  On June 3, 2012, Taylor emailed Lustyik to tell him "I also have a meeting [in the UAE] with the crowned prince of Abu Dhabi who happens to be the Min of Defense as well.  They say they are interested in contracting with us for the Buckeye [surveillance system] and perhaps wanting 3 systems.  That is 90 million a year and about 35 million for us."  Exh. A-117.  Eight days later, on June 11, 2012, Taylor emailed Lustyik and Thaler, stating "[t]his is the signed deal with the company of the crowned prince in Abu Dhabi. . . . their Minister of Defense wants 6 systems.  Each system sells for $30 million, each system gives us $20 million profit.  If I sold it for less they would not be excited about it."  Exh. A-123.  To this email Taylor attached an executed distribution agreement between Taylor's company and a company in the UAE.  *See also Taylor's plea* at 5 (confirming Taylor's intent to share the millions of dollars in profits on this deal with Lustyik and Thaler).  That same day, Thaler texted Lustyik, "[d]id [Taylor] mention anything about the Buckeyes?"  Lustyik responded, "[y]ea.  Said we r rich."  Exh. A-126.  When Thaler followed up

with Taylor a month later, on July 10, 2012, Taylor informed Thaler, "Believe me, I'm pushing as fast as I can because 5 Aug they may charge me. Once they do I can't come here to do work." Exh. A-141.

Other examples of bribes offered or solicited are abundant:

- In an email exchange between Lustyik and Taylor dated March 28, 2012, where Taylor updated Lustyik on the status of his case, Lustyik told Taylor, "They have no witnesses. They have no case. This has been your cross to bare but w Easter comes a rebirth !! I believe you are soon to be vindicated." Taylor responded, "I'm not leaving [Lebanon] until we get at least 50 million in contracts. Unless they charge me then I have to come back." Exh. A-82.

- In a text message from Thaler to Lustyik on May 21, 2012, Thaler wrote, "MT says that the Anbar thing is almost ready to go. He's expecting $15 in the next 30-45 days." Exh. A-106.

- On August 3, 2012, Taylor forwarded an email to Lustyik about an opportunity to bid for a contract to provide security for the Super Bowl in 2014. Taylor stated, "FYI: Seems we have a shot at getting this provided I'm not in jail." Exh. A-154.

- In an August 6, 2012 email exchange, Taylor and Lustyik discussed obtaining gold to resell it for a profit. Taylor told Lustyik, "[y]ou owe me nothing because I never gave you anything. I will settle medical bills for a little Angel." Lustyik responded "I want to make good. I cannot thank you enough for all you have done and are doing?" Taylor replied, "[a]re you nuts-all you have been trying to do for me. Shame on you, don't you thank me." Lustyik settled this dispute by replying, "[l]et's just get Utah over with and get stinking rich." Taylor agreed, stating "[g]etting stinking rick, we are well on the way with that so I have that ball." Exh. A-156. Lustyik's optimism from this email exchange leaked into a text message to Thaler two days later, on August 8, 2012: "We will be rich by Halloween. . . . I mean like RICH. Aug 18th we should see some money though." Exh. A-157.

There were so many business deals Taylor was trying to secure for the three of them that Thaler wrote a note to himself to keep track of them:

Benders $500 mil
Baneasa $22 mil
China $1.2 bil
UAE $160 mil
Salah al din $125 mil
Drilling $400 mil
Exxonmobil ?
Oil deal ?
Al Anbar $15 mil
Pick up and lay down ?
MRE $600,000
200MW Europe proj $440 mil

Exh. A-148.  See also Exh. E at 11.

Taylor also admitted at his plea colloquy that he offered Lustyik millions of dollars to induce Lustyik to help him out of his (Taylor's) criminal troubles.  Taylor admitted to seeking a power generation contract in Iraq potentially worth $50 million, a contract for security and surveillance equipment in the UAE potentially worth $100 million, and a contract to broker 4 million barrels of oil from Iraq to China.  *Taylor's plea* at 4.

Lustyik was also anxious to share the news — and his expected new wealth — with others close to him; in an email to a friend dated June 30, 2012, Lustyik wrote, "[i]f you haven't heard the rumors….I've made us all stinking rich !!!! So you and I need to discuss what you want to do with like a million dollars I will be giving you by the end of august.  For 30 years I've sacrificed to get to this point….and now Hannes and I are days away.  I was thinking we should build a mini football-sports stadium and just host all the big games there ? You should be dreaming big now."  Exh. A-137.  If there was any doubt that the invocation of Lustyik's daughter was merely coded language for bribes flowing from Taylor to Lustyik and Thaler, rather than a genuine cry for help, that email exchange undermines such doubt.  Lustyik dreamed

big — if he truly did need assistance to cover his daughter's medical bills, he saw no reason to settle for just the amount he needed to cover those bills, a pittance in comparison to the tens of millions Taylor promised him they could make together. As Thaler succinctly put it in a March 18, 2012 text message to Lustyik, "[w]e'll be set for generations if this happens the way we're setting this up . . . The money is crazy." Exh. A-62.

> D.    *The Quo — Lustyik Fulfilled His End of the Bargain*

Lustyik made numerous efforts to hold up his end of the bargain, some more successful than others. A number of these steps did, however, have an actual effect on the Utah investigation.

For example, Lustyik opened Taylor as a confidential human source in mid-January 2012. Any federal law enforcement agent is aware that the calculus changes for targets who are cooperating with the government — their chances of indictment, or of having to do significant or any jail time, substantially decrease. Lustyik was aware of this, and even acknowledged that "a paid source is tough to indict." Exh. A-179.

Almost immediately after signing up Taylor as a confidential human source, Lustyik began calling one of the federal agents investigating Taylor in Utah, and attempting to convince him that Taylor had done nothing wrong, and it would be foolish to indict him. Lustyik followed this up with a video teleconference with the Assistant United States Attorneys (AUSAs) on Taylor's Utah case, which was held on March 1, 2012.[4] Lustyik spent the call informing the AUSAs of how valuable Taylor was, and how laudatory Taylor's prior handlers had been of the work Taylor previously did for the FBI. Lustyik believed he was successful on that video

---

[4]    During his plea colloquy, Taylor admitting not only to knowing that this phone call was being made, but also knowing it was part of the bribery scheme. Nov. 27, 2012, M. Taylor Sentencing Tr. at 35–36.

teleconference, texting Thaler that evening that "I really sent a scare into those ausas today."
Exh. A-40.  A few days later, on March 7, 2012, Lustyik wrote to Taylor "[s]eems we sent them
into a reevaluation of MT and his potential knowledge of incident based on our SVTCC [secure
video telephone conference call].  We have now developed enough to get our HQ [headquarters]
to intervene and that's what I will be selling Monday." Exh. A-54.

       In addition to this video teleconference, Lustyik interviewed a number of Taylor's
handlers, who had worked with him 15 to 20 years earlier.  While doing these interviews,
Lustyik was so convinced of their devastating effect on the Utah investigation that he wrote to
Taylor on March 9, 2012 that "[w]e got some huge info that wil make it impossible for utah to
indict u now.  We will have it over next week I believe."  Exh. A-56.  That same day, Lustyik
texted Thaler "[j]ust did another interview.  MT has no chance of indictment now.  I own Utah."
Exh. A-55.

       Lustyik did not stop there.  On April 3, 2012, he wrote an email to one of the agents
handling the Utah investigation, asking him "Can't we just get [Taylor] to be a CW [cooperating
witness] for you guys ??" Exh. A-175.

       Lustyik also intended on taking more direct steps to put an end to the Utah investigation:

- On March 28, 2012, Lustyik wrote to Taylor to inform him about an email he
  received from one of the Utah investigators, and about Lustyik's efforts to end the
  Utah investigation:  "As an investigator, [the Utah law enforcement agent's email]
  shows me that he is in panic mode.  He can't re-interview the people we have spoken
  with, and there really isn't anyone left for him to speak with. . . .  What he is telling
  me is that he must have been chastised by [the Utah prosecutor] because now they
  have NO witness list. . . . Your lawyer should press the issue and ask them to
  'reconsider' your offer to cooperate. . . . [Another FBI agent] and I are meeting w [a
  retired FBI agent] next week.  He is your only 'critic' but I've led him to where we
  need him to be. . . . Now he is on the 'nice list.'" Exh. A-81.

- Lustyik texted Thaler on March 24, 2012 that "the ausa called again n basically said that mike is gonna be left alone." Thaler responded, "[t]hat would be great. As soon as that happens we get some $. Capt will be very grateful." Exh. A-68.

- In an email exchange between Lustyik and Taylor dated April 20, 2012, Lustyik asked Taylor, "[c]an you think of anyone else that we can neutralize with an interview [in addition to the persons Lustyik interviewed for the purpose of creating the laudatory 302s] ? Someone who they might try to use against you that we could go speak with that would basically ruin their offensive ? Where are Harris n Young ?" Harris and Young were the two men ultimately indicted with Taylor in the case that Lustyik was trying to obstruct. When Taylor provided Lustyik with information on Harris's and Young's whereabouts, Lustyik responded, "I am going to interview Young [whose status was then a target of the same federal grand jury investigation looking into Taylor] and just blow the doors off this thing." Exh. A-92.

- On June 4, 2012, in one of the numerous conversations in which Lustyik updated Thaler on his efforts to free Taylor of his criminal troubles in Utah, Lustyik bragged about his efforts to get Taylor free of those troubles: "I'm on a freedom tour." Thaler's reply was "[y]ou're the new Harriet Tubman!" Exh. A-119.

- In a June 26, 2012 email exchange between Lustyik and Taylor, after Taylor brought Lustyik up to speed on another witness the Utah investigators were interviewing, Lustyik told Taylor that he too wanted to interview that witness. Exh. A-133.

- Lustyik intended to take this as far as necessary, telling one of the Utah agents he would testify for Taylor at a trial in Utah, if it came to that. Exh. A-196 at 5.

- On July 2, 2014, Lustyik texted one of the Utah agents, telling him "Looks like we r going to be doing another set of interviews. Did u guys interview [Individual 2]?" Exh. A-201. Individual 2 was a witness in the underlying Utah investigation – there is no indication that Individual 2 had anything to do with Taylor's cooperation with the FBI.

- When Taylor's indictment in Utah was imminent, he emailed Lustyik on August 15, 2012, to let Lustyik know the Criminal Chief in the U.S. Attorney's Office in the

13

District of Utah told Taylor's attorney the indictment was going to happen.  Taylor

further told Lustyik, "[u]nless someone tells him to stop."  Lustyik replied, I'm on it."

Exh. A-159.

Generating classified material from the information Taylor gave him was one of the steps

Lustyik took in his official capacity to fulfill his end of the bribery scheme.  Whether there was

any value to the information Taylor provided is beside the point:   there is no evidence that

Lustyik and Taylor intended to form a handler-confidential source relationship until *after* they

concocted their bribery scheme.  Lustyik was also very clear with Taylor about what affect the

classified information would have on Taylor's case in Utah:  "I'm banking on Utah being scared

off by the [classified] file [Lustyik created on Taylor].  They don't seem to care if ur helping.

They just want to see what the file has that will ruin their case."  Exh. A-151.

Finally, the wire fraud counts to which Lustyik pleaded guilty, Counts Two through Nine

in the Indictment, provide specific examples of the steps Lustyik took to obstruct the Utah

investigation.  Count Two charges the March 1, 2012 video teleconference discussed above, and

Counts Three through Nine charge several text messages, an email, and a phone call Lustyik

made, all intended to intimidate the Utah agents into abandoning their pursuit of charges against

Taylor for fear that those charges would not stick.  Exhs. A-175, A-196, A-198, A-199, A-200,

A-201, A-202, A-203.

> E.      *"I'm so sneaky" — Concealment of the Bribery Scheme*

Lustyik went to great lengths to conceal his illicit relationship with Thaler and Taylor

from the FBI.  When interviewed, none of his fellow FBI agents and supervisors, many of whom

had in one way or another assisted Lustyik in the course of handling Taylor as a confidential

source, were aware that Lustyik had solicited and accepted bribes from Taylor, and was actively

involved in derailing a federal criminal investigation into Taylor in Utah.  Lustyik had told his

colleagues repeatedly that there was no substance to the allegations against Taylor in Utah.  His colleagues had no reason to disbelieve Lustyik — he was a respected veteran of the FBI.

As noted above, Lustyik tried to conceal his involvement in the scheme by using Thaler as a conduit between himself and Taylor.  Thaler was kept closely apprised of the status of Taylor's case, and he kept Lustyik closely apprised of the status of Taylor's business deals.  *See e.g.,* Exhs. A-7, A-45, A-46, A-47.  Lustyik even told Thaler that in order to insulate Lustyik, Taylor would not talk money with Lustyik directly:  Thaler asked Lustyik on June 19, 2012, "[d]id MT mention anything about business?"  Lustyik replied, "[h]e won't with me."  Exh. A-131.  When Lustyik thought he made headway in his obstructive efforts, Thaler often heard first: on June 22, 2012, Lustyik texted Thaler, "Wanna fill u in on MT.  I got it fixed.  I'm so sneaky."  Exh. A-132.

Even after Taylor was closed for cause as a confidential source in early July 2012, and Lustyik was instructed to have no more contact with him, the communications between the two continued, and Lustyik continued to apprise Taylor of steps he wanted to take to get him out of his legal troubles in Utah.  In a July 27, 2012 email where Lustyik purports to inform Taylor of people he wants to introduce Taylor to, in order to keep him active as a confidential source, Lustyik wrote "I will set it up n let u know.  When u r 'closed' we r not allowed to have contact.  Of course I will be violating this…just keep it in mind when u speak w ur lawyers."  Exh. A-150.  When Taylor asked whether Lustyik would be at the meeting that Lustyik was trying to schedule for Taylor, Lustyik responded "I will violate policy and be at the intro."  *Id.*

Lustyik was fully aware of the consequences of getting caught for engaging in the illegal scheme.  In the closing days of the conspiracy, Taylor returned from Lebanon carrying his cell phone and laptop computer; Taylor was detained at the border on September 8, 2012, and his cell

phone and laptop computer were seized.  Taylor (using his son's cell phone) called Thaler to tell

him and told him what had happened, and Thaler in turn told Lustyik.  Lustyik's immediate

response was, "[g]reat.  Now I go to jail too . . . I'm so fcuked.  I told him not to travel w

electronics."  Exh. A-164.

> F.      *"You might have to save me and testify that only you r doing business w him"* —
>         *Obstruction of This Case*

On September 9, 2012, the day after learning that Taylor's laptop was seized at the

border, Lustyik texted Thaler, "MT mightve gotten me jammed up n sent to jail so he better

come thru . . . He really fcuked up.  You might have to save me and testify that only you r doing

business w him."  Exh. A-165.

That is precisely what Thaler did.  On September 18, 2012, during a search warrant at his

home, Thaler agreed to be interviewed by Special Agents from the Office of the Inspector

General.  Though asked a number of times, Thaler denied that Lustyik was involved in the

business dealings between him and Taylor.  Exh. B at 13-14.

The next day, September 19, 2012, Lustyik received a visit to his home by one of his former

colleagues, FBI Special Agent Andrew Dodd.  During that conversation in Lustyik's home, Lustyik

instructed Agent Dodd to destroy an FBI file on a former target of an FBI investigation, who was

also one of the business partners in the scheme that Lustyik, Taylor, and Thaler had concocted.  Exh.

G at 86-87.   Agent Dodd's reaction to this request is found in the excerpted portion of the transcript

attached as Exh. G.

## II.    **DISCUSSION**

A sentence consistent with the terms of the plea agreement reached by the parties

achieves the aims of sentencing under § 3553(a).  As a preliminary matter the United States

agrees with Probation's calculation of the Sentencing Guidelines resulting in a total offense level of 27.

A.    *A Two-Level Enhancement for Multiple Bribes is Proper and Supported by Evidence.*

It is undisputed that the appropriate Guidelines provision for determining defendant Taylor's base offense level is U.S.S.G. § 2C1.1(a)(1) ("Offering, Giving, Soliciting, or Receiving a Bribe; . . . Fraud Involving the Deprivation of the Intangible Right to Honest Services of Public Officials . . ."). Accordingly, the base offense level for defendant Taylor is 12. An enhancement under § 2C1.1(b)(1) reflecting more than one bribe as part of the wire fraud scheme should also apply.

As an initial matter, neither § 2C1.1, nor the honest services fraud statute, nor the bribery statute make a distinction between bribes offered or paid. The plain language of the bribery statute makes it clear that an offer or solicitation is sufficient for a violation of that statute. 18 U.S.C. § 201(b)(1) ("whoever directly or indirectly, corruptly gives, offers, *or* promises anything of value . . .") (emphasis added); *see also United States v. Quinn*, 359 F.3d 666 (4th Cir. 2004) (conviction for solicitation of bribes). Additionally, the language of the enhancement itself does not make a distinction between bribes received or paid and bribes solicited or offered, but merely states that the enhancement is appropriate if the offense "*involved* more than one bribe . . . ." U.S.S.G. § 2C1.1(b)(1) (emphasis added)

Consequently, it is irrelevant for the purposes of the § 2C1.1(b)(1) enhancement whether Taylor actually paid *any* of the bribes he offered to Lustyik. *Quinn*, 359 F.3d at 681 fn. 10 (4th Cir. 2004) (upholding two-level enhancement under § 2C1.1(b)(1) for multiple bribe solicitations); *see also United States v. Newton*, 2007 WL 1098479 at *1 (D. Conn. Apr. 10, 2007) (affirming two level enhancement for solicitation of multiple bribes, but explaining

reasons for upward departure from Guidelines given severity of defendant's conduct and the number of bribe solicitations and payments received).  There is overwhelming evidence that multiple bribes were offered, solicited, paid, and/or received during this bribery scheme.  As the factual background section above details, there were at least the following specific bribes offered, solicited, paid, and/or received:

- The $10,000 payment paid into Thaler's account, intended for Lustyik but split between the two;[5]

- A $300,000 salary for Lustyik and Thaler for anticipated work on a wind farm project in Lebanon;[6]

- Approximately $40 million for each defendant, from profits from the sale of surveillance equipment on which Taylor was able to secure a distribution agreement.  Exh. A-123.

In addition to those specific instances, Thaler's note to himself about the other pending projects (Exh. A-148) offers overwhelming evidence that it was not just these three deals that would bring all three defendants considerable profit.  Taylor confirmed that the business deals listed in this note reflected deals he expected to share in the profits with Lustyik and Thaler as a result of this bribery scheme.  See also Exh. E at 11.

The bribes offered and solicited as part of this scheme were not a single installment payment for a single action by Lustyik.  See U.S.S.G. § 2C1.1(b)(1) comment. 2.  Rather, the bribes were offered in exchange for multiple official acts by Lustyik, all with the same goal— keep Taylor out of jail so they could make money.  See United States v. Martinez, 76 F.3d 1145,

---

[5]  See also Thaler Plea Agreement, Doc. 904, at ¶ 5, admitting that the facts in the Indictment (which included allegations regarding this payment at ¶¶ 21, 22, 24, 26, 29, and 30) "fairly and accurately" describe his actions and involvement; Exhibit E at 3-4.

[6]  See also Lustyik plea h'rg at 44; Thaler Plea Agreement, Doc. 904, at ¶ 5, admitting to the facts in the Indictment (which included allegations regarding this salary at ¶ 28); Exhibit D at 10.

1153–54 (10th Cir. 1996). Here, Lustyik did not take just one official act to obstruct Taylor's investigation in Utah. As described above, Lustyik took multiple actions over an extended period of time, "including but not limited to opening [Taylor] as an FBI confidential human source; seeking to interview potential witnesses and targets in the Utah investigation; and using his official authority and position to contact the federal law enforcement agents and federal prosecutors in Utah to dissuade them from charging [Taylor]." Doc. 39 at 6. *See also* Exhs. 40, 54, 55, 60, 81, 92, 175, 179. In return, Taylor offered not just one bribe, but "corruptly offered and provided a stream of things of value . . . ." *Id.* at 5; *see also* Exhs. 19, 31, 55, 60, 123. Accordingly, the two level enhancement for offering more than one bribe applies, because there were both multiple offers, solicitations, and/or payments of bribes, and multiple official actions. Taylor himself admitted Lustyik took multiple actions on his behalf, including opening him as a confidential source, interviewing his former handlers to generate favorable material to make it difficult to indict Taylor, and conducting a video teleconference with the AUSAs in Utah to try to convince them not to indict Taylor. Doc. 536 at 4.

Most importantly, despite the very language to which he admitted under oath during his plea hearing, Taylor continues to deny the full extent of his conduct. His signed statement in advance of plea states clearly:

> Some of the business deals I was pursuing, and for which I offered Lustyik a share in the proceeds, included a contract to provide security for an oil field in South Sudan, a power generation contract in Iraq worth potentially up to $50 million, a contract for security and surveillance equipment and services in the United Arab Emirates ("UAE") worth potentially $100 million, and a contract to broker the sale of 4 million barrels of oil from Iraq to a factory in China. I expected the profits from these ventures to be in the millions of dollars. I intended to provide a share of these profits to Lustyik in part to induce him to help in the grand jury investigation in Utah. Because Lustyik was an active FBI agent at the time, I knew that my offers of money and other financial incentives to Lustyik would induce him to help me regarding the grand jury investigation in Utah. I

realized that I was providing a personal financial incentive to Lustyik, in addition
to my potential as a source, to convince the prosecutors in Utah not to indict me.

Doc. 536 at 4.

For these reasons, there is a preponderance of evidence that more than one bribe was

offered, paid, solicited, or received, and thus the enhancement under § 2C1.1(b)(1) is

appropriate.

### B. A Twelve-Level Enhancement for Value of Anticipated Bribes is Proper and Supported by Evidence.

The offense level should be enhanced by twelve levels based on the value of the offered

bribes exceeding $200,000, calculated under U.S.S.G. § 2C1.1(b)(2) and § 2B1.1.  The language

of § 2C1.1(b)(2) instructs that the *greater of* the following amounts should be used calculate the

enhancement under this provision: the value of the payment; the benefit received or to be

received in return for the payment; the value of anything obtained or to be obtained by a public

official or others acting with a public official; or the loss to the government from the offense.

Under the first method of calculation, only one direct payment, in the amount of $10,000

made into Thaler's bank account to benefit Lustyik, can definitively be established by the

government's evidence.  Under the second method of calculation, the benefit received (by

Taylor) in return for the paid or proffered bribes, and the loss to the government from the

offense, are essentially the same thing in this case and are difficult to quantify:  the corrupt

services of a veteran FBI Special Agent.  The most reliable method for calculating the

enhancement under this Guideline is to use "the value of anything obtained *or to be obtained* by

a public official."

In determining that amount, the Court has a number of offered or paid bribes it can

include in the calculation:

- The $10,000 payment intended for Lustyik, paid to him through Thaler. Exhs. A-32, A-33, A-36, A-59, A-61.

- A power generation contract with Basra Electric, estimated to bring a profit of $58 million per year, and thus approximately $19.3 million in profits annually to Lustyik. Exh. A-66.

- A $300,000 salary for work on a Lebanon wind farm. Exhs. A-55, A-60.

- Proceeds from the sale of surveillance equipment to the UAE, for which Taylor had procured a distribution agreement (6 systems at $20 million profit each, divided equally between the three defendants), giving Lustyik $40 million. Exhs. A-117, A-123, A-126.

If the Court used all of these figures, the value of the bribe would near $60 million, justifying a 24 level enhancement in Lustyik's Guidelines range, rather than the 12 level enhancement calculated in the PSR. Indeed, even if the Court used the numbers to which Taylor himself admitted to, in the portion of the Statement in Advance of Plea quoted in the section above, a 12 level enhancement is modest compared to what he was offering Lustyik.

The 12-level enhancement reached in the PSR reflects figures that are more firm and easy to calculate. Specifically, the 12-level enhancement is based on the $10,000 payment to Lustyik, and the $300,000 salary he expected to receive. The $300,000 was communicated to Lustyik by Thaler, while Thaler was in Lebanon with Taylor to conduct business meetings. The use of the proposed salary to calculate the bribe amount, despite the fact that specifics were not discussed, is well supported by case law. In *Quinn*, the Fourth Circuit remanded the case for sentencing to determine the correct enhancement for the amount of the bribe, based on the value of the benefit to be received. 359 F.3d at 680. In reaching its decision, the court stated:

> We reject the defendants' argument that it is impossible to value the contracts proposed to CTI and West because they were never executed or even reduced to specific terms. For purposes of sentencing, there is no distinction between a solicitation of a bribe and a completed bribe . . . We have relied upon this rule in holding that a defendant may be sentenced according to the loss he or she

intended, even if this exceeds the amount of loss actually possible, or likely to occur, as a result of the defendant's conduct. Thus, the district court should determine the value of the bribery payment and the value of the benefit to be received as if the contracts proposed to CTI and West had been executed. . . . [W]e also reject the defendants' argument that they cannot be held responsible for two proposed contracts that concern the same subject matter since only one such contract would have been awarded.

*Id.* (internal citations and quotations omitted). *See also United States v. Ziglin*, 964 F.2d 756, 758 (8th Cir. 1992) (rejecting defendant's argument that only the $20,000 he personally expected to receive should be used to determine bribe amount, and affirming use of $1,432,425.58 amount, the amount of taxes that were to be "wiped off the books" as a result of the bribery scheme).

For these reasons, there is a preponderance of evidence that bribes of at least $310,000 were paid, offered to, or solicited by Lustyik, and thus a twelve-level enhancement under § 2C1.1(b)(2) is appropriate.

> C.   *A Sentence Consistent with the Terms of the Plea Agreement Achieves the Aims of Sentencing.*

Based on the enhancements described above and a three-level reduction for acceptance of responsibility, Taylor's total offense level is 27, resulting in a range of 70 to 87 months. The Guidelines range for a fine is from $12,500 to $125,000. In determining the appropriate sentence in this case, the Court must consider the factors enumerated in 18 U.S.C. § 3553:

> (1)   the nature and circumstances of the offense and the history and characteristics of the defendant;
>
> (2)   the need for the sentence imposed—
>
>> (A)   to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;
>>
>> (B)   to afford adequate deterrence to criminal conduct;
>>
>> (C)   to protect the public from further crimes of the defendant; and

(D)     to provide the defendant with needed educational or vocational training, medical care, or other correctional treatment in the most effective manner;

(3)     the kinds of sentences available;

(4)     the kinds of sentence and the sentencing range established for . . .the applicable category of offense committed by the applicable category of defendant as set forth in the [U.S. Sentencing Guidelines] . . .

All of these factors support a sentence consistent with the terms of the plea agreement.

> 1.     The nature and circumstances of the offense and the history and characteristics of the defendant

Bribery "cannot properly be seen as a victimless crime, for in a sense it threatens the foundation of democratic government. . . . [B]ribery tears at the general belief of the citizenry that government officials will carry out their duties honestly, if not always competently.  And that harm, though it may at times appear intangible, is real."  *United States v. Hayes*, 762 F.3d 1300, 1309 (11th Cir. 2014).

Citizens have the absolute right to expect that the conduct of their law enforcement agents, especially those working in counterintelligence for the FBI, would be above reproach, would be a model of rectitude, would enforce the laws and would, importantly, punctiliously and scrupulously obey those laws themselves.  Taylor, however, participated in a scheme to save himself from indictment by bribing a federal law enforcement official.  The text messages and emails the defendants exchanged to facilitate the corruption scheme illustrate the brazenness of their willingness to violate the law and corrupt our judicial process.

Taylor deserves credit for his early acceptance of responsibility and his willingness to meet with the government in advance of the scheduled trial of his co-conspirators.  Specifically, Taylor pleaded guilty nearly one year before the scheduled trial for Lustyik and Thaler.  During that time, Taylor made himself available to the government on two separate occasions.  Taylor's

acceptance of responsibility and cooperation, as well as the lower degree of culpability compared

with Lustyik, the 24-year veteran of the FBI, is reflected in the favorable terms of his plea

agreement capping his sentence at twenty-four months in prison.  In making its recommendation

for additional incarceration, within the twenty-four month cap allowed in his plea agreement, the

government also considers the value and content of the information Taylor provided to the

government, to which it will be able to speak more about at sentencing.

The evidence indicates that the defendant's motive for engaging in this bribery scheme

was to stay out of prison and get his seized money back.  The emails and text messages the

defendants sent each other during the course of this scheme transparently describe Taylor's

desperation to stay out of jail.  As noted above, the bribe scheme involved a job for Lustyik

valued at approximately $300,000, and as described in the PSR, Taylor has significant assets.

Therefore, a fine at the high end of the Guidelines range — specifically, $125,000 — will

appropriately punish and serve to deter that aspect of the Taylor's criminal conduct.

2.  The aims of sentencing

Sentences are to be imposed to reflect the seriousness of the offense, promote respect for

the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct,

and protect the public from further crimes of the defendant.   18 U.S.C. §§ 3553(a)(2)(A) – (C).

A sentence consistent with the terms of the plea agreement properly balance the seriousness of

the crimes with the defendant's acceptance of responsibility and cooperation.  More specifically,

a sentence consistent with the terms of the plea agreement successfully achieves the aims of

sentencing and faithfully satisfies the factors expressed in 18 U.S.C. § 3553(a).

Moreover, where corruption is exposed, "[i]t is important . . . for the public to realize that

white collar criminals will not be dealt with less harshly than are those criminals who have

neither the wit nor the position to commit crimes other than those of violence." *United States v. Brennan*, 629 F. Supp. 283, 302 (E.D.N.Y.) *aff'd*, 798 F.2d 581 (2d Cir. 1986); *see also United States v. Davis*, 537 F.3d 611, 617 (6th Cir. 2008) (noting that "[o]ne of the central reasons for creating the sentencing guidelines was to ensure stiffer penalties for white-collar crimes and to eliminate disparities between white-collar sentences and sentences for other crimes").

WHEREFORE, for the reasons stated above, the government submits that a sentence of no more than twenty-four months in prison and a $125,000 fine satisfies the purposes and goals of sentencing as set forth in 18 U.S.C. § 3553.


Respectfully submitted,

RAYMOND HULSER                          M. KENDALL DAY
Acting Chief                            Acting Chief

By:  */s/  Peter Koski*             By:  */s/  Ann Marie Blaylock Bacon*
     Peter Koski, Deputy Chief            Ann Marie Blaylock Bacon, Trial Attorney
     Maria N. Lerner, Trial Attorney      Asset Forfeiture/Money Laundering Section
     Public Integrity Section